**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF FLORIDA**

SIMONE VALENTINE,

Plaintiff,

v.

TOWN OF PALM BEACH;

KAUFF'S TOWING & RECOVERY, INC.;

GUARDIAN FLEET SERVICES, INC.;

FRED WAYMIRE, individually;

TRISTAN GORDON, individually;

PETER AGUIRRE, individually;

EMILY PELAYO, individually;

LORETTA BROWN, individually;

YANELA NÚÑEZ, individually;

THOMAS A. TEDFORD III, individually;

LINDSEY BURNS, individually;

DOE DEFENDANTS 1–40,

```
FILED BY____Cos____D.C.

JAN 3 0 2026

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.
```

1

Defendants.

**COMPLAINT AND JURY DEMAND**

Plaintiff Simone Valentine brings this civil action for constitutional violations, statutory violations, and related state-law torts arising from the unlawful seizure, detention, concealment, and permanent destruction of her private property, and demands trial by jury on all issues so triable.

**I. INTRODUCTION / NATURE OF THE ACTION**

1. This action arises from an unlawful seizure, prolonged detention, fabricated lien posture, and intentional destruction of Plaintiff's vehicle through misuse of municipal authority, private towing power, and coordinated concealment.

2. After the Town of Palm Beach admitted that Plaintiff's vehicle should not have been towed and issued a release order requiring immediate return without fees, Defendants nevertheless refused release, escalated coercive demands, concealed material facts, and advanced salvage branding without lawful authority.

3. Defendants' conduct deprived Plaintiff of her property without due process, obstructed her access to courts and records, interfered with protected economic relationships, and inflicted severe and lasting harm, all under color of state and municipal authority.

**II. JURISDICTION AND VENUE**

4. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff

asserts claims arising under the Constitution and laws of the United States, including 42 U.S.C. §

1983.

5. This Court has supplemental jurisdiction over Plaintiff's related state-law claims pursuant to

28 U.S.C. § 1367, as those claims form part of the same case or controversy.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the events giving rise

to these claims occurred within this District and Defendants reside or transact business here.

## III. PARTIES

### A. Plaintiff

7. Plaintiff Simone Valentine is a resident of Palm Beach, Florida and was at all relevant times

the lawful owner and entitled possessor of the vehicle at issue.

### B. Municipal Defendant

8. Defendant Town of Palm Beach is a Florida municipal corporation responsible for the policies,

customs, training, supervision, and enforcement actions challenged herein.

### C. Corporate Defendants

9. Defendant Kauff's Towing & Recovery, Inc. is a Florida corporation engaged in vehicle

towing, detention, lien processing, and release operations under color of municipal authority.

10. Defendant Guardian Fleet Services, Inc. is the corporate parent and controlling entity of Kauff's Towing & Recovery, Inc., responsible for enterprise-level policies, lien and salvage protocols, executive oversight, and operative participation in the conduct alleged herein.

**D. Individual Defendants (Sued in Individual Capacities)**

11. Defendant Fred Waymire was at all relevant times a sworn law-enforcement officer employed by the Town of Palm Beach officer and is sued in his individual capacity.

12. Defendant Tristan Gordon was at all relevant times a sworn law-enforcement officer employed by the Town of Palm Beach and is sued in his individual capacity.

13. Defendant Peter Aguirre was at all relevant times a sworn law-enforcement officer employed by the Town of Palm Beach and is sued in his individual capacity.

14. Defendant Emily Pelayo was at all relevant times a sworn law-enforcement officer employed by the Town of Palm Beach and is sued in her individual capacity.

15. Defendant Loretta Brown was at all relevant times a Lead civilian parking enforcement officer employed by the Town of Palm Beach and is sued in her individual capacity.

16. Defendant Yanela Núñez was at all relevant times a civilian parking enforcement officer employed by the Town of Palm Beach and is sued in her individual capacity.

17. Defendant Thomas A. Tedford III was at all relevant times an executive officer, including Chief Operating Officer, of Guardian Fleet Services, Inc., acting under color of state law through delegated towing authority, and is sued in his individual capacity.

18. Defendant Lindsey Burns was at all relevant times an employee or agent of Kauff's Towing & Recovery, Inc., and is sued in her individual capacity.

### E. Doe Defendants

19. Doe Defendants 1–20 (Town / Law-Enforcement Does) are presently unknown employees, officers, supervisors, command-level officials, policymakers, records custodians, dispatch personnel and agents of the Town of Palm Beach who participated in, approved, enforced, ratified, concealed, or failed to intervene in the unlawful conduct alleged herein. Plaintiff can identify certain Does by role, appearance, voice, or conduct, but not by name, due to information being withheld.

20. Doe Defendants 21–40 (Kauff's / Guardian Does) are presently unknown employees, supervisors, managers, lien processors, salvage coordinators, records personnel, or agents of Kauff's Towing & Recovery, Inc. and/or Guardian Fleet Services, Inc. who participated in, directed, approved, ratified, or concealed the unlawful conduct alleged herein.

21. Plaintiff will seek leave to amend this Complaint to substitute the true names of Doe Defendants when their identities are ascertained through discovery.

## IV. GENERAL ALLEGATIONS

22. At all relevant times, Defendants acted under color of state and municipal authority and in concert with one another.

23. The conduct challenged herein arose from an enforcement structure that delegated coercive police powers to unsupervised civilian employees and profit-motivated private actors without lawful authority or constitutional safeguards.

24. Defendants' actions were not isolated errors, but flowed from institutional practices, ratification, and deliberate indifference to constitutional and statutory limits.

## V. STATEMENT OF FACTS

The following Statement of Facts is set forth in chronological order and reflects the sequence in which events occurred and continued to unfold through the time of filing. This section is intentionally comprehensive and fact-specific, and is pleaded as the primary factual record supporting all claims asserted herein.

Certain facts, relationships, and institutional roles become apparent only when viewed in sequence and in context. For clarity and efficiency, Plaintiff pleads these facts in detail in a single, consolidated narrative and incorporates them by reference in the counts that follow, rather than repeating factual allegations in each count.

### V. Vehicle Ownership, Condition, and Investment

1. Following the sudden passing of her fiancé, Plaintiff lost access to the private Las Vegas residence where the Prius had been securely stored and unused for several years.

2. The vehicle was maintained in excellent, low-mileage condition (approximately 20,000 miles) with higher-trim features, supporting a pre-tow fair-market value of approximately $21,750.

3. Since purchasing it in 2019, Plaintiff maintained full-coverage insurance averaging approximately $300 per month—totaling approximately $24,000 to date—and continues to pay that coverage despite being unlawfully deprived of possession for more than seven months.

4. The Prius was Plaintiff's only tangible asset and primary symbol of stability, representing independence following personal loss.

5. Plaintiff's investment extended far beyond purchase cost: for six years she maintained, insured, and preserved the car with reasonable, investment-backed expectations of lawful use or trade-in.

6. It was only upon attempting to finalize the purchase of a new Mini Cooper—intended as the replacement vehicle—that Plaintiff realized the Prius's physical title had been lost during her move.

7. The dealership declined the trade-in due to the missing title, prompting Plaintiff to immediately submit multiple expedited duplicate-title requests to the California DMV, including overnight mailings with prepaid priority return envelopes, expecting quick issuance to finalize the lawful transaction.

8. Relying on that expectation, she proceeded with the Mini Cooper purchase using borrowed funds, believing the duplicate title would arrive momentarily and allow completion of the trade-in without delay.

II. Good-Faith Compliance and Temporary Parking Status

9. Upon arrival in Palm Beach, the Prius was parked near Plaintiff's residence on Bradley Place, moved only occasionally between spaces, and was not being operated on public roads.

10. It was neither abandoned nor obstructing traffic and posed no safety hazard. Plaintiff awaited the duplicate title—without which neither trade in, sale or registration renewal could occur.

### VI. Unlawful Citations Issued Without Statutory Authority

11. Despite the vehicle's inactive status, the Town of Palm Beach Parking Enforcement Division issued expired-registration citations without statutory authority. Vehicle registration enforcement is governed by Fla. Stat. §§ 316.605, 316.610, and 320.07.

12. The Town of Palm Beach has enacted no ordinance authorizing civilian parking-enforcement personnel to issue registration citations. The citations were therefore ultra vires, void, and without legal effect.

13. Plaintiff paid earlier citations in good faith, unaware they were void for lack of jurisdiction.

14. By late May 2025, one expired-registration citation had accrued two late fees, totaling $115.

15. On May 24, 2025, officers issued two new citations two minutes apart—one for overtime parking (the only arguably valid citation) and one for registration, again without jurisdiction.

16. Both May 24 citations remained well within their 14-day statutory payment window under Fla. Stat. § 316.1967(1) at the time of the booting and tow.

### VII. Premature Immobilization and Tow — June 2-3, 2025

17. On June 2-3, 2025—five days before any late fee could lawfully attach to the May 24 citations—the Town directed Kauff's Towing & Recovery to immobilize and tow Plaintiff's 2016 Toyota Prius.

18. At the time the vehicle was immobilized and removed:

(a) the May 24, 2025 citations were non-delinquent;

(b) the registration citation was void for lack of jurisdiction; and

(c) Plaintiff received no prior warning, hearing, or opportunity to cure any alleged violation before the escalation enforcement and immobilization occurred.

19. Plaintiff passed her vehicle three to four times between June 2 and June 3, at close proximity and under ordinary conditions, and observed no boot, warning placard, tow notice, or other visible or conspicuous indication that the vehicle had been immobilized or was subject to imminent seizure.

20. Plaintiff learned that her vehicle had been seized only after it had already been removed.

21. No statutorily compliant Immobilization Notice was affixed to the vehicle or otherwise displayed as required by Florida law prior to tow. The Town has published no municipal code provision or public-facing escalation policy authorizing immobilization or towing based on non-delinquent parking citations.

## VIII. Inflated and Arbitrary Fee Assessment

(Illegality of Enforcement Escalation and Absence of Any Lawful Basis for Boot or Tow)

22. Town records show that at the time Plaintiff's vehicle was immobilized, her total alleged balance was $115—a figure far below any threshold that would authorize immobilization or tow under Florida law or any municipal policy. This amount was also based on a citation later determined to be void for lack of jurisdiction.

23. Despite the vehicle not being delinquent at the time of immobilization, Defendants imposed a $350 boot fee, issued an additional ultra vires $60 registration citation, and included approximately $150 in non-delinquent May 24 citations—at least one of which was void—into the current balance, thereby inflating the asserted balance by approximately $560 within minutes.

24. At the time of immobilization, Plaintiff was non-delinquent. Even assuming arguendo that any citation had been late or valid, nowhere on any parking citation, the Town's website, or posted signage does it state—or imply—that a vehicle may be immobilized or towed based on unpaid citations prior to delinquency, the imposition of late fees, or the exhaustion of statutory contest periods.

25. Each citation states only that if payment is not received within fourteen (14) days, a $20 late fee will be added—affirmatively indicating that the sole consequence for nonpayment is the accrual of late fees, not immobilization, seizure, or forfeiture.

26. The Town's online parking portal expressly states: "You can only appeal a ticket up to 90 days after the ticket is issued." This representation guarantees a full contest period during which punitive enforcement is not authorized.

27. Despite these representations, Plaintiff's vehicle was booted on June 2, 2025, and towed on June 3, 2025.

28. While some Florida municipalities authorize immobilization or towing after multiple delinquent citations, the Town of Palm Beach has enacted no such ordinance, published no such rule, and provided neither Plaintiff nor the public with any notice of an escalation policy or procedures.

29. Even if such a policy had existed, Plaintiff's citations were non-delinquent, void, or both.


## IX. TOWN ACKNOWLEDGMENT AND DIRECTIVE TO RELEASE

30. After discovering the tow, Plaintiff went to Town Hall to resolve the issue. Town staff expressed surprise that a tow had occurred with such minimal citation history.

31. Plaintiff immediately paid her entire outstanding balance in full, believing this would correct the error.

32. Town staff informed Plaintiff that towing and booting are permitted only under a three-citation rule—when a vehicle has accumulated three or more citations, each carrying at least one late fee—and advised her that her vehicle did not meet that threshold because she was not delinquent.

33. After reviewing Plaintiff's account, Town staff stated that the boot and tow were premature and inconsistent with Town practice.

34. The Town voided all boot fees in its system and issued an immediate no-fee release order directing that Plaintiff's vehicle be released without any charges.

35. One Town staff member explained that she had never seen a tow occur with such a minimal balance and that, in her experience, when processing payments associated with a boot and tow,

the balance is typically in the thousands of dollars—not in the minimal range applicable to Plaintiff at the time of the tow (approximately $115, based on a single expired-registration citation later determined to have been illegally issued).

36. She further explained that towing occurs only when a vehicle has at least three legally valid citations, each carrying multiple late fees accrued over an extended period of nonpayment— conditions Plaintiff's account did not meet.

37. Town staff immediately notified Kauff's Towing & Recovery that the tow was erroneous and directed Kauff's to release Plaintiff's vehicle without fees. Kauff's representatives refused to comply with that determination, insisting that payment was required for their services despite the Town's acknowledged determination that the tow was improper.

38. Because Kauff's refused to comply with the release directive, Town staff contacted the Palm Beach Police Department ("PBPD") for assistance enforcing the no-fee release order.

39. The PBPD officer who received the Town's call was already familiar with the circumstances of the tow, having participated in it only hours earlier.

40. Despite the Town's express determination that the tow was erroneous and required immediate correction, PBPD made no inquiry into the legality of the tow or the basis for the no-fee release order. Instead, officers redirected their questioning toward Plaintiff's emotional state and demeanor—matters seemingly irrelevant in light of the undisputed municipal determination and directive requiring immediate correction and release of the vehicle without fees.

41. Town staff advised PBPD that Plaintiff had already paid the full outstanding balance without incident—much of which was not yet due—and that Plaintiff required PBPD assistance securing the prompt return of the vehicle without any fees imposed by Kauff's.

## X. PBPD REFUSAL TO ENFORCE THE TOWN'S RELEASE ORDER AND USE OF COERCIVE THREATS

42. Plaintiff arrived at the Palm Beach Police Department in direct response to the Town's directive that her vehicle be released without charge. Upon arrival, five uniformed PBPD officers (later six) were already positioned outside the station waiting for her. The officers had just been in direct communication with Town staff regarding the no-fee release order and the request for police enforcement.

43. Immediately upon Plaintiff's arrival—and before Plaintiff spoke a single word—one officer pulled her aside and warned her to "be careful what you say," stating that they did not want her to "get into trouble" or "incriminate [her]self." The warning was framed as a precaution against self-incrimination rather than assistance and communicated that Plaintiff was being treated as a potential wrongdoer rather than as the reporting party seeking enforcement of a corrective municipal order.

44. The pre-positioned presence of multiple officers, combined with the immediate warning, conveyed that Plaintiff was under scrutiny and exposed to criminal consequences, despite the fact that she had arrived solely to obtain enforcement of the Town's written no-fee release order correcting an unlawful tow.

45. PBPD officers then refused to enforce the Town's written no-fee release order, asserting that once the vehicle was in Kauff's possession the matter was "civil" and "outside [their] jurisdiction," despite PBPD having participated in the original tow and retaining authority and responsibility to remedy an unlawful seizure.

46. At Plaintiff's insistence that the Town's no-fee release directive be communicated and enforced, PBPD officers reluctantly monitored a speakerphone call between Plaintiff and Kauff's. During that call, Kauff's representatives openly mocked Plaintiff and stated that the vehicle would not be released without payment of fees, asserting that "the police told us to tow it" and that payment was required for services rendered.

47. During the call, PBPD officers remained silent and did nothing to correct these statements, did not contradict Kauff's refusal, and did not reiterate or enforce the Town's no-fee release order, thereby permitting continued detention of Plaintiff's vehicle in direct defiance of municipal authority.

48. After the call, a supervising officer stated that even if the tow had been "premature," PBPD could tow Plaintiff's vehicle "whenever [they] wanted" based solely on its registration status. This statement falsely conveyed unlimited police authority to seize Plaintiff's vehicle at will, notwithstanding due-process protections.

49. PBPD officers then presented Plaintiff with a limited set of purported "options," each of which guaranteed either continued financial harm or criminal exposure:

(a) leaving the vehicle at Kauff's while storage fees accrued indefinitely pending issuance of a duplicate title;

(b) retaining a towing company, at Plaintiff's expense, to move the vehicle to another daily storage location;

(c) towing the vehicle back to Plaintiff's residential street with the assurance of daily citations and repeated towing; or

(d) driving the vehicle home and being arrested and jailed.

50. These outcomes were presented as certainties, not contingencies. Officers stated unequivocally that if Plaintiff drove the vehicle approximately 2.8 miles home, she would be arrested and "absolutely go to jail".

51. Officers further told Plaintiff that if the vehicle appeared again on her street, it would receive daily citations and be subject to repeated further towing "whenever [they] wanted," implying ongoing surveillance and discretionary enforcement regardless of the Town's no-fee release order, Plaintiff's pending good-faith compliance, and the non-moving status of the vehicle.

52. During the interaction, Plaintiff expressly informed PBPD officers that she had recently suffered the sudden loss of her fiancé, that she was living alone without support, and that she was financially vulnerable in the aftermath of that loss.

53. Plaintiff further explained that she had reasonably relied on the expected issuance of a duplicate title—after making repeated, documented submissions for several months, including overnight mailings, to the California Department of Motor Vehicles in order to complete her trade in—and that the prolonged delay was entirely outside her control.

54. PBPD officers were also aware that Plaintiff's Prius possessed a valid residential parking permit for her street. While the permit did not cure the registration issue, it reflected Plaintiff's continued efforts to comply with municipal requirements within her control and her lack of intent to evade enforcement.

55. Plaintiff repeatedly asked responding officers—separately and individually—what lawful steps she could take to be in compliance while awaiting issuance of her duplicate title to avoid further escalation. At no time did any officer advise Plaintiff of any option other than the four

punitive choices presented to her, nor did any officer suggest that Plaintiff could obtain temporary registration or otherwise lawfully cure the issue.

56. At all relevant times, the responding and bystanding PBPD officers knew that Plaintiff was not operating her vehicle, intentionally evading lawful compliance, the tow had been deemed erroneous by the Town, and that immediate, non-punitive remedies were available and required, including enforcement of the Town's no-fee release order and restoration of Plaintiff's vehicle without charge. Each officer was sworn to uphold the law and carry out lawful municipal directives. Nevertheless, the officers did not correct the unlawful seizure, restrain Kauff's conduct, or provide accurate legal guidance. Instead, Plaintiff was repeatedly told—by officers speaking with apparent authority—that her only options were continued financial harm or arrest if she attempted to recover her vehicle without payment. Through their statements, omissions, and redirection, officers lent official credibility to these representations, causing Plaintiff to reasonably believe they were lawful, final, and unchallengeable.

57. Instead, PBPD officers withheld all cost-free and restorative remedies available to correct the unlawful tow, including enforcing the Town's no-fee release order, permitting Plaintiff to drive the vehicle home under municipal correction, advising Plaintiff of temporary registration options, or arranging a no-cost municipal solution as mandated by the Town.

58. PBPD officers structured the situation so that acquiring Kauff's services was presented as the most  obvious and safe path of least resistance, while every alternative exposed Plaintiff to arrest, jail, daily citations, repeated towing, or further police surveillance and escalation.

59. PBPD officers knew Plaintiff had no private place to store the vehicle and that even the least expensive alternative they presented would still require immediate payment of multiple towing,

administrative, and storage fees. These costs flowed directly from Defendants' refusal to enforce the Town's no-fee release order and represented financial burdens that were not lawfully Plaintiff's responsibility, but rather the obligation of Defendants to remedy their own unlawful tow.

## XI. BYSTANDING OFFICERS' COORDINATED SILENCE AND REINFORCEMENT OF COERCION

60. Throughout the encounter, at least five additional PBPD officers stood within feet of Plaintiff while the intimidation, misinformation, and coercive tactics described above were carried out. Two of these officers are verified through official records to have directly participated in the immobilization and tow of Plaintiff's vehicle earlier that same day. Upon information and belief, Plaintiff has reason to believe that one or more additional officers present were also involved in, or had  knowledge of, the unreasonable seizure, based on their proximity, coordinated conduct, and chain-of-command relationships. Each officer observed the interaction in real time.

61. Each of these officers knew—because Plaintiff expressly told them—that she was recently bereaved, living alone, financially vulnerable, and had acted in continuous, documented good-faith efforts for months to bring the vehicle into compliance. Each officer was also aware that the Town had determined the tow to be premature and erroneous and had issued a no-fee release directive. Despite this knowledge, no officer intervened, corrected false statements, or acknowledged the Town's determination.

62. Seeking lawful guidance, Plaintiff individually approached multiple bystanding officers and asked what they would do in her situation. The responses were uniform and evasive, consisting

of suggestions that she "leave the car at Kauff's," "work out a deal with Kauff's," or have Kauff's relocate the vehicle elsewhere "if they have a better price." Despite their superior knowledge of the law, not one officer advised Plaintiff of any lawful, non-punitive remedy, including:

(a) obtaining temporary registration;

(b) seeking judicial or court intervention; or

(c) bonding the vehicle to compel release.

Nor did any officer take action themselves to enforce the Town's directive or halt or remedy the unlawful detention. Instead, officers legitimized Kauff's continued detention of Plaintiff's vehicle and conveyed that submission to escalating charges or criminal exposure was Plaintiff's only means of compliance—one they themselves would have followed.

63. Through their collective silence, coordinated omissions, and redirection toward Kauff's, PBPD officers lent official credibility to false and coercive representations, making the unlawful detention of Plaintiff's vehicle appear sanctioned, lawful, and unavoidable.

64. PBPD's refusal to correct, restrain, or contradict Kauff's unlawful refusal to release the vehicle—despite the Town's explicit no-fee release order—reasonably led Plaintiff to believe that Kauff's was acting with police authorization and government sanction. That belief directly informed Plaintiff's subsequent understanding, decisions, and continued loss and possession of her vehicle.

**XII. Plaintiff's Condition and Understanding Following the PBPD Encounter**

65. As a direct result of the statements made to her, the limited options presented, and the material information withheld, Plaintiff left the police station with the understanding that compliance with PBPD's purported options was the only means to avoid immediate criminal exposure and escalating punishment.

66. The unusually large police response to a routine, non-emergency compliance issue—multiple uniformed officers responding to a single civilian who had voluntarily appeared seeking enforcement of a corrective municipal order—reasonably led Plaintiff to believe that she had been singled out for heightened scrutiny and control, despite the absence of any threat, misconduct, or public-safety concern.

67. The officers' collective focus, refusal to provide guidance, lack of explanation, and absence of corrective action reasonably conveyed that their purpose was not to remedy an acknowledged municipal error, but to compel compliance through intimidation and deterrence. Plaintiff reasonably understood that any deviation from the officers' instructions—even if lawful—risked immediate escalation.

68. Plaintiff experienced acute fear, confusion, and distress, coupled with anxiety regarding escalating financial consequences and the risk of arrest, and came to believe—incorrectly—that she herself was at fault rather than the victim of an improper tow and the continued unlawful detention of her property.

69. These beliefs materially affected Plaintiff's decision-making and conduct. While continuing to pursue recovery of her vehicle through the limited options presented to her, Plaintiff altered her behavior to avoid further contact with law enforcement, based on a reasonable fear that

additional inquiry or resistance would trigger renewed scrutiny, humiliation, escalation, or enforcement consistent with the threats conveyed during the encounter.

70. The encounter fundamentally altered Plaintiff's sense of safety, autonomy, and ability to freely protect and access her lawfully owned property, based on the reasonable belief that she was subject to immediate and ongoing legal detention or punitive enforcement under color of law.

## XIII. Attribution and Identity of Defendants; Guardian Fleet Services' Enterprise Role and Municipal Influence

71. For purposes of this Statement of Facts, any reference to Kauff's Towing & Recovery refers jointly to its corporate parent, Guardian Fleet Services ("GFS"), acting through its owned and controlled operating entity, unless otherwise specified

72. At all relevant times, Kauff's Towing & Recovery, Inc. operated at 4701 East Avenue, West Palm Beach, Florida, which is the national corporate headquarters of Guardian Fleet Services. This was not a shared or coincidental location; it was the principal place of business from which Guardian Fleet Services conducted its corporate administration, executive oversight, and enterprise-level operations.

73. Plaintiff's in-person encounters, the denial of release of her vehicle, and the conduct complained of herein all occurred at this exact address—the same physical location where Guardian Fleet Services' executive leadership and corporate administration were based and operating.

74. At all relevant times, Guardian Fleet Services' senior leadership and corporate officers were registered at, worked from, and exercised oversight authority at this headquarters location, including:

Francis Geoffrey Russell, Chief Executive Officer and Director;

Thomas Tedford, Chief Operating Officer;

Scotty Crockett, President and Director;

Rocky Gunter, Secretary/Treasurer; and

Mark Kara, Vice President and Director.

75. Accordingly, the conduct, representations, refusals, policies, and communications attributed to Kauff's were not isolated acts of a local towing operator, but occurred under the same roof, under the same corporate administration, and subject to the same enterprise policies and oversight of Guardian Fleet Services. Any reference in this Statement of Facts to "Kauff's" conduct therefore refers equally to the conduct of Guardian Fleet Services itself, acting through its owned and controlled operating entity at its headquarters location.

76. Since 2022, Guardian Fleet Services has undergone rapid expansion, growing from approximately nineteen locations to more than forty-five locations in fewer than three years, reflecting a significant consolidation of operations driven by corporate policy changes and the expansion of municipal and government contracting.

77. As of 2025–2026, Guardian Fleet Services operates one of the largest towing, recovery, and impound enterprises in the southeastern United States, and upon information and belief is among the largest—and in Florida, the largest—municipal towing and impound contractors by

geographic footprint and volume of government-authorized tows, with a dominant presence throughout Florida and operations extending across multiple states.

78. Guardian Fleet Services serves as a primary provider of municipal towing and impound services, particularly throughout South Florida, and routinely operates pursuant to contracts with cities, towns, and law-enforcement agencies. These contractual relationships create ongoing operational and financial alignment between Guardian Fleet Services and municipal entities, including police departments, through shared objectives related to vehicle enforcement, impoundment, storage, and release.

79. As a result of this alignment, Guardian Fleet Services' policies, representations, and asserted release conditions are frequently incorporated into, relied upon, or enforced in coordination with municipal and law-enforcement actions during vehicle detention and enforcement encounters. This coordination does not operate in isolation, nor does it rest solely with Guardian Fleet Services. Rather, the towing contractor, municipalities, police departments, sworn officers, and parking enforcement personnel each benefit from and participate in the enforcement framework established through these municipal contracts and related enforcement practices.

80. Given Guardian Fleet Services' extensive involvement in government-authorized towing, impoundment, and detention activities—often carried out in the presence of police officers or pursuant to police direction—Guardian Fleet Services routinely performs functions closely intertwined with governmental authority, involving the seizure, detention, and conditional release of private property.

81. The policies enforced at Guardian Fleet Services' West Palm Beach headquarters—the same location where Plaintiff's vehicle was withheld—are the policies that govern and are

implemented across its expanding network of locations. In light of GFS's scale, municipal role, and close working relationship with law enforcement, strict adherence to statutory requirements, due-process protections, and constitutional limits is paramount.

82. The conduct complained of in this action occurred within this enterprise framework, at Guardian Fleet Services' headquarters location, under the oversight and ratification of corporate leadership, and in coordination with municipal and law-enforcement actors.

## XIV. WRONGFUL DETENTION AND LIEN-RELATED CONDUCT BY KAUFF'S

### A. Wrongful Refusal of Release on June 4

83. On June 4, 2025, Plaintiff appeared in person at Kauff's Towing & Recovery to recover her vehicle, presenting comprehensive proof of ownership, including her Florida driver's license reflecting her current Florida address and her most recent (though non-current) vehicle registration.

84. Plaintiff further offered to produce additional ownership and entitlement documentation in her possession, including duplicate title applications, proof of active insurance, repair records, and other ownership materials maintained in the vehicle's original buyer folder; however, Kauff's declined to review or consider any such materials, stating that it would accept only current vehicle registration or a certificate of title as a condition of release, notwithstanding that neither is required for release under Fla. Stat. § 713.78(2)(a).

85. At all relevant times, the determinations and conditions communicated to Plaintiff were made by a supervising employee with authority to approve or deny vehicle release, rather than by

front-desk staff, and mirrored the release requirements publicly represented on the Kauff's/Guardian Fleet website.

86. Upon presenting her driver's license and non-current registration, the supervising employee took both documents from Plaintiff and brought them into a back office area, where they remained out of Plaintiff's possession for several minutes. Plaintiff could see the supervisor reviewing the documents before returning and denying release of the vehicle.

87. At the time of Plaintiff's appearance, Kauff's had already refused to honor the no-fee release order on two prior occasions, each refusal independently extinguishing any lawful basis for continued detention or lien assertion.

88. Despite Plaintiff providing more than ample, statutorily exceeding proof of ownership, and despite Kauff's undeniable knowledge of the Town's no-fee release directive, Kauff's knowingly refused to release the vehicle within the one-hour period mandated by statute, marking another instance in which Kauff's invalidated its own claimed lien.

89. In support of its refusal, Kauff's asserted that it was "heavily monitored by the government" and would "get in trouble" or face "fines" if it released the vehicle, mischaracterizing its discretionary decision to continue detention as a compulsory legal obligation.

90. At all relevant times, Kauff's was aware that Plaintiff could not obtain current vehicle registration without issuance of a duplicate certificate of title, particularly given the vehicle's out-of-state origin and the pendency of her duplicate-title request.

91. By knowingly imposing unattainable conditions and withholding the vehicle despite a valid municipal release order and Plaintiff's proof of ownership, Kauff's intentionally prolonged the deprivation of Plaintiff's vehicle, causing continued loss of possession.

## B. Misrepresentation of Fees and Statutory Requirements

92. When Plaintiff asked whether daily storage charges could be suspended, reduced, or otherwise mitigated while she awaited issuance of a duplicate title, Kauff's responded that "the government" did not allow any adjustment of fees, reinforcing the impression that Plaintiff was legally prohibited from disputing, negotiating, or mitigating charges as a matter of law.

93. At the time of these representations, Plaintiff had already been attempting for months to obtain issuance of her duplicate title through the California Department of Motor Vehicles without success. Kauff's was aware of these circumstances and nevertheless continued to condition release of the vehicle on possession of either a physical title or current vehicle registration—both of which Plaintiff had no statutory obligation to produce in order to recover her vehicle.

94. Despite Plaintiff's documented and diligent efforts, the duplicate title was not issued until July 29, 2025, and was not received by Plaintiff until September 2025 due to the California DMV's standard processing and mailing timeframe.

95. By demanding, as conditions of release, requirements Plaintiff could not meet —and which were not required by statute—Kauff's placed Plaintiff in a circular and unavoidable position that indefinitely prevented her from recovering her vehicle despite the absence of any lawful basis for its continued detention.

## C. Refusal to Provide Required Receipt Upon Request

96. On June 4, 2025, Plaintiff requested an itemized towing receipt from Kauff's to confirm whether the Town's no-fee release directive had been honored, to understand what charges were being asserted, and to determine whether any lawful amount should be paid under protest.

97. The supervisor refused to provide any itemized receipt, stating that no payment of any kind could be made until the vehicle was "eligible" for release.

98. Kauff's then continued to withhold the required itemized receipt for more than 170 days, despite Plaintiff's repeated written and verbal requests in October and November 2025.

99. As a result, Plaintiff was denied access to the statutorily required disclosures customarily printed on itemized towing receipts, including written instructions and third-party advocacy channels for contesting the tow and disputing charges.

100. When Kauff's ultimately produced the receipt months later, it contained the statutory references, third-party contact information, dispute procedures, and contest instructions that Plaintiff was entitled to receive on June 4, 2025, and that would have enabled timely third-party intervention and recovery of the vehicle before prolonged detention occurred.

101. By withholding the receipt at the time of Plaintiff's initial request and for months thereafter, Kauff's deprived Plaintiff of the statutory mechanisms required to assert her property rights, challenge the tow, and secure recovery of her vehicle, directly causing the continued detention of the vehicle and the escalation of compounding financial, psychological, and emotional harm.

## XII. POST–TOW TARGETING, MANUFACTURED DELINQUENCY, AND COERCIVE MISUSE OF AUTHORITY BY LEAD PARKING ENFORCEMENT OFFICER LORETTA BROWN

102. Parking Enforcement Officer Loretta Brown, at all relevant times the Lead Parking Enforcement Officer for the Town, was the principal official responsible for the enforcement actions taken against Plaintiff that culminated in the premature immobilization and towing of Plaintiff's vehicle on June 2–3, 2025.

103. As Lead Parking Enforcement Officer, Brown had a non-delegable duty to know, enforce, and supervise compliance with the limits of her jurisdiction; to prevent ultra vires enforcement actions; and to safeguard against unlawful interference with private property.

104. Beginning in February 2025, Brown repeatedly issued unauthorized registration citations to Plaintiff's non-moving vehicle despite lacking statutory or municipal authority to enforce registration violations. These citations formed the foundation of an enforcement narrative later used to justify escalation.

105. On May 24, 2025, acting under Brown's direction, Parking Enforcement Officer Yanela Núñez—Brown's subordinate—issued two citations in rapid succession: one for registration and one for overtime parking. This coordinated double citation inflated the citation count while obscuring Brown's direct role in accelerating enforcement.

106. On June 2, 2025—five days before any citation could lawfully become delinquent—Brown personally issued another registration citation outside her jurisdiction and imposed a $350 boot fee in rapid succession. Both Brown and Núñez were present during the immobilization, constituting circumstantial evidence of joint action, coordination, and shared intent.

107. The immobilization notice affixed to Plaintiff's vehicle was a homemade sign invoking police authority, cited no statute, ordinance, or lawful basis for immobilization or towing and required cashiers or money order only written by hand (See section XVII). Through these acts, Brown created the appearance of delinquency to justify a premature tow—conduct she was duty-bound to prevent, not perpetrate.

108. Only weeks after the Town formally determined that the June 3 tow lacked a lawful basis, Brown remained authorized to access Plaintiff's property and continued enforcement actions against Plaintiff's other vehicle. On July 1, 2025, Brown issued a $75 citation labeled only "OTHER," and on July 2, 2025, issued a second citation for $60 bearing the same designation, while Plaintiff's vehicle was lawfully parked on her permitted residential street and no statutory basis was identified for either citation.

109. Confused by the unexplained citations, Plaintiff left a polite voicemail with the Town identifying herself as "the individual from the wrongful June 3 tow" and stating that Kauff's still retained possession of her vehicle. Plaintiff explained that she possessed a valid residential parking permit, expressed her belief that the citations must have been issued in error, and requested an explanation, neutral administrative review, and a refund of the citations given the ongoing financial hardship caused by Kauff's refusal to release her vehicle.

110. Brown intercepted the inquiry within minutes by calling Plaintiff directly and leaving a voicemail falsely identifying herself as police, stating verbatim:

"This is Palm Beach police… parking. Your vehicle is parked in a restricted area. It's not a permit parking area. You were ticketed once. We need you to move your vehicle to the permit

parking area with signs. Call the main dispatchers at the police department when you can move your vehicle: 561-538-5455."

111. Brown knew that Plaintiff possessed a valid residential parking permit and knew that the street in question was authorized for permit parking at the time the citations were issued. By invoking sworn police authority and directing Plaintiff to Palm Beach Police Department dispatch, Brown created the reasonable belief that Plaintiff faced imminent police enforcement and escalation if she failed to comply.

112. Contrary to Brown's representation in the voicemail that Plaintiff had been cited only once, Brown had issued two citations. Although the July 1 citation was later voided, its initial issuance and subsequent removal from the record obscured the full scope of enforcement taken against Plaintiff.

113. Acting under the reasonable belief that she faced immediate police enforcement and potential criminal consequences—based on Brown's voicemail and prior threats of arrest, repeated towing, and ongoing citations communicated to Plaintiff by Palm Beach Police Department officers during the June 3 encounter—Plaintiff immediately moved her vehicle and promptly attempted to pay both citations, at which point she discovered that one citation had been voided.

114. Brown's direct contact bypassed neutral administrative review and compelled Plaintiff to unknowingly submit to the asserted authority of the same official whose ultra vires conduct had precipitated the original tow and whose continued enforcement actions lacked any stated legal basis, while Plaintiff's vehicle remained detained by Kauff's.

115. Brown knew Plaintiff's identity, knew Plaintiff was the individual wrongfully towed on June 3, knew the financial and personal disruption already caused, and nevertheless continued enforcement actions after the Town acknowledged the tow lacked a lawful basis.

116. Brown's conduct was not isolated. Weeks earlier, Brown enforced a substantially similar citation against Plaintiff's neighbor on the same street under the same purported rationale. At the time of that enforcement, the sidewalk in question had not yet been painted and no signage existed prohibiting parking.

117. Prior to the court hearing, Brown attempted to persuade the neighbor to avoid judicial review and resolve the matter informally. The neighbor declined, proceeded to court, and obtained dismissal—placing Brown on express notice that the enforcement theory was unlawful and unenforceable.

118. Despite this express knowledge, Brown returned weeks later and enforced the same unlawful theory against Plaintiff. Unlike the neighbor—who was permitted to contest the citation without coercion—Plaintiff was treated as a criminal, subjected to threats of police enforcement, and compelled to pay under duress to avoid escalation.

119. At the time Brown issued the citations against Plaintiff, the sidewalk still had not been painted and no signage prohibited parking. Brown's enforcement photographs conspicuously omitted the sidewalk entirely, while Plaintiff independently photographed the area, preserving evidence that the physical markings relied upon by Brown did not yet exist.

120. The Town's system nevertheless permitted Brown—whose actions were already implicated in an unlawful seizure of property—to intercept Plaintiff's attempt to obtain neutral administrative review. Rather than being routed to an independent Town official, Plaintiff's

inquiry was diverted to Brown herself, effectively cutting off Plaintiff's right to contest or seek redress.

121. This structural failure denied Plaintiff access to impartial review, enabled Brown to suppress oversight of her own misconduct, and reinforced the Town's deliberate indifference to the deprivation of Plaintiff's due-process rights.

122. Brown carried out the June 2–3 immobilization and towing alongside sworn Palm Beach Police Department officers, including a supervisor, without intervention or correction. Her continued authority following the Town's acknowledgment that the tow was improper supports the inference that the conduct was jointly undertaken and institutionally tolerated

123. The Town's failure to restrain, discipline, supervise, or remove Brown after determining that she orchestrated the unlawful seizure of Plaintiff's property—together with the absence of corrective action by police despite their involvement—reflected deliberate indifference to her misconduct. That failure permitted Brown to continue enforcement actions against Plaintiff, resulting in ongoing financial, emotional, and psychological harms.

## XV. FALSE AUCTION CLAIMS, COERCIVE PAYMENT DEMANDS, AND CONCEALED SALVAGE DESIGNATION

124. After receiving her duplicate certificate of title in early September 2025, Plaintiff contacted Kauff's to retrieve her vehicle. Kauff's informed Plaintiff that the Prius had been "auctioned" in August, that they "did not know where it was," and that it was "most likely sold" and "gone," conveying that the vehicle had been permanently disposed of.

125. Kauff's delivered this information as routine and final, implying that Plaintiff had missed some unknown window and that Kauff's was merely following procedure. Plaintiff was left with the clear understanding that her vehicle was irretrievably lost.

126. Plaintiff had never previously experienced a vehicle tow and had received no certified notice, no itemized invoice, no sale notice, and no accurate information indicating that the vehicle could lawfully be sold or auctioned. Plaintiff had also been repeatedly denied lawful release of the vehicle and meaningful information necessary to make informed decisions regarding her property.

127. But for the concern and urging of a third party, Plaintiff would have accepted Kauff's representations as final. Plaintiff had no independent reason to suspect that the vehicle had not been lawfully sold or permanently gone.

128. After a period of despair following Kauff's representations, Plaintiff confided in a third party regarding the events that had occurred. At that third party's urging, Plaintiff agreed that the third party should contact Kauff's on Plaintiff's behalf, as Plaintiff was overwhelmed and discouraged by Kauff's prior assertion that the vehicle was permanently gone.

129. On the late afternoon of Friday, October 3, 2025, the third party contacted Kauff's and— after firmly pressing for clarity—placed Plaintiff on a conference call with Kauff's personnel. During that call, Kauff's abruptly reversed its prior representations and stated for the first time that the Prius had been "found."

130. This sudden reversal created the false appearance that the vehicle had narrowly escaped permanent loss and that Kauff's had fortuitously rediscovered it.

131. After repeated unexplained hold periods, Kauff's demanded payment of approximately $4,500 for release of the vehicle and insisted that Plaintiff remit full payment within two business days—by 12:00 p.m. on October 8, 2025—or the vehicle would be "lost forever."

132. When Plaintiff attempted to ask questions or discuss the amount demanded, Kauff's employees refused to negotiate, raised their voices, and told Plaintiff she should "feel lucky" that the vehicle was still purportedly in their possession.

133. Having previously believed the Prius had been permanently disposed of, Plaintiff began urgently gathering funds and preparing to comply. Plaintiff needed the vehicle to address financial obligations and mitigate debt arising from its loss.

134. Kauff's nearly succeeded in extracting payment and closing the matter. Plaintiff paused only because of continued urging by the third party to check the VIN before doing so, not because of any disclosure or transparency by Kauff's.

135. At that point, and for the first time, Plaintiff independently checked the vehicle's VIN.

136. Plaintiff then discovered that the Prius had been branded salvage on August 18, 2025.

137. Kauff's never disclosed—nor suggested—that the vehicle had been salvage-branded more than six weeks earlier. That branding permanently destroyed the vehicle's clean-title value, rendered it unlawful to operate, and transferred ownership interests away from Plaintiff.

138. At the time Kauff's demanded approximately $4,500 from Plaintiff on October 3, 2025, Kauff's was simultaneously:

(a) Concealing that the Prius had already been designated salvage in national and interstate vehicle-history databases, permanently impairing its title integrity, insurability, registrability, and resale value;

(b) Demanding payment for approximately 127 days of storage without lawful lien authority, including over $1,600 in post-salvage storage charges expressly prohibited by law and imposed without notice or disclosure;

(c) Asserting a towing lien that never legally existed, having failed to satisfy any statutory prerequisite required under Florida law to create or perfect a lien;

(d) Imposing an artificially compressed two-business-day deadline under threat of permanent loss, while inducing Plaintiff to believe payment would result in lawful release and full recovery of the vehicle in its pre tow condition;

(e) Creating circumstances under which Plaintiff's payment would unknowingly legitimize and obscure Defendants' prior unlawful conduct under the false appearance of consent; and

(f) Structuring the demand so that Defendants would benefit regardless of Plaintiff's response—by retaining the vehicle, extracting payment for a severely devalued and legally impaired asset, or both—while Plaintiff suffered loss in every possible outcome.


## XVI. STATUTORY NOTICE FAILURES AND ABSENCE OF ANY LAWFUL LIEN AUTHORITY

139. In the days and hours following the October 3, 2025 payment demand—and while still under a two-business-day deadline—Plaintiff conducted research to determine whether Kauff's

possessed any lawful authority to detain the vehicle, demand payment, or claim that a sale or salvage process had occurred.

140. That review revealed that Kauff's had not satisfied any mandatory statutory prerequisite required under Florida law to lawfully assert a towing lien, accrue storage charges, sell or auction the vehicle, or designate it as salvage.

141. Plaintiff further discovered that, absent compliance with those prerequisites, Kauff's asserted authority to detain the vehicle, charge storage, demand payment, claim a sale or auction, or designate the vehicle as salvage despite having taken none of the required statutory steps, and that Kauff's voided any purported towing lien multiple times over and in independent ways, by:

(a) Seizing possession of the vehicle without first verifying the legality of the tow;

(b) Refusing to honor the Town's June 3, 2025 no-fee release directive, ongoing to this day;

(c) Refusing release of the vehicle upon presentation of valid proof of ownership;

(d) Failing to conduct the mandatory good-faith records search to identify the registered owner or lienholders within three (3) business days of the tow, as required by Florida Statute § 713.78;

(e) Making no statutory good-faith effort to locate or notify Plaintiff, despite Plaintiff appearing in person on June 4, 2025 and presenting a valid Florida driver's license reflecting her Florida address;

(f) Failing to send any Notice of Claim of Lien by certified mail posted no later than 11:00 a.m. Eastern Time on the fifth (5th) business day following the date of storage, or at any time thereafter, thereby forfeiting any lawful authority to impose or collect storage fees;

(g) Refusing, upon repeated requests, to provide any itemized invoice or written accounting of charges for more than 170 days;

(h) Failing to disclose to Plaintiff any rights, remedies, or procedures to contest the tow, challenge the charges, redeem the vehicle, or seek judicial review at any time;

(i) Misrepresenting Florida law and Defendants' authority to detain the vehicle and accrue storage charges in order to prolong possession and manufacture additional storage days;

(j) Misrepresenting the existence, validity, and enforceability of any towing lien to Plaintiff and through official interstate reporting channels, despite no lawful lien ever having arisen;

(k) Failing to notify Plaintiff of any purported auction or sale date, timeline, or forfeiture clock, while later claiming that such an auction or sale had already occurred;

(l) Failing to schedule, notice, advertise, or conduct any lawful public auction of the vehicle as required by Florida law, including failure to provide public notice, competitive bidding, or statutory transparency safeguards governing lien-based sales, thereby confirming that no bona fide sale process ever occurred and that Defendants lacked any lawful authority to dispose of or retain the vehicle or its value;

(m) Failing to complete any lawful determination, adjudication, or authorization by the Florida Department of Highway Safety and Motor Vehicles, the California Department of Motor Vehicles, or any other governmental authority with jurisdiction to decide lien validity, title status, ownership rights, or salvage eligibility for an out-of-state titled vehicle, notwithstanding that such determinations are mandatory prerequisites to any lawful disposition, reporting, or alteration of a vehicle's legal status;

(n) Taking irreversible action to destroy the vehicle's legal status and market value through salvage designation without lawful notice, lien authority, or opportunity for Plaintiff to redeem, contest, or cure;

(o) Attempting to collect months of post-salvage and post-auction storage charges illegally and without full disclosure; and

(p) Attempting to return the vehicle to Plaintiff without disclosing that its legal status and market value had already been destroyed.

## XVII. First and Only Purported Notice Attempt

142. By the time of Defendants' October 3, 2025 two-business-day payment demand, the only artifact Plaintiff had ever received reflecting any attempted delivery associated with her vehicle was a USPS Form 3849 dated July 30, 2025—fifty-seven (57) days after Defendants took possession of the vehicle on June 3, 2025, and more than fifty (50) days after the statutory deadline for certified-mail lien notice had expired.

143. Plaintiff's duplicate certificate of title was issued by the California DMV on July 29, 2025—one day before the July 30, 2025 Form 3849 first attempt at notice—making the timing of such an action notable.

144. USPS Form 3849 is a "Sorry We Missed You" delivery slip. It is not a Notice of Claim of Lien and does not contain, attach, or disclose the contents of any mailing. Plaintiff was provided no copy of any letter, no itemization, no lien language, and no information describing what

document was allegedly being sent or what rights, deadlines, or consequences it purported to trigger

145. The July 30, 2025 Form 3849 was marked "First Attempt," reflecting that no prior delivery attempt of any kind had been made during the preceding fifty-seven (57) days. Certified-mail lien notices, when properly sent, typically generate additional delivery attempts and provide tracking and retrieval instructions; Plaintiff received no second attempt, no tracking or article number, and no information permitting her to identify, locate, or retrieve any purported mailing.

146. The Form 3849:

was not itself a Notice of Claim of Lien; (b) contained no declaration of lien; (c) contained no itemized charges or storage rates; (d) contained no notice of any right to contest, redeem, or seek judicial review; (e) identified no sale, auction, forfeiture, or deadline; and (f) contained no tracking or article number associated with any certified mailing.

147. Notably, Defendants' purported timelines, payment demands, and narratives alleging lien accrual, sale, or salvage processing make no mention of the July 30, 2025 Form 3849 or of any attempted notice on that date, notwithstanding that this Form 3849 is the only artifact of any purported notice attempt Plaintiff has ever received.

148. Plaintiff has found no evidence, and Defendants produced no evidence, of any earlier notice, any subsequent certified mailing, or any statutorily compliant Notice of Claim of Lien sent to Plaintiff before or after July 30, 2025. Defendants have also not provided the alleged letter itself, any USPS tracking record, or any proof of contents for any purported lien notice, nor have they identified any additional delivery attempts

149. The July 30, 2025 Form 3849 did not satisfy any notice requirement under Florida Statute § 713.78 and did not authorize lien creation, storage charges, sale, salvage designation, or payment demands. Despite the absence of compliant statutory notice, Kauff's treated the vehicle as lawfully held, accrued storage charges, asserted lien authority, and demanded payment as if statutory notice obligations had been satisfied.

## XVIII. PLAINTIFF'S ATTEMPT TO REPORT VIOLATIONS AND SEEK LAWFUL LAW-ENFORCEMENT INTERVENTION

150. On October 6, 2025, while under a two-business-day deadline imposed by Kauff's and believing that law enforcement would intervene once presented with documentary proof of serious violations, Plaintiff went in person to the Palm Beach Police Department ("PBPD") to report the unlawful detention and conversion of her vehicle, Kauff's concealment of a salvage branding, and an extortionate demand for payment under a two-day deadline backed by the threat of permanent loss of her property.

151. Plaintiff arrived with her physical certificate of title and a detailed written report outlining Kauff's refusal to release the vehicle upon proof of ownership on June 4, 2025, misrepresentations of law, and multiple statutory violations.

152. One of the officers present on October 6 had also been present on June 3, 2025, during Plaintiff's earlier attempt to secure enforcement of the Town's immediate no-fee release order and had full knowledge of the Town's directive and the circumstances surrounding the tow.

153. During that June 3 interaction, while Plaintiff was seeking enforcement of the Town's directive and recovery of her vehicle, that same officer cautioned Plaintiff to be "careful what [she] said" so that she would not "get herself in trouble."

154. On October 6, despite Plaintiff's presentation of documentation, proof of violations, and a written report, officers declined to read or accept Plaintiff's materials.

155. Officers took only the first page of Plaintiff's submission, stating it was needed solely to "look up the VIN," and declined to review the remaining documentation, explaining that there was "no point" in doing so without a supervisor present.

156. While Plaintiff waited, officers left the public area multiple times and contacted Kauff's from a back office, outside Plaintiff's presence and without explanation.

157. Plaintiff was not present for, and was excluded from, any discussions between the Palm Beach Police Department and Kauff's regarding her vehicle, despite expressly requesting full transparency concerning her property, the basis for Kauff's continued refusal to release it, whether any police review was impartial and grounded in law, and the grounds relied upon to continue accruing charges

158. Plaintiff explained that the continued detention of her vehicle had caused severe disruption to her life and that she had largely remained confined to her home since the incident.

159. Despite this disclosure, officers declined to take a report, repeatedly stating that the matter was "civil," outside their jurisdiction, and that no action could be taken without a supervisor present.

160. Plaintiff offered to return the following morning to speak with a supervisor, explaining that she was under an imminent deadline and needed the matter addressed and formally documented before the vehicle was permanently disposed of.

161. On the morning of October 7, 2025—before Plaintiff returned to the station—a PBPD supervising officer contacted Plaintiff by telephone and instructed her not to come to the police department.

162. The supervisor stated that there was "nothing [he] could do," that the matter was "civil," and that it was "outside [PBPD's] jurisdiction."

163. When Plaintiff reiterated that she needed to file an official report for legal protection and that she possessed proof of multiple statutory violations, the supervisor stated that if she came in she would "be sitting there for hours" because all officers were "on the street."

164. The supervisor advised Plaintiff that, if she insisted on making a report, she should instead request that an officer come to her home.

165. During the same call, the supervisor abruptly asserted that Plaintiff was delinquent on parking tickets and owed "over $400," despite Plaintiff having resolved all parking-related charges on June 3, 2025, with receipts and Town witnesses.

166. The supervisor further stated that he had spoken with someone at the Town who was willing to "cut the balance in half" if Plaintiff paid within the next few days.

167. Plaintiff was provided no documentation, verification, or opportunity to respond to this assertion, which was presented as fact.

168. Plaintiff found the call confusing, inconsistent with the documented history of the matter, and unrelated to her attempt to report the unlawful detention and conversion of her vehicle.

169. Weeks later, through a public-records request, Plaintiff obtained the PBPD incident report generated from the October 6, 2025 visit.

170. The report omitted Plaintiff's allegations and made no reference to unlawful detention, conversion, refusal to release, salvage designation, or statutory violations.

171. Instead, the report summarized the matter as a dispute over parking tickets and stated that Kauff's claimed Plaintiff owed money and that the vehicle had been in there for months.

172. The report listed a supervising officer as having been present on June 3, 2025, despite officers having told Plaintiff at the time that no supervisor was present and that this absence was the reason no action could be taken.

173. After the October 7, 2025 phone call with the supervisor and PBPD's continued refusal to act, document, or enforce the law—and with Kauff's October 8 deadline rapidly approaching— Plaintiff sent a formal legal notice to Kauff's on October 7, 2025, having been left with no other means to protect herself or preserve her property while investigating the full scope of the misconduct.


**XIX. Town's Misapplied Payment and Artificial "Delinquency" Classification**

174. On October 8, 2025, Plaintiff visited Town Hall to address the ongoing "delinquency" classification. She spoke with the same employee who had issued the June 3 no-fee release order. Plaintiff expressly requested written and signed confirmation of that release. The employee

recognized Plaintiff but declined to provide any written confirmation, citing "liability reasons." When Plaintiff stated that she believed the Police Department may be concerned about its potential liability, the employee responded by nodding her head in silent affirmation while remaining visibly nervous.

175. Despite the employee's clear recognition of the June 3 payment and release order, she provided only citation numbers rather than formal documentation. The marked shift in her demeanor—from helpful and outraged on June 3 to nervous and constrained on October 8— coincided with her refusal to document the no-fee release. This lack of documentation, combined with the continued false delinquency classification, further obstructed Plaintiff's ability to defend her rights.

## XX. Public Records Requests, Preservation Failures, and Limited Production

176. Between October 11 and mid-December 2025, Plaintiff submitted eleven (11) detailed public records requests and multiple preservation notices seeking core enforcement records related to the June 2–3 immobilization and tow, the Town's June 3 no-fee release directive, and the October 6 follow-up encounter. Defendants did not provide Chapter 119–compliant responses, did not identify the individuals responsible for responding, and repeatedly issued boilerplate replies stating that "no footage exists beyond 90 days," without addressing the specific categories requested, identifying custodians, describing search methodology, or explaining omissions.

177. In multiple responses, Defendants issued categorical assertions that "no records exist" or that "all footage is deleted after 90 days," even where Plaintiff's requests sought numerous non-

video records, including but not limited to CAD logs, dispatch records, call logs, routing and approval records, audit trails, internal communications, deletion metadata, and custodian identities. Defendants did not provide itemized responses to these non-video categories, did not identify any exemption or statutory basis for withholding, did not state whether responsive records ever existed, and did not explain whether any records were deleted, when any deletion occurred, by whom, or pursuant to what policy or authority.

178. Plaintiff's requests sought identification of the official custodian(s) and any designated personnel responsible for receiving, searching, reviewing, and responding to Chapter 119 requests. Defendants did not identify any such custodian or designee and did not disclose whether Plaintiff's requests were referred to, reviewed by, or supervised through any designated records office

179. Only one response to Plaintiff's public-records requests was signed, by Yanela Núñez. That response was signed:


"Yanela Núñez

Palm Beach Police."


Núñez is not a sworn Palm Beach Police Department officer. She is a Parking Enforcement employee who directly participated in the June 2–3 immobilization and tow and previously issued multiple citations against Plaintiff's vehicle. The response she signed concerned police records relating to the same incident in which she had direct involvement.

180. Defendants have not identified Núñez as a sworn officer, designated police records custodian, or authorized designee of the Palm Beach Police Department for purposes of responding to Chapter 119 requests. Defendants likewise did not disclose whether her response was reviewed, supervised, or approved by any neutral records custodian or sworn officer.

181. Defendants further produced no exemption log, custodian certification, or itemized justification identifying which records were searched, which were withheld, who accessed them, or under what authority the response was issued.

182. Out of all eleven requests, Plaintiff received only four limited police incident reports and a small number of timestamped Town photographs depicting the boot and tow. No other substantive records were produced.

183. Despite Plaintiff's timely requests and preservation notices, Defendants did not produce, and did not account for the non-production of, the following categories of records including but not limited to:

(a) Body-worn camera footage from June 3, 2025 and related enforcement encounters, despite circumstances giving rise to a reasonable expectation of litigation, including Plaintiff's in-person appearance at the police station, the presence of 6 responding officers, threats of arrest, an ongoing dispute, and the continued withholding of Plaintiff's property;

b) CAD logs, dispatch logs, and call records reflecting decision-making, tow coordination, and communications surrounding the immobilization, tow, and Town-issued release directive;

c) Tow authorization, supervisory approval, or routing records identifying who approved the immobilization and tow and on what stated authority;

d) Internal communications among PBPD, Town personnel, Parking Enforcement, and Kauff's/Guardian concerning the no-fee release order and the continued detention of Plaintiff's vehicle;

e) Complete citation and payment backend histories, audit trails, and metadata necessary to confirm or refute any claimed delinquency or enforcement predicate;

f) Any exemption log, itemized justification for withheld records, identification of custodians searched, or description of search methodology, as required under Chapter 119.

184. Defendants did not state whether any June 3, 2025 body-worn camera footage ever existed, did not identify when or by whom any such footage was deleted or withheld, and did not cite any retention policy, exemption, or statutory basis justifying its non-production. Defendants likewise produced no deletion metadata, retention or destruction logs, audit trails, or custodial certifications identifying whether responsive footage existed, whether it was preserved, reviewed, or deleted, who authorized any deletion, or when any such deletion allegedly occurred.

185. Defendants further provided no explanation for why nine public-records requests were required before acknowledging that body-worn camera footage from October 6, 2025 existed, nor why earlier responses categorically denied the existence of any responsive recordings.

186. Defendants further failed to comply with Chapter 119 by refusing to identify or consistently sign the individuals responsible for responding to Plaintiff's public records requests. Despite Plaintiff's express December 2025 requests that Defendants identify who accessed, reviewed, and responded to each request, Defendants have never provided that information—denying Plaintiff the statutory right to know who handled her records and obstructing her ability to assess compliance, scope of searches, and potential conflicts.

187. Chapter 119 contemplates that inspection, review, and handling of public records occur under the supervision of the custodian or authorized designee. By refusing to identify who accessed, reviewed, searched, or responded to Plaintiff's requests, Defendants denied Plaintiff the ability to assess whether records were handled by neutral custodians, whether conflicts existed, and whether searches were conducted in good faith.

188. Plaintiff sent at least six (6) separate written preservation requests expressly requesting acknowledgment and confirmation that responsive records were preserved. Defendants did not acknowledge any preservation request, did not confirm that litigation holds were implemented, and did not identify any custodians subject to preservation obligations.

189. What follows is a reflection of the produced reports, regardless of the fact that there has never been any lawful authority, three-ticket rule, or ordinance allowing immobilization or seizure based on parking citations in any town code, statute, or municipal law—making the entire operation and seizure void and unlawful ab initio. Nevertheless, based on the limited reports received, here is what can be ascertained.


## XXI. WARNING SIGN USED IN CONNECTION WITH THE JUNE 2, 2025 IMMOBILIZATION

### A. Non-Standard and Legally Insufficient Nature of the Purported Notice

190. On June 2, 2025, parking enforcement employee Loretta Brown affixed a document to Plaintiff's vehicle in connection with wheel immobilization. The document was not a standardized municipal notice, citation, or warning authorized by ordinance or statute, but a homemade sign.

191. The sign bore the word "WARNING" in large red lettering, contained handwritten payment instructions demanding cashier's check or money order only, and displayed "Palm Beach Police Department" in large, bold print at the bottom. The sign did not conform to any standardized Town, police, or parking-enforcement notice format.

192. The sign did not identify any issuing agency, municipal department, ordinance, statute, or enforcement authority under which immobilization was imposed, nor did it provide any official reference number, report number, or case identifier.

**B. False Appearance of Police Authority**

193. Although the sign prominently invoked the Palm Beach Police Department, it contained no police case number, officer name, badge number, or identification of any sworn law-enforcement officer.

194. Loretta Brown is a civilian parking-enforcement employee and not a sworn Palm Beach Police Department officer. No police report, supervisory authorization, or contemporaneous law-enforcement record identifies any sworn officer as authorizing, issuing, approving, or reviewing the immobilization notice.

**C. Placement and Visibility**

195. The sign was not placed on the driver's-side window and was not reflective or conspicuous. It was affixed with duct tape in a manner not reasonably calculated to provide actual notice.

196. On June 2 and June 3, 2025, Plaintiff passed the vehicle multiple times prior to towing and did not observe any warning or immobilization notice in any location reasonably calculated to provide notice of enforcement.

## D. Information Omitted from the Sign

197. The sign omitted all of the following:

(a) any citation number;

(b) any ordinance, code, or statute;

(c) the reason for immobilization;

(d) any cure period;

(e) any hearing or contest information; and

(f) contact information for any authorized municipal office.

## E. Payment Restriction

198. The sign demanded payment by cashier's check or money order only. The handwritten instruction did not reference any Town payment portal, finance office, or alternative payment method.

199. This restriction is inconsistent with the Town's acceptance of Plaintiff's payment by credit card on June 3, 2025 in connection with the same enforcement episode. The records produced identify no ordinance, policy, or standardized procedure authorizing such a restriction.

200. No Town ordinance, policy, or statutory authority authorizing restriction of payment to a single category—or authorizing use of a handwritten, non-standard payment demand—was identified on the sign or in any contemporaneous municipal or law-enforcement record.

## F. Owner Identification Failures

201. Although later records state that the vehicle owner was "unable to be contacted," the materials produced reflect no attempt to identify or contact Plaintiff through readily available municipal or law-enforcement systems prior to immobilization or towing.

202. A routine inquiry of the vehicle's California license plate or VIN would have identified Plaintiff by name, with her address and contact information readily discoverable through standard law-enforcement, DMV, or interstate vehicle databases.

203. At the time of immobilization, Plaintiff had an established citation and payment history with the Town of Palm Beach, including recent payments made using consistent identifying information maintained within Town systems.

204. Plaintiff also had another vehicle registered in her name with the State of Florida, with her address and identifying information on file and accessible to municipal systems.

205. Despite these readily available means of identification, Defendants made no DMV inquiry, registration lookup, title search, or cross-reference of Town payment, permit, or registration records prior to immobilizing or towing the vehicle, and the records reflect no attempt to contact Plaintiff before immobilization or towing.

### G. Notice and Escalation Failure

206. The records produced do not reflect that Plaintiff was provided any advance notice, cure period, hearing information, or contest procedure prior to wheel immobilization, nor any advisement that immobilization was authorized, possible, or imminent.

207. The records likewise do not reflect publication, disclosure, or notice to Plaintiff of any ticket-threshold or escalation policy in effect at the time, nor any advisement that immobilization could be imposed without additional notice or opportunity to cure.

208. The warning sign was affixed contemporaneously with the immobilization and did not precede it. Accordingly, it did not function as pre-immobilization notice and provided no advance warning of authorization, escalation, or impending enforcement action.

209. The warning sign likewise did not function as a legally sufficient pre-tow notice. It disclosed no escalation policy, did not advise that towing could follow immobilization, identified no statutory authority for towing, and provided no cure period, hearing information, or means by which towing could be avoided

### H. Undisclosed Citation Issued Contemporaneously with Immobilization

210. Through subsequent public-records review, Plaintiff discovered that an additional citation was issued contemporaneously with the June 2, 2025 immobilization.

211. Plaintiff did not observe this citation on June 2 or June 3, 2025, despite multiple walk-bys of the vehicle. The citation was not referenced on the warning sign, was not disclosed prior to immobilization or towing, and was not communicated to Plaintiff before seizure of the vehicle.

212. Plaintiff later paid this citation on June 3, 2025, without having observed or been informed of its existence prior to payment.

## XXII. POLICE REPORTS PRODUCED IN RESPONSE TO PUBLIC RECORDS REQUEST

### A. June 2, 2025 "Boot Installed" Entry (Parking Enforcement) Report

213. The June 2 entry identifies Loretta Brown, a civilian parking enforcement employee, as the sole actor, assigns low priority, and contains no narrative. The record omits that:

a) any sworn officer was present, supervising, authorizing, or reviewing the immobilization;

b) any ordinance, statute, or delinquency determination authorized immobilization;

c) any enforceable ticket-threshold or "three-ticket rule" existed or applied;

d) any notice was served in a conspicuous or compliant manner;

e) any cure, contest, or hearing rights were provided;

f) any attempt was made to identify or contact the owner;

g) any sworn review occurred before immobilization.

h) any narrative describing the factual basis, legal authority, or decision-making process underlying the immobilization;

i) any verification, substantiation, or sworn confirmation of the information entered into the record by non-scene administrative personnel;

j) any lawful calculation, explanation, or citation supporting the monetary amount recorded in connection with the immobilization.

**B. June 3, 2025 Morning Tow Report**

214. On the morning of June 3, 2025, Officer Peter Aguirre arrived on scene in connection with the planned towing of Plaintiff's vehicle and authored the primary incident report memorializing the seizure. The report itemized a series of parking citations and charges, including expired-registration citations issued by civilian parking enforcement personnel, and treated those citations as the operative basis for immobilization, towing, and placement of a hold on the vehicle.

215. Although Officer Aguirre documented the presence of a boot and a "warning" notice affixed to the vehicle, the report does not describe the notice's issuing authority, legal basis, placement, contents, payment recipient, appeal rights, or statutory compliance, nor does it acknowledge that the notice was a homemade sign falsely invoking police authority. The report contains no assessment of whether the notice satisfied any municipal, statutory, or constitutional notice requirements.

216. The report further reflects that Officer Aguirre relied on representations made by civilian parking enforcement personnel regarding an alleged monetary threshold and a purported "24-hour" towing rule, asserting that if parking fines exceeded a specified amount the vehicle would be subject to tow. The report does not cite any statute, ordinance, municipal code, or written policy authorizing such a rule, nor does it document any independent verification that such authority existed.

217. The report does not state that Officer Aguirre verified the validity, delinquency status, or enforceability of the listed citations, nor does it indicate that any grace periods had expired or that lawful escalation criteria had been met. The dollar amounts cited in the report are internally inconsistent and expressly exclude at least one citation issued the same day as the immobilization, further undermining any claim of a defined or verified enforcement threshold.

218. Despite functioning as the narrative author of the tow report, Officer Aguirre did not document any independent probable-cause determination, legal analysis, or finding that immobilization, towing, or placement of a hold was authorized by law. The report does not reflect that he reviewed, questioned, or challenged the authority of civilian parking enforcement to initiate or escalate the seizure.

219. The report further omits any indication that Officer Aguirre—or any other officer—attempted to identify or notify the vehicle's registered owner prior to towing, despite the availability of ownership information through routine DMV inquiries and despite the acknowledged deficiencies in the immobilization notice.

220. In addition to the primary narrative, the incident report contains multiple status entries authored by non-scene administrative or dispatch personnel, including Taisha Coleman, Josephine Naujok, and Monica Quint. These individuals were not responding officers and did not claim personal observation of events, yet they logged enforcement conclusions such as the decision to tow, the alleged inability to contact the owner, tow coordination with Kauff's, and confirmation that the vehicle had been towed.

221. None of the log entries identify the source of the information being recorded, the officer or official who made the underlying determinations, or any legal authority supporting those

conclusions. The report does not distinguish between firsthand observations and secondhand information relayed by others, nor does it document any verification before the information was adopted into official police records.

222. The structure of the report reflects a multi-hand administrative logging process in which enforcement conclusions were relayed through civilian parking enforcement, sworn officers, dispatch, and clerical personnel, without attribution, legal citation, or documented review. Civilian parking enforcement assertions were memorialized as police facts without verification or statutory grounding.

223. For a single vehicle immobilization and tow, the use of multiple non-scene administrative personnel to log enforcement conclusions—without personal observation, source attribution, or legal citation—is not consistent with standard police reporting practices, which ordinarily rely on a single responding officer's firsthand narrative supplemented, if necessary, by clearly sourced supervisory or dispatch annotations.

224. In this instance, none of the three non-scene personnel who logged enforcement actions identified the source of the information recorded, the officer or official who made the underlying determinations, or whether the information originated from sworn officers, civilian parking enforcement, or third parties. The absence of attribution is uniform across entries, despite the entries memorializing legally operative conclusions.

225. The report does not reflect any operational necessity for multiple non-scene personnel to log enforcement determinations in connection with a single vehicle tow, nor does it explain why a routine and allegedly lawful seizure required fragmented documentation rather than a single, source-attributed narrative grounded in identified legal authority.

226. As reflected in the report's structure, responsibility for the tow decision was fragmented across multiple actors, none of whom documented personal knowledge, legal authority, or decision-making responsibility. This diffusion of authorship obscured the origin of the enforcement determinations while allowing those determinations to be adopted into official police records as completed facts.

227. The report reflects that representations originating with civilian parking enforcement personnel were relayed through sworn officers and administrative channels and memorialized as police action without documentation of verification, statutory authorization, or independent legal assessment at any stage of the process.

228. Supervisor Fred Waymire approved the tow within this fragmented reporting structure without documenting supervisory findings, legal analysis, or review of notice sufficiency, authority to immobilize or tow, owner-identification efforts, or citation validity.

229. As documented in the report itself, the tow proceeded before any verified delinquency, without documented legal authority, without adequate notice, without owner identification or contact, and through a diffuse decision-making process that obscured responsibility while converting unsupported assertions into official police action.

## C. June 3, 2025 Afternoon Station Encounter Report

230. On the afternoon of June 3, 2025, Plaintiff appeared at PBPD seeking enforcement of a Town-issued no-fee release order. Approximately six officers, including supervisory personnel, were present.

231. The corresponding report lists only one officer, contains no narrative, and omits that officers:

a) refused to enforce the Town's no-fee release order;

b) monitored a call with Kauff's Towing during which Kauff's refused release without payment and failed to intervene;

c) warned Plaintiff to be careful about what she said and communicated threats of arrest and jail;

d) responded with an overwhelming and intimidating police presence to a simple release request;

e) offered only coercive, financially harmful options carrying risk of criminal exposure;

f) represented the vehicle could be towed and retained at will based solely on registration status;

g) failed to provide lawful alternatives such as temporary registration, third-party intervention, or court-ordered release;

h) failed to correct false or ultra vires statements regarding Plaintiff's rights or police authority;

i) Never acknowledged personal involvement in the immobilization or tow hours earlier;

j) failed to record that the Town had already deemed the tow erroneous and unauthorized;

k) failed to record that Plaintiff had no delinquency justifying a tow or that no enforceable "three-ticket rule" existed.

232. Plaintiff left the police station without relief, without a remedial path, and without enforcement of the Town's no-fee release directive. Despite Plaintiff's report of an ongoing seizure of her vehicle, refusal to release property, and noncompliance with a municipal order, the incident was classified as a low-priority civil follow-up.

233. By categorizing the incident as civil and low priority, and by omitting any and all narrative—including the number of officers present, their actions, and any substantive details of the event—the department failed to meet the fundamental requirement that police reports include a detailed narrative. This omission not only obstructed the investigation but also created the conditions for the department to withhold or delete body-worn camera footage without consequence. Given the reasonable expectation of future litigation, this deliberate omission effectively shielded the officers, the private contractor Kauff's, Guardian Fleet, and the Town from scrutiny and potential criminal investigation.

234. This deliberate omission ensured that no documented account of officer conduct, legal authority, or enforcement justification was preserved, further preventing any meaningful investigation into the unlawful seizure and the misconduct of those involved.

235. By classifying the matter as civil and omitting all narrative, the department effectively removed the incident from the investigative, supervisory, and enforcement pathways that would have held them accountable.

236. This classification also excluded the incident from evidence-preservation measures, such as supervisory review and the retention of body-worn camera footage, allowing critical recordings to be overwritten, deleted, or withheld without oversight.


**D. October 6, 2025 PBPD Incident Report — Selective Documentation and Material Omissions**

237. The October 6, 2025 Palm Beach Police Department incident report affirmatively reflects supervisory presence, identifies Officer Tristan Gordon as a responding officer, and classifies the matter as a low-priority civil issue.

238. The report further reflects statements attributed to Kauff's Towing & Recovery asserting that Plaintiff owed money, that the vehicle had been in their possession for an extended period, and that the matter was a dispute over parking citations.

239. The October 6, 2025 incident report omits material facts affirmatively known or disclosed to responding officers, including that:

(a) although Supervisory Officer Fred Waymire was listed as present, Plaintiff was told no supervisor was available, and that this asserted absence was used to refuse acceptance of her report;

(b) the same supervisory officer had personally participated on June 3, 2025 in approving and authorizing the tow and later that same day threatened Plaintiff with arrest and jail;

(c) Officer Tristan Gordon had previously participated on June 3, 2025 in refusing to enforce the Town-issued no-fee release order and warned Plaintiff to be "careful" about what she said;

(d) Plaintiff informed officers that she appeared at Kauff's on June 4, 2025 with proof of ownership and that Kauff's refused to release the vehicle despite that proof;

(e) Plaintiff disclosed Kauff's demand for approximately $4,500 under threat of imminent permanent loss of the vehicle by a stated October 8, 2025 deadline, without disclosure of prior salvage branding;

(f) Plaintiff disclosed salvage-branding or title-related actions initiated without notice;

(g) Plaintiff presented documentation identifying multiple statutory violations demonstrating the absence of any valid lien or lawful detention;

(h) Plaintiff attempted to make a formal criminal report alleging unlawful detention, conversion, civil theft, fraud, and extortion, which officers refused to read, accept, or document;

(i) officers engaged in an approximately twenty-minute private communication with Kauff's outside Plaintiff's presence, repeatedly disappearing into a back office without explanation or transparency;

(j) Plaintiff disclosed severe emotional distress, financial hardship, and functional impairment caused by the continued detention and imminent loss of her vehicle;

(k) officers failed to advise Plaintiff of available legal remedies, including court intervention or bonding out the vehicle; and

(l) the Town of Palm Beach had previously determined the tow to be erroneous and issued a no-fee release order on June 3, 2025, which officers declined to enforce.

240. The incident report contains no narrative documenting investigative steps, legal analysis, enforcement consideration, or intervention relating to the disclosures described above.

241. Instead, the report adopts assertions attributed to Kauff's Towing & Recovery while omitting Plaintiff's allegations, evidence, and requests for assistance.

242. The incident was classified as a low-priority civil matter notwithstanding Plaintiff's disclosure of imminent and irreversible deprivation of property.

243. The report does not preserve a complete, source-attributed record of Plaintiff's attempted reporting, officers' prior involvement, supervisory presence, or the urgency of the threatened loss.

244. As reflected on its face, the October 6, 2025 incident report excludes material facts disclosed to responding officers while incorporating the narrative of the private towing contractor.

245. The report therefore documents officer presence, supervisory awareness, and classification decisions without documenting Plaintiff's allegations, supporting evidence, or the basis for declining intervention.

246. On October 6, 2025, PBPD generated a report acknowledging that Plaintiff's vehicle had been held for months, sent to auction, and towed in error, and that Plaintiff faced imminent permanent loss by October 8, 2025 due to the earlier failure to enforce the Town's release order.

247. The report nevertheless does not reflect that officers initiated any investigation, took steps to preserve or recover the vehicle, halted or reversed the auction process, enforced or revisited the Town's release directive, coordinated with the Town regarding correction, accepted a sworn complaint, initiated a case number for unlawful detention or conversion, or undertook any action reasonably calculated to protect Plaintiff's property or preserve evidence despite clear notice of an ongoing deprivation.

**E. Pattern Reflected in Produced Police Reports**

248. Across all records produced in response to Plaintiff's public-records requests, the four police reports had minimal or no narrative; material and legally significant information was omitted; officer and supervisory involvement were documented in a way that obscured responsibility, frustrating Plaintiff's ability to track who did what; not one report cited any ordinance, statute, municipal code, written policy, or legal authority authorizing any action; and matters involving civil theft, conversion, unlawful detention, and destruction of Plaintiff's property were repeatedly classified as low-priority or civil.

249. These omissions and classifications, taken together, created a pattern that obscured liability and protected both the officers, the Town, their parking enforcement personnel, and the private contractor, to Plaintiff's severe detriment.

## XXIII. LINDSEY BURNS COMMUNICATIONS 43 DAYS AFTER FORMAL STOP-SALE NOTICE

250. From the date Defendants seized Plaintiff's vehicle in early June 2025 through mid-November 2025—a period exceeding one hundred seventy (170) days—Defendants categorically refused to negotiate, discuss release terms, provide itemization, or engage in any substantive dialogue regarding resolution. Throughout that period, Defendants' position was absolute: no negotiation, no discussion, and no release absent full payment of escalating charges they refused to document.

251. Furthermore, the communications initiated by Lindsey Burns on November 18, 2025 constituted Defendants' first self-initiated outreach or direct contact with Plaintiff of any kind since June 3, 2025, when Defendants took custody of her vehicle—marking the end of more than

one hundred seventy (170) days of complete silence. This outreach also represented the first time Defendants expressed any willingness to negotiate or discuss resolution, and it occurred only after Defendants had already salvage-branded the vehicle, received Plaintiff's formal stop-sale legal notice, and faced imminent legal exposure arising from that notice.

252. Defendants did not respond to Plaintiff's formal stop-sale legal notice for forty-three (43) days. On November 18, 2025—more than five months after the tow—Defendants, through Lindsey Burns, initiated direct contact only after Defendants had reversed prior representations that the vehicle was "gone," "sold," or "at auction."

253. Burns did not initiate contact by providing statutory lien documentation, certified-mail proof, sale records, or release paperwork. Instead, Burns's initial communications framed Defendants as having voluntarily "stopped" an alleged process and shifted immediately to in-person pickup and payment.

254. In a November 18, 2025 voicemail, Burns stated:

"You sent an email to our office… on the eleventh of November… and we are following up on that email… We still currently have it… we have stopped the process for you and we are waiting on further instructions on you picking up your vehicle."

255. Plaintiff did not send any email on November 11, 2025. Plaintiff had instead transmitted a Formal Legal Notice on October 7, 2025—forty-three (43) days earlier. Burns's voicemail

attributed contact and "instructions" to Plaintiff that Plaintiff did not make and characterized Defendants' cessation of an asserted "process" as discretionary.

256. Minutes later, Burns sent a written email stating:

"We received your below email… At your request, we have stopped the sale… We would be willing to negotiate with you on the fees but need to know when you will be picking up your vehicle."

257. Plaintiff requested documentation and clarity—including an itemized amount and proof— before committing to any pickup. Burns responded by returning to pickup timing rather than verification, stating:

"Once a fee is negotiated when can you pick up your vehicle?"

258. On November 19, 2025, Burns offered a reduced amount and imposed a deadline, stating:

"We would be able to get the total bill down to $2,255.91… This price would be good till 11/25/2025… Please let me know when you would be able to come in and settle this so you can pick up your vehicle."

259. At the time this offer was made, Defendants had previously represented that storage charges accrued at $30 per day plus tax, in addition to towing and administrative fees. Based on Defendants' own asserted fee structure and the length of detention by mid-November 2025, the purported balance would have exceeded $6,300–$6,500. The offered amount of $2,255.91 therefore reflected a reduction of more than sixty percent (60%) from the amount Defendants' prior representations indicated was owed.

260. Plaintiff requested (a) a dated photograph of the vehicle, (b) an itemized breakdown of charges, and (c) clarification of the consequences if the imposed deadline could not be met. Burns refused to provide any proof or itemization electronically and responded:

"You are more than welcome to look at the vehicle Monday – Friday from 8–5… If you come in we can print you an itemized bill."

261. Burns repeated that verification, documentation, and itemized billing would be provided only if Plaintiff appeared in person at the tow yard, conditioning all meaningful disclosure on physical presence at the tow yard.

262. All written communications sent by Kauff's between November 18 and November 20, 2025 were transmitted by Lindsey Burns and copied to Natalie Hunter. Hunter never introduced herself, never communicated directly with Plaintiff, and was never identified as a contact, decision-maker, or records custodian. Plaintiff did not initiate contact with Hunter and was never

informed of her role, yet Hunter remained copied on all material communications concerning the vehicle, asserted charges, and conditions for release.

263. At no time during the November 18–22 communications did Burns or any other representative disclose this corporate structure, the enterprise relationship, or that the detention, billing, and release decisions were emanating from Guardian Fleet Services' headquarters rather than merely the local tow yard.

264. On November 20, 2025, Burns wrote:

"We stopped the sale process as a courtesy for you when we received your email."

265. In the same communication chain, Burns asserted completed statutory compliance and threatened continuation of a sale process conditioned on payment, stating:

"Your vehicle has already gone through all of the Florida State Statute requirements and has already gone for sale… If you do not come pay for your vehicle… we will continue with the sale process."

266. Burns's written communications included an express admission that Defendants altered the claimed storage period, stating:

"The bill was reduced… by reducing the total days of storage… from 170 days to 61 days."

267. During this period, Burns repeatedly represented that Plaintiff could view and pick up the vehicle and stated words to the effect that the vehicle "looks the same as it did back in June," while not disclosing that the vehicle had already been designated salvage in national VIN systems.

268. On November 21, 2025, Burns transmitted a lengthy email purporting to explain statutory compliance and Defendants' alleged notice steps.

269. At the time these communications were transmitted, emails addressing statutory compliance or Defendants' legal authority were sent in dense, non-standard formatting with compressed spacing, small font size, and paragraph structures that materially impaired readability, searchability, screenshot capture, and accurate comprehension on standard mobile and desktop devices. As a result, Plaintiff was required to expend substantial time and effort re-opening, enlarging, re-formatting, cross-referencing, and reconstructing the contents of Defendants' communications in order to understand what was being asserted, what was being omitted, and how those assertions aligned—or failed to align—with statutory requirements and external records. This formatting materially delayed Plaintiff's ability to discover the significance, internal inconsistencies, and factual impossibilities contained in Defendants' written representations.

## XXI. The November 21, 2025 Email — Internal Contradictions, Statutory Impossibility, and Absence of Good-Faith Compliance

270. On November 21, 2025, Lindsey Burns transmitted a lengthy written response purporting to explain Defendants' compliance with Florida towing and lien "statue" and the asserted basis for continued detention, sale authority quoting,

"We follow the Florida State Statue for Towing and Lien Procedures. Basically, there are guidelines that we have to follow and we have done all of that with your vehicle. The Statue states we have to hold vehicles for a certain amount of days depending on the year of the vehicle and after that time is up the vehicle goes through a sale process. Once the sale date has passed, we have to process paperwork with the DMV to obtain a certificate of destruction to dispose of the vehicle. In that Statue it states we have to send certified mail to the address listed on file with the State that it is registered with. We have no other way to communicate with you as we do not have email addresses, phone numbers or any other contact information."

271. Burns's November 21, 2025 statements are materially misleading not only for what they affirmatively claim, but for what they omit and falsely imply. While asserting that Defendants "have done all" statutory towing and lien procedures and that the vehicle had proceeded through a sale process requiring DMV involvement, the email does not disclose that Defendants had already caused Plaintiff's vehicle to be reported or branded in interstate and national vehicle-history databases, impairing its title status and market value.

272. Plaintiff subsequently verified with the California Department of Motor Vehicles that no lien, transfer, salvage authorization, certificate of destruction, or ownership action relating to Plaintiff's vehicle was ever approved, authorized, or processed by the California DMV, and that no such action could lawfully occur absent a valid lien. As Defendants never possessed a lawful lien and failed to satisfy any statutory prerequisites required to invoke DMV authority, any

implication that Defendants lawfully engaged DMV processes to sell, dispose of, salvage, or take ownership of the vehicle was false.

273. In that email, Burns also asserted, among other things, that:

(a) Defendants had followed "all statue" towing and lien procedures;

(b) certified-mail notice was sent to Plaintiff on July 18, 2025;

(c) Defendants obtained Plaintiff's address through certified-mail inquiries to the Palm Beach County Sheriff's Office and the State of California;

(d) returned certified mail triggered lawful sale authority;

(e) the vehicle had proceeded through a sale process culminating on August 18, 2025; and

(f) Defendants thereafter processed paperwork to obtain a certificate of destruction.

274. The assertions in the November 21 email are contradicted by objective records, internal inconsistencies, and statutory requirements, including but not limited to the following:


**Impossibility of the Asserted Address-Location Narrative**

275. Burns claimed that Defendants obtained Plaintiff's Florida mailing address from the California Department of Motor Vehicles ("California DMV") on July 18, 2025. Plaintiff later obtained official California DMV records confirming that her address was not updated to her Florida residence until August 8, 2025, and that no inquiry, request, certified mailing, or address-related transaction associated with Plaintiff or her vehicle was received or processed by the California DMV during July 2025. Given standard DMV processing timelines—under which

Plaintiff herself waited from March until September 2025 for her duplicate title—California DMV records could not have produced Plaintiff's Florida address in the timeframe asserted.

276. Defendants were not required—and were not permitted—to rely on any out-of-state DMV inquiry to identify Plaintiff or her residence. Good-faith compliance with Florida Statute § 713.78 requires a towing operator to promptly search Florida DMV databases and to review all police reports and law-enforcement records relating to the tow for identifying information before the statutory notice deadline expires. Plaintiff's identity and Florida address were known or readily accessible through multiple contemporaneous sources, including: Defendants' communications with the Town of Palm Beach and PBPD on June 3, 2025 concerning the no-fee release order; Plaintiff's direct payment of citations to the Town using consistent identifying information; Plaintiff's in-person appearance at Kauff's on June 4, 2025 with her Florida driver's license, which Defendants reviewed; and police records generated in connection with the tow reflecting Plaintiff's identity and Florida residence.

**Non-Existence of the Asserted Sheriff's Office Inquiry**

277. Burns stated that Defendants sent a certified-mail inquiry to the Palm Beach County Sheriff's Office on June 9, 2025 to obtain Plaintiff's address. Plaintiff subsequently contacted the Sheriff's Office records division, which confirmed that no inquiry—certified mail, electronic request, database query, or otherwise—had ever been received from Kauff's regarding Plaintiff, her vehicle, or her address.

278. Even assuming that such an inquiry had occurred, Florida Statute does not permit a towing operator to delay or substitute certified-mail notice to the vehicle owner by initiating address

inquiries after the statutory notice period has ended. The statute requires certified-mail notice to the owner within five (5) business days by 11:00am of the tow, following prompt and good-faith efforts to identify the owner using readily available information.

279. Here, Plaintiff appeared in person on June 4, 2025—within one (1) day of the tow—and provided government-issued identification bearing her Florida address. Any subsequent claim that Defendants could not locate Plaintiff and therefore initiated address inquiries days later is inconsistent with both the statute's good-faith requirements and the undisputed fact that Plaintiff's address had already been provided.

280. Defendants' asserted June 9, 2025 inquiry—six (6) days after the vehicle was taken into custody and after expiration of the statutory owner-notice period—could not toll, extend, or substitute for the statute's mandatory requirement that certified notice be sent to the owner within five (5) business days. Accordingly, the asserted inquiry cannot support the existence of any lawful lien or sale authority

**Absence of Any Certified-Mail Proof**

281. Although Burns asserted that certified mail was sent to two addresses and returned as unclaimed, Defendants produced no certified-mail receipts, USPS tracking numbers, return-receipt ("green card") records, envelope images, mailing logs, or other contemporaneous documentation corroborating those assertions. Plaintiff never received any certified mail from Defendants at any address.

282. Florida Statute § 713.78 requires towing operators to maintain lien-notice and certified-mail records for a minimum of three (3) years and to produce such records upon request within a reasonable time. Defendants have produced none.

**The Omitted July 30, 2025 USPS "First Attempt" Slip and Its Incompatibility With Defendants' Asserted Notice Timeline**

283. The only postal document ever left at Plaintiff's residence was a USPS Form 3849 "First Attempt" slip dated July 30–31, 2025. The slip contained no certified-mail notation, tracking number, article number, or statutory disclosures, did not disclose the contents of the attempted mailing and was never followed by a second delivery attempt. Defendants' multiple asserted notice timelines never referenced this July 30 slip, despite it being the only postal document actually received by Plaintiff. Standing alone, the slip did not constitute certified mail and did not satisfy any notice requirement under Florida Statute § 713.78.

**Statutory Noncompliance if Defendants' own Assertions Were True**

284. Even if Defendants' asserted mailing timeline were accepted as true, the described conduct would still fail to satisfy Florida Statute § 713.78. The statute requires timely, good-faith, certified-mail notice containing specific disclosures within prescribed deadlines. Returned or unclaimed mail does not trigger sale authority, does not commence a redemption period, and does not cure untimely or defective notice.

**Absence of Good-Faith Effort**

285. In her November 21 email, Burns asserted that Defendants relied exclusively on certified mail to attempt notice. That assertion omits multiple readily available and statutorily relevant avenues for locating and contacting Plaintiff. At all relevant times, Defendants had access to law-enforcement and municipal records generated in connection with the June 2–3, 2025 immobilization and tow, including police and parking-enforcement reports identifying Plaintiff, her vehicle, and her involvement. Defendants also had direct access to Town records reflecting Plaintiff's June 3 payment and the Town-issued no-fee release order. Defendants further had the ability—and statutory obligation—to conduct a Florida Department of Highway Safety and Motor Vehicles owner search, which would have identified Plaintiff and her Florida address within seconds. Defendants' records do not reflect that any such Florida DMV owner search was conducted.

286. These omissions occurred despite Plaintiff's in-person appearance on June 4, 2025, during which she presented government-issued identification bearing her Florida address, and despite Defendants' continued possession of the vehicle thereafter. The absence of any documented effort to consult police reports, Town records, or Florida DMV databases demonstrates that Defendants did not undertake timely, affirmative, or good-faith efforts to locate or notify Plaintiff.

**Continued Reliance on Discretionary Framing**

287. The November 21 email continued to frame cessation of sale activity as a discretionary accommodation ("we stopped the sale process as a courtesy") rather than a legal obligation

arising from defective notice and lack of statutory authority, reinforcing that Defendants treated statutory compliance as optional rather than mandatory.

**Material Omissions**

288. Despite purporting to "explain everything," the November 21 email did not disclose that the vehicle had already been salvage-branded, did not disclose any VIN-based title impairment, and did not explain how payment could restore Plaintiff to her pre-tow property interest.

289. Plaintiff responded by demanding underlying and contemporaneous proof, including certified-mail receipts, USPS tracking, lien documentation, sale records, DMV and sheriff correspondence, and internal logs. Burns then ceased responding.

290. Nine days later, Guardian Fleet Services' Chief Operating Officer entered the same email chain, adopted the same narrative, and escalated the exchange, confirming that Burns's communications were supervised and ratified at the executive level.

## XXIV. THE NOVEMBER 19, 2025 IMPOUND INVOICE, WITHHELD DISPUTE INFORMATION, AND PAYMENT INSTRUCTIONS

291. On November 19, 2025—more than one hundred seventy (170) days after seizing Plaintiff's vehicle and after repeated requests for receipts, itemization, and billing documentation—Defendants generated an "Impound Invoice" dated November 19, 2025, issued by Kauff's Towing & Recovery, Inc.

292. This invoice was the first written billing document Defendants provided to Plaintiff, despite months of escalating payment demands and Plaintiff's repeated requests for documentation necessary to understand, verify, dispute, or resolve the asserted charges.

293. The invoice was not issued to Plaintiff. Instead, it lists the account holder and purchaser as "Palm Beach Police," yet Defendants presented the invoice to Plaintiff as a personal financial obligation required for release of her vehicle.

294. The invoice is titled "Impound Invoice," lists the invoice date as November 19, 2025, and identifies the "Reason for Tow" solely as "Impound," without reference to any statute, ordinance, citation threshold, or other lawful authority authorizing the tow or continued detention.

295. Despite the Town of Palm Beach having deemed the tow unauthorized and having issued a no-fee release directive, the invoice assessed towing, storage, administrative, research, notification, and lien-related charges, stating a total "Amount Due: $2,255.91."

296. The invoice reflects towing-related charges totaling $219.50, notwithstanding the Town's express determination that no towing or storage fees were authorized.

297. The invoice further reflects a claimed storage duration of approximately sixty-one (61) days, even though Defendants had detained Plaintiff's vehicle for more than one hundred seventy (170) days at the time the invoice was issued.

298. Defendants provided no explanation for the discrepancy between the stated storage duration and the actual length of detention, nor did they provide contemporaneous billing records accounting for the remaining period.

299. Prior to issuing the invoice, Defendants had repeatedly represented to Plaintiff that storage accrued at $30 per day plus tax, in addition to towing and administrative fees, which—based on the duration of detention by mid-November 2025—would have resulted in a balance exceeding approximately $6,300–$6,500.

300. The invoice imposed a payment deadline of November 25, 2025, representing a reduction of more than sixty percent (60%) from the amount implied by Defendants' prior representations, without explanation.

301. The invoice contains mandatory consumer-protection language expressly advising recipients of dispute and complaint mechanisms. Specifically, the invoice states, verbatim:

"If you have questions or complaints about non-consent tows that are not resolved by the towing company management, contact the Palm Beach County Consumer Affairs Division, West Palm Beach, Florida, telephone 561-712-6600 or by internet at www.pbcgov.com/consumer."

302. The invoice also specifies accepted forms of payment, stating verbatim that payment may be made by:

"Cash, money order or valid traveler's check and valid debit card, which shall include but not be limited to Mastercard."

303. Despite these express dispute instructions and payment options appearing on the face of the invoice, Defendants did not provide the invoice to Plaintiff until more than five months after the seizure of her vehicle.

304. As a result of Defendants' prolonged withholding of the invoice, Plaintiff was denied timely access to the very consumer-protection channels, third-party oversight mechanisms, and documented payment options expressly identified on the invoice itself.

305. During the period in which the invoice was withheld, Defendants maintained exclusive custody and control over all billing records, lien documentation, and communications concerning Plaintiff's vehicle.

306. Defendants' first provision of any invoice occurred only after Plaintiff issued a formal stop-sale notice, Defendants' legal exposure became imminent, and after at least 5 requests.


## XXV. EXECUTIVE-LEVEL INVOLVEMENT AND COMMUNICATIONS BY GUARDIAN FLEET'S SENIOR EXECUTIVE, THOMAS A. TEDFORD III

307. Defendant Thomas A. Tedford III is a senior executive of Guardian Fleet Services, Inc., the parent company of Kauff's Towing & Recovery. Tedford joined Guardian Fleet in or around March 2022 as Chief Operating Officer (COO) and exercised enterprise-wide operational oversight over towing practices, lien processing, billing procedures, and compliance across Guardian Fleet's affiliated companies.

308. As of November 2025, Tedford had assumed the role of Chief Executive Officer (CEO) of Guardian Fleet Services, a leadership transition reflected in Guardian Fleet's 2025 corporate communications and executive activities.

309. At all relevant times in late 2025, including during the issuance of the November 19, 2025 impound invoice and Defendants' first written billing communications following months of silence, Tedford held enterprise-level authority over Guardian Fleet's towing operations, billing

practices, lien enforcement, and compliance functions.

310. Tedford has more than thirty-five (35) years of experience in the towing industry and is a Towing Industry Hall of Fame inductee, as well as a nationally recognized trainer, lecturer, and industry authority on towing operations, statutory notice requirements, lien enforcement, and towing compliance.

311. On December 1, 2025, after nine days of no response from Lindsey Burns, Tom Tedford joined the email chain and responded to Plaintiff's requests for certified-mail receipts, USPS tracking attempts, returned envelopes, law enforcement outreach records, and itemized invoices.

312. In his December 1, 2025 communication, Tedford asserted, verbatim:

"In response to your requests below we have all the back up and information on file for this and I have completed a full review. Everything is in order and in full compliance with FL State Statue and the notification and lien process to dispose of the vehicle for failure to pay the charges owed."

313. In the same communication, Tedford further represented, verbatim:

"This has gone on for some time and as your aware you have had several notices regarding such."

314. Tedford then stated that the documentation Plaintiff had repeatedly requested would not be produced unless and until litigation, writing:

"The documents you requested can be produced at trial as evidence and will be in a counter

claim for legal and administrative fees in addition to full funds due for storage and towing on the

vehicle."

315. Tedford further asserted that storage charges would continue to accrue and attributed the

continued accrual to Plaintiff's preservation request, stating:

"Those of which will continue to accrue because of your request (which we honored) to not sell

or dispose of the vehicle as per statute allows."

316. Tedford also represented that Defendants retained possession of the vehicle, stating:

"We are in possession of the vehicle exactly in the condition of the date it was towed and

brought into our possession."

317. Tedford then imposed a deadline and threatened disposition, writing:

"Again, and for the final time would you like to pick up and claim your vehicle? You have until

December 15th to do so at which time we will continue forward with the sale/disposal process to

satisfy the fees owed and place a lien on your license in the state of FL as is allowed by statute."

318. In the same communication, Tedford conditioned release of the vehicle on payment and

invited payment negotiations, stating:

"If you would like to claim it, I will consider any reasonable offer you feel you can make payment on."

319. Tedford concluded by threatening litigation if payment was not made, stating:

"Otherwise, file suit and we will begin legal proceedings as well."

320. Despite asserting full statutory compliance, Tedford did not provide Plaintiff with certified-mail lien notices, statutory sale notices, itemized billing records, or any documentary proof of compliance with Florida lien and sale statutes, notwithstanding Plaintiff's written requests and the statutory requirement that such documentation be made available to permit verification of compliance. Specifically, Tedford failed to produce:

(a) any certified-mail receipts, tracking records, or delivery attempts for lien or sale notices;

(b) any statutory notice of sale or documentation of a VIN-identified public auction;

(c) any itemized towing or storage invoices supporting the charges demanded; or

(d) any documentation demonstrating lawful compliance with Florida lien and sale statutes.

321. Instead of producing compliance documentation, Tedford expressly linked Plaintiff's pursuit of legal remedies to escalating financial consequences while denying Plaintiff the ability to verify whether Defendants lawfully possessed the vehicle or had legal authority to demand payment, including:

(a) asserted counterclaims for Guardian's legal and administrative fees;

(b) continued accrual of storage and towing charges dating back to June 2025 and accruing daily thereafter;

(c) threatened sale or disposal of the vehicle;

(d) threatened placement of a lien on Plaintiff's driver's license, despite no lawful authority permitting such action under the cited statutes; and

(e) the assertion that Plaintiff's October 7, 2025 legal notice and request to preserve the vehicle constituted a "courtesy," for which Plaintiff would be held financially responsible through continued and retroactive storage charges.

322. At no time during or after Tedford's involvement did Defendants disclose or produce proof of certified-mail lien notice, a VIN-identified public auction, or any lawful statutory sale documentation for Plaintiff's vehicle. Nor did Tedford disclose that the vehicle had been designated or treated as salvage, despite affirmatively representing that Defendants retained the vehicle "exactly in the condition of the date it was towed" and simultaneously demanding payment and inviting Plaintiff to make "any reasonable offer" to recover the vehicle, thereby requiring Plaintiff to consider payment without disclosure of the vehicle's true legal and economic status and preventing timely verification of statutory compliance or the validity of any asserted lien.

## XXVI. STATEMENT OF FACTS AS OF TIME OF FILING

323. This Statement of Facts reflects the record as it exists at the time of filing. Plaintiff has revised and supplemented this section repeatedly in good faith as new information, documents, and admissions have surfaced through her own sustained investigation, undertaken without counsel and while the underlying conduct remained ongoing. The facts set forth herein represent only what Plaintiff has been able to confirm through public records, preserved communications,

and Defendants' own representations. Given the pattern of withheld documentation, shifting narratives, and delayed disclosures described above, Plaintiff reasonably anticipates that formal discovery will reveal additional facts concerning the scope, coordination, intent, and duration of the conduct at issue, including conduct affecting other property owners similarly situated.

## COUNT I – UNREASONABLE SEIZURE OF PROPERTY

(U.S. Const. amend. IV; Art. I, § 12, Fla. Const.; 42 U.S.C. § 1983)

Against All Defendants Who Participated in, Authorized, Directed, Ratified, Enforced, or Failed to Intervene in the Unlawful Seizure and Continued Detention of Plaintiff's Property

### A. Incorporation

324. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

### B. The Initial Seizure Was Unreasonable Ab Initio

325. On June 2–3, 2025, Defendants jointly caused Plaintiff's 2016 Toyota Prius to be immobilized and towed while it was non-operational, non-hazardous, and not subject to any statutory or ordinance-based towing authority.

326. At the time of immobilization and towing, Plaintiff had no delinquent citations, no qualifying violations, and no legally cognizable enforcement status that could authorize seizure of her vehicle under Florida law or the Town of Palm Beach Code of Ordinances.

327. Civilian parking-enforcement personnel lacked jurisdiction to issue or rely upon registration-based citations under Florida law. The enforcement of vehicle registration requirements is governed by Chapter 316, Florida Statutes, and is reserved to sworn law-enforcement officers authorized under Fla. Stat. §§ 316.640 and 316.650. Civilian parking-enforcement personnel possess no statutory authority to enforce registration violations or to initiate seizure on that basis. Any registration-based citations issued or relied upon by civilian personnel were therefore void ab initio and legally incapable of supporting immobilization or towing.

328. No Florida statute, municipal ordinance, or lawfully adopted regulation authorizes the immobilization or towing of a vehicle based solely on parking citations, regardless of number.

329. The purported "three-ticket rule" referenced by Defendants is not codified, not enacted by any statute, town ordinance, municipal code, or resolution, not disclosed through lawful notice, and has no legal force.

330. Even if such a rule had lawfully existed, Plaintiff did not qualify for immobilization or towing under any such purported rule.

331. Defendants therefore lacked legal authority to seize Plaintiff's vehicle, rendering the immobilization and tow unreasonable under the Fourth Amendment from their inception.

## C. Lack of Notice and Procedural Safeguards

332. Defendants executed the seizure without any advance notice, warning, opportunity to be heard, opportunity to cure, or legally sufficient pre-deprivation process.

333. This failure occurred in addition to Defendants' lack of statutory authority and reliance on invalid citations.

334. Defendants made no attempt to contact Plaintiff prior to seizure despite ready access to her identifying information and the availability of non-seizure alternatives.

335. The seizure was therefore independently unreasonable even assuming arguendo that lawful authority existed —which it did not.

## D. Continuing Seizure After Acknowledged Illegality

336. On June 3, 2025, Town officials determined that the immobilization and tow were unauthorized and issued a no-fee release order directing the immediate return of Plaintiff's vehicle.

337. Despite that determination and directive, Defendants jointly refused to release the vehicle on multiple occasions, including again on June 4, 2025, after Plaintiff presented proof of ownership. Defendants have since jointly and repeatedly refused lawful release of the vehicle without payment, from that date forward and continuing to the present.

338. Defendants' joint and repeated refusals to release Plaintiff's vehicle after the illegality of the seizure was acknowledged constitute an ongoing Fourth Amendment seizure.

## E. Seizure by Coercion and Threat of Arrest

339. When Plaintiff sought enforcement of the no-fee release order, Palm Beach Police Department officers threatened Plaintiff with arrest and jail if she attempted to retrieve or drive her own vehicle pursuant to that directive, and further stated that if the vehicle were returned to her street it would receive daily citations and be subject to repeated towing.

340. These threats, combined with Defendants' show of official authority, their inaction in enforcing the release directive, and their endorsement of Kauff's continued towing and detention, restrained Plaintiff's freedom of movement and interfered with her possessory rights and her ability to contest the tow, effectuating a continued seizure through coercion rather than physical force.

341. By misrepresenting the law, threatening criminal enforcement, refusing to follow a municipal release order, and withholding all lawful remedies, Defendants prevented Plaintiff from exercising control over her property, thereby compounding and perpetuating the ongoing unreasonable seizure.

## F. Prolonged Detention and Constructive Seizures

342. Defendants continued to detain Plaintiff's vehicle for months without lawful lien authority, statutory notice, or due process.

343. Defendants' refusal to provide receipts, documentation, or disclosure of lien status obstructed Plaintiff's ability to reclaim or protect her property and constituted additional constructive seizures.

344. Defendants falsely represented that the vehicle had been sold or auctioned, depriving Plaintiff of the ability to assert her ownership rights.

345. Defendants demanded coercive payment under threat of permanent loss, constituting seizure by extortion under color of law.

## G. Destruction Seizure

346. On August 18, 2025, Defendants caused Plaintiff's vehicle to be designated as salvage without lawful authority, notice, or lien rights.

347. The salvage designation permanently extinguished Plaintiff's ownership interests, rendered the vehicle unusable, and destroyed its market value.

348. The destruction of Plaintiff's property interest constituted a final and irreversible Fourth Amendment seizure.

## H. State Action and Joint Participation

349. Guardian Fleet Services and Kauff's Towing acted jointly with municipal officials and under color of state law in executing and prolonging the seizures described herein.

350. Defendants' actions were interdependent, coordinated, and mutually reinforcing, rendering each Defendant liable for the unconstitutional seizures.

## I. Causation and Damages

351. As a direct and proximate result of Defendants' unreasonable seizures and related misconduct, Plaintiff suffered the loss of her vehicle and its use, substantial financial loss and economic disruption, fear of driving, fear of arrest and retaliation by law-enforcement personnel, and significant daily emotional distress. Defendants' actions interfered with Plaintiff's daily living, mobility, autonomy, future plans, and sense of personal security, resulting in anxiety, humiliation, and ongoing psychological harm associated with the sudden and prolonged deprivation of her property.

352. These emotional and psychological injuries were the foreseeable and natural consequences of Defendants' conduct and constitute compensable damages under 42 U.S.C. § 1983, independent of and in addition to Plaintiff's economic losses.

**WHEREFORE,** Plaintiff seeks all compensatory damages (including emotional, general, punitive, and future damages), declaratory and injunctive relief, attorney's fees available under law, and any other relief as set forth in the Prayer for Relief.

## COUNT II – DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS OF LAW

(U.S. Const. amend. XIV; Art. I § 9, Fla. Const.; 42 U.S.C. § 1983)

Against All Defendants Who Participated in, Authorized, Directed, Enforced, Ratified, Concealed, or Failed to Remedy the Deprivation of Plaintiff's Property Without Constitutionally Adequate Notice, Hearing, or Opportunity to Be Heard

## A. Nature of the Due-Process Violations

353. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

354. This Count challenges Defendants' failure to provide constitutionally required notice, a meaningful opportunity to be heard or cure, and any adequate pre- or post-deprivation remedy before, during, and after the taking, detention, and ultimate destruction of Plaintiff's property.

355. At all relevant times, Defendants acted under color of state law and pursuant to municipal authority, delegated enforcement power, or joint participation.

356. Plaintiff possessed a clear and constitutionally protected property interest in her 2016 Toyota Prius, which was her primary asset of substantial personal and financial value.

## B. Absence of Pre-Deprivation Notice or Opportunity to Be Heard

357. The Fourteenth Amendment and Article I, § 9 of the Florida Constitution prohibit any governmental deprivation of property without due process of law, which requires notice reasonably calculated to reach the owner and a meaningful opportunity to be heard or cure before seizure or forfeiture.

358. Plaintiff's vehicle was safely parked, non-obstructing, and not abandoned when Defendants immobilized and later towed it.

359. The Town's parking citations affirmatively represented that the sole consequence of nonpayment within fourteen (14) days was the addition of a $20 late fee. No citation warned of booting, towing, immobilization, seizure, or loss of property.

360. Any reasonable resident reviewing the Town's citations and public website would conclude that enforcement consequences were limited to monetary penalties (i.e., late fees), and that no custodial or property-seizure consequences would occur absent further notice.

360. The Town's public website states that a citation may be contested for up to ninety (90) days after issuance, thereby conveying that citations are not treated as final or subject to escalated enforcement action prior to the expiration of the appeal period. The website and citations contain no published escalation policy, warning, or notice of immobilization or towing, nor do they reference any enacted town ordinance or municipal code authorizing such escalation.

362. Proceeding with immobilization and towing during an active appeal period, and without any published escalation policy or lawful authorization, violated the Town's own stated procedures and deprived Plaintiff of her right to contest or cure.

363. Defendants made no attempt to contact Plaintiff before the deprivation, despite possessing or having immediate access to her name, mailing address, resident parking permit information, email address, and citation payment history. Had Defendants provided Plaintiff with any opportunity to be heard, they would have learned that Plaintiff had been actively and continuously attempting compliance for months, including pursuing issuance of a duplicate title and lawful registration—delays outside Plaintiff's control. Under those circumstances, continued registration-based citations and escalation against a stationary vehicle pending compliance served no legitimate public interest and exceeded any lawful enforcement authority, rendering the escalation arbitrary and unconstitutional.

**C. Constitutionally Deficient "Notice" and Invisible Boot Placement**

364. No public or individualized notice preceded the immobilization of Plaintiff's vehicle. Defendants provided no posted notice, mailed notice, electronic notification, warning on any citation, notice on the Town's website or payment portal, and no officer initiated contact by phone, email, or in person—despite all such contact information being readily available and reasonable to use under the circumstances.

365. Defendants relied exclusively on a homemade warning sign affixed to the vehicle with duct tape including a handwritten request for "cashier's check or money order only" and invoked the issuing authority of the "police department," despite listing no lawful basis, statute, ordinance, or codified authority authorizing immobilization or tow.

366. The homemade "warning sign" contained no statutory basis, no deadline, no timeline, no cure period, no hearing or appeal rights, no citation to legal authority, no explanation of consequences for noncompliance, no officer identification, no Town letterhead, and no warning that towing was imminent.

367. The boot was placed on the front wheel facing away from Plaintiff's residence. Plaintiff passed the vehicle multiple times from the rear on June 2-3, 2025 under ordinary conditions and observed no visible notice or indication that the vehicle had been immobilized.

368. Because the purported notice was not visible, intelligible, or reasonably calculated to reach Plaintiff prior to deprivation, and was not legally sufficient, it failed to satisfy the requirements of due process under Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306 (1950).

369. The homemade warning sign further demanded payment by cash-equivalent instruments only, in violation of § 713.78(2)(a), Florida Statutes, independently rendering the notice facially improper and legally deficient.

**D. Tow Executed Without Any Pre-Deprivation Procedure**

370. The Town maintained no safeguard to ensure actual notice before towing, including no mailing requirement, no electronic alert, no permit-holder cross-check, and no supervisory verification.

371. Because no constitutionally adequate notice was given prior to the boot, the boot itself constituted a pre-hearing deprivation.

372. Relying solely on homemade and legally defective immobilization warning sign as justification for towing compounded the due-process violation by stacking one unlawful deprivation atop another without any intervening process or opportunity to be heard.

373. Plaintiff first learned of any enforcement action only after discovering her vehicle missing—the precise harm that due process exists to prevent.

**E. Deliberate Withholding of Itemized Receipt for Over 170 Days**

374. On June 4, 2025, Plaintiff appeared at Kauff's and expressly requested an itemized towing receipt. That request was refused. Despite repeated follow-up requests, Defendants continued to withhold any itemized receipt or statutory notice for more than one hundred seventy (170) days following the original tow.

375. When Defendants eventually produced an itemized receipt, it expressly stated: "If you have questions or complaints about non-consent tows that are not resolved by the towing company

management, contact the Palm Beach County Consumer Affairs Division…" and provided a telephone number and internet address for initiating third-party review.

376. By deliberately withholding this receipt, Defendants deprived Plaintiff of notice of her right to third-party intervention and neutral review—the very mechanism through which the legality of the tow and continued detention could have been immediately challenged—while Defendants and Palm Beach Police Department officers simultaneously misrepresented the law and conveyed that Plaintiff had no remedy other than payment.

377. Had Plaintiff been provided the statutorily required receipt when first requested, she would have been informed of the Consumer Affairs process and could have promptly sought review, preventing the prolonged detention and escalation. The deliberate suppression of this notice foreclosed Plaintiff's meaningful opportunity to be heard and directly contributed to the continuation of the unlawful deprivation.

## F. Deliberate Silence and Joint Misrepresentation Foreclosing a Meaningful Opportunity to Be Heard

378. At every critical stage following the unlawful immobilization and tow, Defendants—acting individually and jointly—failed to inform Plaintiff of her right to contest the seizure, seek neutral review, or obtain judicial relief.

379. Neither Kauff's, Guardian Fleet, the Town, nor Palm Beach Police Department officers advised Plaintiff that she could challenge the tow, seek court intervention, or pursue third-party remedies if the vehicle was not released pursuant to the Town's no-fee release order. Instead,

each entity conveyed—explicitly or implicitly—that Plaintiff's only option was compliance through payment.

380. Palm Beach Police Department officers misrepresented the law by characterizing the matter as "civil," discouraging further action, and declining to provide access to reports, enforcement, or judicial pathways, despite knowledge that the Town had determined the tow was unauthorized.

381. Kauff's and Guardian Fleet reinforced the same false narrative by denying the existence of any dispute mechanism and demanding payment as the sole path to recovery.

382. Had any Defendant accurately informed Plaintiff—at any stage—of her right to contest the tow or seek neutral or judicial review, the prolonged detention, escalating charges, and ultimate destruction of Plaintiff's property would not have occurred.

383. The coordinated silence, omissions, and misrepresentations deprived Plaintiff of notice, foreclosed access to remedies, and denied her the opportunity to be heard at a meaningful time and in a meaningful manner, in violation of procedural due process.

**G. Deliberate Withholding of Statutorily Required Notices and Safeguards**

384. After taking possession of Plaintiff's vehicle, Kauff's and Guardian Fleet failed to provide any statutorily required notices explaining the legal basis for the seizure or the continued detention.

385. Defendants did not disclose the claimed authority for possession, the asserted basis for any lien, the amount allegedly owed on a daily or cumulative basis, or how such charges were calculated.

386. Defendants further failed to notify Plaintiff of her right to contest the tow or continued detention before a neutral third party, or that continued detention could result in sale, auction, or permanent loss of her vehicle.

387. These omissions deprived Plaintiff of notice that her ownership interest was at risk and foreclosed any meaningful opportunity to challenge the detention, dispute the charges, or prevent irreversible loss.

388. The safeguards Defendants withheld—itemized billing, lien disclosure, dispute rights, notice of sale, and deadlines—are mandatory protections imposed by law precisely to prevent predatory detention and enforcement of disputed or unlawful liens.

389. Defendants' failure to provide these safeguards cannot be attributed to oversight. Had Defendants been acting pursuant to lawful authority and a valid lien, there would have been no legitimate basis to withhold the notices required to justify and subject their actions to review.

## H. Engineered Impossibility and Denial of a Meaningful Opportunity to Cure

390. When Plaintiff attempted to recover her vehicle, Kauff's demanded "current registration" and "original title," despite knowing that Plaintiff's duplicate title was already in active DMV processing, that Defendants' own lien entry prevented registration renewal, and that Florida law does not require current registration or an original title for release of an impounded vehicle.

391. Defendants thereby created a deliberate "Catch-22" that made compliance impossible and foreclosed any meaningful opportunity to cure, in violation of due process. Fuentes v. Shevin, 407 U.S. 67 (1972).

**I. Final Deprivation, Substantive Due Process, and Damages**

392. Defendants ultimately branded Plaintiff's vehicle as "junk/salvage" without statutory lien notice, certified mail, DMV notice, or any opportunity to contest, permanently extinguishing Plaintiff's ownership interests.

393. Defendants' conduct was arbitrary, conscience-shocking, and wholly unrelated to any legitimate governmental objective, constituting substantive due-process violations.

394. Defendants' actions directly and proximately caused Plaintiff to suffer severe financial loss, emotional distress, anxiety, humiliation, hypervigilance, and prolonged destabilization—foreseeable consequences of depriving a person of her sole vehicle without notice, hearing, or remedy.

**WHEREFORE,** Plaintiff seeks all compensatory damages (including emotional, general, punitive, and future damages), declaratory and injunctive relief, attorney's fees available under law, and any other relief as set forth in the Prayer for Relief

**COUNT III — RETALIATION FOR EXERCISE OF FIRST AMENDMENT RIGHTS**

(42 U.S.C. § 1983; U.S. Const. amends. I & XIV)

Against All Defendants Who, Acting Under Color of State Law, Participated in, Directed, Enforced, Ratified, or Failed to Prevent Retaliatory Actions Taken in Response to Plaintiff's Protected Speech and Petitions for Redress

### A. Incorporation and Legal Basis

395. Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.

396. This Count arises under 42 U.S.C. § 1983 and the First and Fourteenth Amendments. Defendants retaliated against Plaintiff for engaging in protected First Amendment activity, including questioning unlawful government conduct, seeking enforcement of a municipal Release Order, requesting public records and statutory tow documentation, and attempting to file complaints and reports.

### B. Plaintiff Engaged in Protected Activity

397. Plaintiff engaged in protected First Amendment conduct when she, among other things:

(a) questioned the legality of the June 2–3 tow;

(b) requested PBPD enforcement of the Town's written Release Order;

(c) attempted to file a theft, conversion, or criminal complaint;

(d) challenged false statements of law made by PBPD and Parking Enforcement;

(e) disputed retaliatory citations issued to her second vehicle;

(f) submitted public-records and preservation requests; and

(g) insisted on her right to retrieve her lawfully owned vehicle.

398. Plaintiff exercised these rights through lawful inquiry, requests for documentation, and peaceful petitioning of government officials.

## C. Adverse Actions Taken in Retaliation

399. In direct response to Plaintiff's protected activity, Defendants took adverse actions that would deter a person of ordinary firmness from asserting constitutional rights, including:

(a) refusing to enforce the Town's Release Order;

(b) threatening Plaintiff with arrest and jail if she failed to comply with Defendants' purported "only options," in direct defiance of the no-fee release order;

(c) deliberately withholding lawful options to cure;

(d) discouraging Plaintiff from appearing at the police station and instead threatening police presence at her home;

(e) refusing to accept, review, or read Plaintiff's detailed written police reports, despite the submission of overwhelming supporting evidence and proof of statutory violations;

(f) misclassifying, minimizing, and suppressing Plaintiff's attempted criminal report;

(g) omitting involved officers and material facts from official reports, retroactively manipulating narratives through selective reporting, and in some instances omitting narratives entirely;

(h) impersonating and invoking law-enforcement authority to coerce immediate compliance, suppress objections, and shield unlawful conduct from neutral governmental review, including by asserting police-backed authority where none existed;

(i) deliberately obstructing and ignoring eleven (11) preservation demands and public-records requests;

(j) engaging in selective silence and misrepresentation of the law when disclosure would have enabled Plaintiff to contest the seizure, access remedies, or petition the government for redress;

(k) chilling Plaintiff's speech in order to block her right to petition the government for redress, while misrepresenting the law to deter Plaintiff from unknowingly exercising her constitutional rights.

**D. Retaliatory Motive and Causal Connection**

400. Defendants' retaliatory actions followed immediately after and because of Plaintiff's protected speech and petitions for redress.

401. Defendants' motive is evidenced by the timing, escalation, and explicit linkage between Plaintiff's requests and Defendants' punitive responses, including statements indicating that continued assertion of rights would result in increased enforcement, surveillance, daily fees, loss of property, or arrest and jail.

**E. Retaliation by Kauff's and Guardian Fleet Acting Under Color of Law**

402. Acting jointly with municipal officials and under color of state law, Kauff's Towing & Recovery and Guardian Fleet Services retaliated against Plaintiff by:

(a) refusing to comply with the Town's Release Order;

(b) imposing fabricated and unlawful release conditions;

(c) withholding statutorily required tow documentation, itemized billing, and mandatory third-party contest and appeal information;

(d) making false representations of legal authority; and

(e) issuing coercive threats of escalating fees, liens, and disposal of Plaintiff's vehicle.

(f) attempting to induce Plaintiff to pay money under threat of permanent loss while concealing material facts regarding the vehicle's disposition.

403. After Plaintiff requested preservation of evidence, demanded statutory tow documentation, disputed false statements of law, and indicated her intent to pursue judicial relief, Guardian Fleet Services' CEO, Thomas A. Tedford III, sent a retaliatory communication on behalf of Kauff's and Guardian Fleet.

404. Tedford expressly linked punitive consequences to Plaintiff's protected activity, threatening that if Plaintiff did not "negotiate" payment and retrieve the vehicle by December 15, she would be required to:

(a) pay all attorney's fees incurred, including not only her own but also those purportedly incurred on behalf of Guardian Fleet Services and Kauff's Towing & Recovery;

(b) pay all accumulated storage charges retroactive to June 3;

(c) forfeit ownership of her vehicle through sale or disposal; and

(d) face placement of a lien against her driver's license until payment—an assertion with no basis in law.

405. These threats were knowingly false, coercive, and designed to deter Plaintiff from accessing the courts, pursuing public-records remedies, or continuing to petition for redress, and would deter a person of ordinary firmness from exercising First Amendment rights.

**F. Chilling Effect and Harm**

406. Defendants' conduct was intended to—and did—chill Plaintiff's exercise of her First Amendment rights.

407. As a direct and proximate result of Defendants' retaliation, Plaintiff suffered fear of arrest, emotional distress, psychological intimidation, loss of access to her property, financial harm, and deterrence from further petitioning government authorities.

408. A person of ordinary firmness would have been deterred from continuing to engage in protected speech under these circumstances.

**G. Liability**

409. Defendants' retaliatory conduct violated Plaintiff's clearly established rights under the First and Fourteenth Amendments and is actionable under 42 U.S.C. § 1983. Defendants acted individually and jointly, pursuant to municipal customs, practices, and failures of training and supervision, and with deliberate indifference to Plaintiff's constitutional rights.

**WHEREFORE,** Plaintiff seeks all compensatory damages (including emotional, general, punitive, and future damages), declaratory and injunctive relief, attorney's fees available under law, and any other relief as set forth in the Prayer for Relief.

## COUNT IV — FAILURE TO INTERVENE

(42 U.S.C. § 1983; U.S. Const. amends. I, IV & XIV; Fla. Const. art. I §§ 9 & 12)

Against All Individual Defendants Who, While Acting Under Color of State Law, Witnessed, Knew of, or Had Reason to Know of Ongoing Constitutional Violations Against Plaintiff and Had the Authority and Opportunity to Prevent or Mitigate Such Violations, Including Sworn Law-Enforcement Officers, Supervisors, Dispatch and Records Personnel, and Enforcement Officials of the Town of Palm Beach

### A. Incorporation and Clearly Established Duty

410. Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.

411. At all relevant times, the Failure-to-Intervene Defendants were sworn PBPD officers, supervisors, dispatchers, or records personnel acting under color of state law.

412. It is clearly established that law-enforcement officers and supervisory personnel have an affirmative duty to intervene when they witness, know of, or have reason to know of an ongoing constitutional violation and have the ability to prevent it. This duty extends to unlawful seizures,

coercion, retaliation, denial of due process, obstruction of access to courts, spoliation of evidence, and joint public-private misconduct.

**B. Failure to Intervene in the June 2–3 Unlawful Seizure**

413. On June 2–3, 2025, multiple PBPD officers were physically present during the booting, towing, and seizure of Plaintiff's vehicle.

414. These officers knew or had reason to know that no lawful towing authority existed, that Plaintiff's citations were non-delinquent and contestable, and that Parking Enforcement was misrepresenting law and facts.

415. Officers further knew that Town personnel later acknowledged the tow was unauthorized and issued a written no-fee Release Order.

416. Despite this knowledge and their ability to act, no officer intervened to stop the seizure, correct false statements of law, or enforce the Town's directive. At all times, these officers possessed the authority and practical ability to intervene, correct the unlawful conduct, or enforce the Town's directive without risk to officer safety.

**C. Failure to Intervene in Coercion, Threats, and Retaliation on June 3**

417. On June 3, multiple PBPD officers were present while Plaintiff was threatened with arrest and jail if she attempted to retrieve or drive her own lawfully owned vehicle.

418. Officers heard and spoke false statements of law, observed Plaintiff's distress, and witnessed and engaged in intimidation designed to suppress her objections and protected speech.

419. No officer intervened to correct the false legal claims, explain Plaintiff's rights, or stop the coercive threats, thereby enabling unconstitutional retaliation and psychological restraint.

**D. Failure to Intervene in Ongoing Deprivation After the Release Order**

420. After issuance of the Town's written Release Order, PBPD officers knew that Kauff's was defying the directive and imposing unlawful and impossible release conditions.

421. Officers were present while Kauff's asserted false "government rules," demanded unlawful payments, and continued detaining Plaintiff's vehicle.

422. Officers failed to intervene to enforce the Release Order or halt the ongoing unconstitutional deprivation.

**E. Failure to Intervene in Misclassification, Obstruction, and Evidence Suppression**

423. PBPD officers, supervisors, and records personnel became aware that Plaintiff attempted to file criminal complaints related to the unlawful seizure and detention.

424. These personnel misclassified the matter as "civil," omitted involved officers from reports, discouraged Plaintiff from appearing at the station, and obstructed documentation.

425. Records and supervisory personnel received detailed preservation and public-records requests concerning officer misconduct and material evidence.

426. Despite knowledge of the seriousness of the allegations, they failed to intervene to preserve evidence, halt deletion, or correct misclassification, facilitating spoliation and denial of access to courts.

### F. Failure to Intervene in Joint Public–Private Coercion and Retaliation

427. PBPD officers were present while Kauff's employees mocked Plaintiff, refused release, asserted false legal authority, and engaged in retaliatory and coercive conduct.

428. Officers had the authority and opportunity to stop this joint misconduct but instead lent implicit state authority through silence and presence.

### G. Causation and Damages

429. Had any Defendant intervened at any stage, the unlawful seizure, detention, retaliation, evidence suppression, and ultimate destruction of Plaintiff's property could have been prevented or mitigated.

430. Defendants' collective failure to intervene directly and proximately caused Plaintiff to suffer loss of property, financial harm, emotional distress, fear of law enforcement, and lasting psychological injury.

**WHEREFORE,** Plaintiff seeks all compensatory damages (including emotional, general, punitive, and future damages), declaratory and injunctive relief, attorney's fees available under law, and any other relief as set forth in the Prayer for Relief.

## COUNT V — DENIAL OF ACCESS TO COURTS / MISCLASSIFICATION

(42 U.S.C. § 1983; U.S. Const. Amends. I & XIV; Fla. Const. art. I §§ 9 & 21)

Against the Town of Palm Beach; Individual Palm Beach Police Department Officers, Supervisors, and Records Personnel Acting Under Color of State Law; Kauff's Towing & Recovery, Inc.; Guardian Fleet Services, Inc.; and Individual Defendants Who Knowingly Obstructed, Suppressed, or Chilled Plaintiff's Access to Judicial Remedies

### A. Incorporation and Nature of the Claim

431. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

432. This Count arises from Defendants' deliberate obstruction of Plaintiff's right to meaningful access to the courts by misclassifying criminal complaints, falsifying and suppressing official records, concealing available judicial remedies, intimidating Plaintiff away from court, and allowing evidence critical to redress to be destroyed.

433. The constitutional right of access to courts protects both:

(a) forward-looking access—the ability to stop an ongoing constitutional violation; and

(b) backward-looking access—the ability to obtain a remedy for completed violations.

Defendants violated both.

### B. Initial Misclassification and Creation of a False Official Narrative

434. On June 2–3, 2025, Plaintiff sought police assistance to contest and halt an unlawful tow and seizure of her vehicle.

435. PBPD officers knowingly created and ratified false and incomplete records that:

(a) omitted the presence of multiple officers;

(b) omitted threats of arrest and false statements of law;

(c) omitted the Town's admission of error and issuance of a Release Order; and

(d) falsely framed the encounter as routine and civil in nature.

419. These false entries became the official narrative later relied upon to block Plaintiff's criminal complaints and deny investigation.

**C. October 6–7 Refusal to Accept Criminal Complaints**

436. On October 6, 2025, Plaintiff returned to PBPD to file criminal complaints arising from an ongoing unlawful deprivation of her vehicle, including theft, conversion, extortion, fraud, refusal to obey a municipal release order, and evidence destruction.

437. PBPD officers and supervisors refused to accept or document Plaintiff's complaints, knowingly misclassifying them as "civil" despite awareness that:

(a) the Town had declared the tow unauthorized;

(b) a written Release Order existed;

(c) the deprivation was ongoing; and

(d) Plaintiff faced imminent permanent loss of her vehicle.

438. A supervisory officer further instructed Plaintiff not to return to the station and instead suggested an officer would come to her home—an action that ensured no written complaint, case number, or investigative file would be created.

## D. Records Suppression and Evidence Destruction

439. PBPD records personnel received Plaintiff's detailed preservation and public-records requests concerning officer identities, body-camera footage, CAD logs, and dispatch records.

440. Despite knowing the requests concerned serious misconduct and ongoing litigation risk, records personnel:

(a) issued generic "no records exist" responses;

(b) refused to identify custodians;

(c) failed to preserve responsive evidence; and

(d) allowed critical records to be deleted or concealed.

425. This conduct directly caused spoliation of evidence necessary for Plaintiff to seek judicial relief.

## E. Concealment of Judicial Remedies

441. At no point—on June 2–3, July 1–2, October 6–7, or thereafter—did any PBPD officer inform Plaintiff that she could seek immediate judicial relief, including but not limited to:

(a) filing an emergency motion or writ to recover unlawfully seized property;

(b) obtaining a court order enforcing the Town's Release Order; or

(c) seeking court-supervised release or bonding of the vehicle.

427. This omission occurred despite officers knowing Plaintiff faced imminent and irreversible loss of her sole vehicle and that judicial intervention was the only remaining means to halt the deprivation.

442. Concealing available court remedies while simultaneously issuing threats of arrest, discouraging Plaintiff from returning to the station, and misrepresenting her legal options constituted deliberate interference with Plaintiff's right of access to the courts.

**F. Court-Chilling Threats by Guardian Fleet's CEO Tom Tedford**

443. When Plaintiff requested proof of certified-mail notice, statutory lien compliance, and the legal basis for continued detention of her vehicle, Defendant Tom Tedford, Chief Executive Officer of Guardian Fleet Services, did not provide documentation or lawful justification. Instead, he responded with explicit threats conditioned on Plaintiff's decision to pursue judicial relief or continue contesting the detention.

444. Tedford expressly warned that if Plaintiff did not "negotiate" payment and retrieve the vehicle by a fixed deadline—and instead chose to go to court or continue asserting her rights— she would be subjected to punitive consequences, including being required to: (a) pay all attorney's fees allegedly incurred, including those purportedly incurred on behalf of Guardian Fleet Services and Kauff's Towing & Recovery; (b) pay all accumulated storage charges

retroactive to June 3, notwithstanding the Town's no-fee Release Order; (c) forfeit ownership of her vehicle through sale or disposal; and (d) face placement of a lien against her driver's license, an assertion with no basis in Florida law.

445. These threats were knowingly false and materially misleading. Tedford knew or had reason to know that Plaintiff was proceeding pro se; that storage charges were unlawful following issuance of the Town's Release Order; that no certified-mail notice or statutory lien compliance had occurred; and that Florida law does not authorize a lien against a driver's license for towing or storage charges. Tedford simultaneously withheld material facts, including the absence of lawful notice and the imminent or completed salvage designation of Plaintiff's vehicle.

446. By conditioning severe financial penalties, permanent loss of property, and fabricated legal consequences on Plaintiff's decision to seek judicial relief, Tedford deliberately chilled Plaintiff's right of access to the courts and interfered with her ability to obtain timely judicial review, constituting actionable denial of access and retaliation in violation of the First and Fourteenth Amendments under 42 U.S.C. § 1983.

## G. Actual Injury

447. As a direct and foreseeable result of Defendants' obstruction:

(a) Plaintiff was unable to halt the ongoing deprivation;

(b) critical evidence was destroyed;

(c) unlawful storage and lien actions proceeded unchecked; and

(d) Plaintiff's vehicle was permanently salvage-branded and lost.

448. Plaintiff suffered concrete financial loss, loss of property, loss of judicial remedies, and severe emotional distress.

**H. Municipal Liability**

449. Defendants Town of Palm Beach and PBPD are liable under Monell because Plaintiff's injuries were caused by customs, practices, and failures to train, including:

(a) routine misclassification of towing complaints as "civil";

(b) tolerance of falsified or incomplete police records;

(c) suppression of complaint filing; and

(d) records practices that permit evidence destruction.

**WHEREFORE,** Plaintiff seeks all compensatory damages, including emotional, general, punitive, and future damages; declaratory and injunctive relief; attorney's fees available under law; and any other relief as set forth in the Prayer for Relief.

**COUNT VI — CIVIL CONSPIRACY TO DEPRIVE CONSTITUTIONAL RIGHTS**

(42 U.S.C. § 1983; U.S. Const. Amends. IV & XIV; Fla. Const. art. I §§ 9 & 12; Florida Common Law)

Against the Town of Palm Beach; Individual Law-Enforcement Officers, Supervisors, and Parking-Enforcement Personnel Acting Under Color of State Law; Kauff's Towing & Recovery,

Inc.; Guardian Fleet Services, Inc.; and Doe Defendants 1–40 Who Knowingly Participated in, Ratified, or Furthered the Conspiracy

## A. Incorporation and Legal Standard

450. Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.

451. This Count arises under 42 U.S.C. § 1983 and Florida common law. A civil conspiracy exists where two or more persons, acting under color of state law or in joint action with state actors, reach an agreement—express or tacit—to deprive a person of constitutional rights, and commit overt acts in furtherance of that agreement that cause injury.

452. A conspiracy need not be formal or explicit. A "meeting of the minds" may be inferred from coordinated conduct, shared false narratives, mutual reinforcement, collective inaction, and post-event ratification.

453. This conspiracy falls outside any intracorporate-conspiracy doctrine because it involves multiple independent legal actors, including a municipality, sworn law-enforcement officers, civilian parking-enforcement personnel, and private towing and fleet-management corporations acting jointly.

## B. Agreement and Shared Unlawful Objective

454. Beginning no later than June 2, 2025, and continuing thereafter, Defendants entered into a coordinated agreement to unlawfully seize, detain, and permanently deprive Plaintiff of her

111

vehicle without lawful authority or due process, and to conceal and ratify that deprivation through intimidation, misinformation, report suppression, and obstruction of judicial remedies.

455. The shared unlawful objectives of the conspiracy included:

(a) depriving Plaintiff of possession and ownership of her vehicle;

(b) preventing Plaintiff from retrieving the vehicle despite a municipal release order;

(c) coercing compliance through threats of arrest and escalating penalties;

(d) extracting unlawful storage fees and leveraging fabricated lien authority; and

(e) suppressing complaints, evidence, and access to courts to avoid accountability.


**C. Joint Action Under Color of Law**

456. Public-sector Defendants and private Defendants acted jointly and in concert. Parking-enforcement personnel initiated the seizure; PBPD officers enforced and escalated it; supervisory officials ratified, participated in, and orchestrated the conduct while repeatedly refusing correction or lawful intervention; and Kauff's Towing & Recovery and Guardian Fleet Services detained the vehicle and imposed fabricated release conditions and unlawful lien assertions.

457. PBPD officers were physically present during critical stages of the deprivation, refused to enforce a Town-issued no-fee Release Order, threatened Plaintiff with arrest if she attempted to retrieve or drive her vehicle, and thereby lent official authority to Kauff's continued detention of Plaintiff's property.

458. Kauff's and Guardian could not have accomplished the continued deprivation without PBPD's active participation, threats, and refusal to intervene. Their conduct is therefore attributable to the state for purposes of § 1983.

## D. Overt Acts in Furtherance of the Conspiracy

459. In furtherance of the agreement, Defendants committed overt acts including, but not limited to:

(a) enforcing a tow and continued detention without statutory authority;

(b) refusing to release the vehicle after the Town acknowledged the tow was unauthorized and issued a written Release Order;

(c) threatening Plaintiff with arrest and jail if she attempted to retrieve or drive her vehicle;

(d) imposing fabricated and impossible release conditions known to be unattainable;

(e) issuing uniform false statements of law to Plaintiff across agencies and entities;

(f) misclassifying criminal complaints as "civil" to block investigation;

(g) omitting involved officers and material facts from official reports; and

(h) suppressing or allowing destruction of evidence relevant to Plaintiff's claims.

## E. Causation and Constitutional Injury

460. As a direct and proximate result of Defendants' conspiracy, Plaintiff suffered:

(a) unlawful seizure and prolonged detention of her vehicle;

(b) permanent deprivation of property through salvage branding and loss of ownership value;

(c) denial of due process and access to courts;

(d) financial loss and economic instability; and

(e) emotional distress, fear of law enforcement, and loss of personal security.

461. Each Defendant is liable for the acts of every co-conspirator committed in furtherance of the conspiracy, regardless of individual motive or degree of participation.

**F. Municipal and Supervisory Liability**

462. The Town of Palm Beach and PBPD are liable because the conspiracy was enabled, ratified, and perpetuated through municipal customs, practices, and failures to train or supervise, including routine non-enforcement of release orders, misclassification of complaints, and tolerance of joint misconduct with towing contractors.

**G. Florida Common-Law Conspiracy**

463. Defendants also entered into an agreement to commit unlawful acts and lawful acts by unlawful means under Florida law, including conversion, unlawful detention of property, and obstruction of legal remedies, resulting in damages to Plaintiff.

**H. Relief**

464. Defendants' conduct was willful, malicious, and undertaken with reckless or callous indifference to Plaintiff's federally protected rights, entitling Plaintiff to compensatory and punitive damages, declaratory and injunctive relief, and all other relief available at law and in equity.

**WHEREFORE,** Plaintiff seeks all compensatory damages, including emotional, general, punitive, and future damages; declaratory and injunctive relief; attorney's fees available under law; and any other relief as set forth in the Prayer for Relief.

## COUNT VII — EQUAL PROTECTION

(Class of One; Selective Enforcement; Selective Non-Protection; Arbitrary and Retaliatory Treatment)

(U.S. Const. amend. XIV; 42 U.S.C. § 1983)

Against the Town of Palm Beach; Individual Law-Enforcement Officers and Supervisors Acting Under Color of State Law; Civilian Parking-Enforcement Personnel; Kauff's Towing & Recovery, Inc.; Guardian Fleet Services, Inc.; and Doe Defendants 1–20 Who Participated in or Ratified the Discriminatory Conduct

### A. Incorporation

465. Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.

**B. Governing Principles**

466. The Equal Protection Clause prohibits government actors from intentionally treating a person differently from others similarly situated without a rational basis, including through selective enforcement, selective non-protection, or retaliatory application of discretionary authority.

467. A "class-of-one" Equal Protection violation occurs where a plaintiff is singled out for harsher treatment than a similarly situated comparator for reasons wholly unrelated to any legitimate governmental objective.

468. Private actors who jointly participate with municipal officials in discriminatory or arbitrary enforcement act under color of state law and are liable under 42 U.S.C. § 1983.

**C. Similarly Situated Comparator**

469. Plaintiff and her immediate neighbor were similarly situated in all material respects:

(a) same street and neighborhood;

(b) same Parking Enforcement personnel;

(c) same citation type;

(d) same municipal rules and procedures.

470. The neighbor contested her citation and was treated respectfully, provided review, and granted relief without escalation.

471. Plaintiff, by contrast, was subjected to hostility, misrepresentation of law, retaliatory escalation, fabricated delinquency, threats, and coercive enforcement.

472. The disparate treatment of Plaintiff and her neighbor—under identical circumstances—constitutes class-of-one discrimination.

## D. Selective and Retaliatory Enforcement

473. After Plaintiff questioned unlawful citations and enforcement practices, Parking Enforcement escalated enforcement against her by issuing knowingly invalid citation types and doubling citations across two vehicles.

474. The same Parking Enforcement Officer continued issuing citations she knew were improper, creating a false appearance of repeated violations applicable only to Plaintiff.

475. No ordinance authorized immobilization or towing for the alleged violations. Enforcement instead relied on an unpublished and standardless "three-ticket rule" selectively invoked against Plaintiff.

476. The use of a non-codified rule left enforcement to personal discretion, enabling favoritism toward some residents and punitive targeting of Plaintiff.

## E. Selective Non-Protection and Falsification

477. When Plaintiff reported theft, conversion, extortion, and unlawful detention of her vehicle, PBPD refused to accept or document criminal complaints and misclassified the matter as "civil."

478. PBPD omitted material facts from official records, including the presence of multiple officers, threats of arrest, and the Town's issuance of a written release order.

479. In contrast, PBPD routinely accepts reports, documents officer involvement, and preserves evidence for similarly situated residents.

480. PBPD's selective refusal to protect Plaintiff, document her complaints, or preserve evidence constitutes discriminatory non-protection.

## F. Discriminatory Intimidation and Impersonation

481. After Plaintiff contacted the Town to question improper citations, the same Parking Enforcement Officer left a voicemail falsely identifying herself as "Palm Beach Police… parking," directing Plaintiff to police dispatch.

482. The officer was not a sworn police officer and had no authority to invoke PBPD identity.

483. This impersonation of police authority was used to intimidate, coerce immediate payment, and shield her unlawful actions from neutral review at the detriment of Plaintiff and her rights and was not employed against other residents.

484. The use of false police authority against Plaintiff constitutes arbitrary and retaliatory discrimination without legitimate governmental purpose.

## G. Joint Participation by Tow Contractors

485. Kauff's and Guardian jointly participated with PBPD and Parking Enforcement in the discriminatory scheme by refusing to release Plaintiff's vehicle despite proof of ownership and a municipal release order.

486. Defendants imposed uniquely burdensome and unattainable requirements on Plaintiff— never applied to other vehicle owners—ensuring she could not reclaim her property.

487. This coordinated conduct made Kauff's and Guardian state actors for purposes of Equal Protection liability.

## H. Municipal Liability

488. Plaintiff's unequal treatment resulted from municipal customs and practices, including:

(a) tolerating retaliatory enforcement;

(b) shielding officers who violate rights;

(c) misclassifying criminal complaints as "civil";

(d) failing to train on Equal Protection limits; and

(e) permitting private contractors to operate without oversight.

475. These customs were the moving force behind Plaintiff's constitutional injury.

## I. Injury

489. As a direct and proximate result of Defendants' discriminatory and arbitrary treatment, Plaintiff suffered loss of her vehicle, loss of property rights, emotional distress, intimidation, financial harm, and denial of equal protection of the laws.

**WHEREFORE,** Plaintiff seeks all compensatory damages, including emotional, general, punitive, and future damages; declaratory and injunctive relief; attorney's fees available under law; and any other relief as set forth in the Prayer for Relief.

## COUNT VIII — SUPERVISORY LIABILITY, RATIFICATION, AND DIRECT PARTICIPATION

(42 U.S.C. § 1983; U.S. Const. Amends. IV & XIV; Art. I §§ 9 & 12, Fla. Const.)

Against Individual Supervisory Defendants Acting Under Color of State Law

**Defendants Subject to This Count**

490. This Count is asserted against supervisory officials and lead enforcement personnel of the Palm Beach Police Department ("PBPD"), the Town of Palm Beach, and associated civilian enforcement actors, including Defendant Fred Waymire, Defendant Loretta Brown, and any other supervisory personnel whose actions, approvals, directives, ratifications, or knowing failures contributed to the unconstitutional seizure, continued deprivation, coercive intimidation, suppression of reporting, destruction of evidence, denial of due process, and denial of access to courts alleged herein.

## A. Incorporation and Legal Basis

491. Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.

492. At all relevant times, each supervisory defendant acted under color of state law and exercised—or claimed to exercise—authority over subordinate officers, civilian parking-enforcement personnel, and other enforcement actors who carried out or perpetuated the unconstitutional seizure, continued deprivation, coercive intimidation, and suppression described in this Complaint.

493. Supervisory liability under 42 U.S.C. § 1983 attaches where a supervisor: personally participates in unconstitutional conduct; directs subordinates to engage in it; knowingly allows it to continue; ratifies or approves it; permits it to persist as a custom or practice; or conceals it with deliberate indifference to obvious constitutional violations.

494. Each supervisory defendant encompassed by this Count satisfies one or more of these bases for liability.

## B. Supervisory Direction, Approval, and Ratification

495. On June 2 and June 3, 2025, supervisory defendants knowingly approved, authorized, or allowed an unlawful tow predicated on jurisdictionally void citations, fabricated enforcement authority, and nonexistent delinquency, and failed to stop subordinates from carrying out an unconstitutional seizure.

495. On June 2 and June 3, 2025, supervisory defendants knew or should have known that the tow was predicated on jurisdictionally void citations, fabricated enforcement authority, and nonexistent delinquency. Rather than intervene, they approved, authorized, permitted, or failed to stop the unconstitutional seizure, and repeatedly participated in conduct that violated Plaintiff's constitutional rights and obstructed her access to justice.

496. Supervisory defendants ratified the concealment of multiple officers present at the scene, approved or tolerated a false official narrative minimizing officer involvement, and permitted records to reflect only a single responding officer despite the presence and participation of numerous officers engaged in coercive enforcement and intimidation.

497. Supervisory defendants actively participated in and authorized coercive enforcement, including threats of arrest, jail, and repeated towing despite the absence of any lawful authority, and deliberately misrepresented governing law under color of police authority in order to compel submission and deter resistance.

498. At the same time, supervisory defendants engineered a false and punitive choice framework by presenting Plaintiff with only unlawful, punitive, or impossible "options," while deliberately withholding and suppressing lawful remedies, including enforcement of the Town's written no-fee release directive and recognition of Plaintiff's ownership and entitlement to immediate possession of her vehicle

## C. Role of Lead Civilian Enforcement and Denial of Neutral Review

499. Defendant Loretta Brown, as lead parking-enforcement personnel, exercised de facto supervisory authority over citation issuance, escalation decisions, and coordination with PBPD officers and the towing contractor.

500. Brown initiated and escalated enforcement actions outside statutory jurisdiction, persisted in those actions after notice of defect, and acted with knowledge that her conduct would trigger seizure, detention, and coercive downstream consequences.

501. In addition to initiating unlawful enforcement, Brown deliberately intercepted, displaced, and obstructed neutral municipal review by presenting herself as acting under police authority and by invoking the Palm Beach Police Department to deflect accountability for her own conduct. By doing so, Brown denied Plaintiff meaningful access to neutral Town processes, foreclosed corrective intervention, and prevented review of the legality of her actions.

502. This impersonation and misuse of police-adjacent authority was designed to suppress scrutiny, maintain the appearance of lawful enforcement, and force Plaintiff into submission and payment under duress, while shielding Brown and associated actors from oversight and consequence. Supervisory defendants at the town knowingly allowed this conduct to proceed and thereby ratified it.


### D. Suppression of Complaints and Obstruction of Reporting

503. Supervisory defendants knowingly prevented or obstructed Plaintiff from filing a criminal complaint in October 2025, misclassified her reports as "civil," and isolated her from formal reporting and documentation channels.

504. Defendant Fred Waymire, acting in a supervisory and command capacity, threatened Plaintiff with arrest and jail, misrepresented the scope of police authority and jurisdiction, offered only punitive and unlawful "options," instructed Plaintiff not to come into the police station to file a report, and affirmatively withheld and obstructed Plaintiff's access to lawful remedies and recorded complaint procedures.

505. Waymire's conduct constituted direct participation in the constitutional violations, not mere inaction, and was undertaken with knowledge that the underlying seizure and detention were unlawful.

506. These actions demonstrate intentional suppression of complaints, obstruction of access to courts, and ratification of ongoing constitutional violations by supervisory personnel.

**E. Supervisory Role in Evidence Destruction and Spoliation**

507. Supervisory defendants deliberately failed to preserve body-camera footage, dispatch logs, tow-authorization records, portal records, and scene-presence documentation despite repeated written preservation demands and public-records requests.

508. Supervisory defendants allowed evidence to be deleted, altered, withheld, or misclassified—including "no records exist" responses—and failed to implement corrective measures, demonstrating deliberate indifference and ratification of unconstitutional conduct.

**F. Causation and Harm**

509. The constitutional violations committed by subordinate officers and civilian enforcement actors were the direct and foreseeable result of supervisory defendants' actions, approvals, directives, concealment, and ratification.

510. As a direct and proximate result of these supervisory violations, Plaintiff suffered:

(a) unlawful loss of her vehicle and constitutionally protected property interest;

(b) permanent destruction of title integrity, equity, and trade-in value;

(c) severe financial harm, instability, and cascading economic consequences;

(d) emotional trauma, humiliation, and ongoing psychological distress;

(e) persistent fear of retaliation, fear of driving, and fear of further enforcement abuse; and

(f) lasting loss of trust in law-enforcement and municipal institutions.

## G. Liability Statement

511. Each supervisory defendant is individually liable under 42 U.S.C. § 1983 for personally participating in, directing, approving, concealing, and ratifying unconstitutional conduct that deprived Plaintiff of her rights under the Fourth and Fourteenth Amendments and corresponding provisions of the Florida Constitution.

**WHEREFORE**, Plaintiff seeks compensatory damages, punitive damages where permitted by law, declaratory relief, and such other relief as the Court deems just and proper for the constitutional violations committed by the supervisory Defendants.

## COUNT IX — MONELL – MUNICIPAL LIABILITY

Failure to Train, Supervise, and Discipline; Unconstitutional Customs and Practices

(42 U.S.C. § 1983; U.S. Const. amend. XIV)

Against the Town of Palm Beach

### A. Incorporation

512. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

### B. Legal Standard

513. A municipality is liable under 42 U.S.C. § 1983 when a constitutional injury is caused by an official policy, an unofficial custom with the force of law, a failure to train or supervise amounting to deliberate indifference, or the ratification of unconstitutional conduct by officials with final policymaking authority. Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978).

514. Municipal liability does not require a written policy; a persistent practice, pattern of tolerance, or knowing failure to act in the face of obvious constitutional violations—amounting to deliberate indifference—is sufficient.

514A. Plaintiff alleges municipal liability on multiple independent and alternative Monell theories, each of which independently establishes liability.

**C. Absence of Any Lawful Policy or "Three Ticket Rule" Authorizing the Unlawful Seizure**

515. At all relevant times, the Town of Palm Beach had no enacted ordinance, written policy, or publicly disclosed procedure authorizing immobilization, towing, or prolonged detention of a safely parked residential vehicle based solely on unpaid parking citations or alleged registration issues.

516. No Town citation, notice, website, payment portal, or appeal instruction warned residents that vehicle immobilization, towing, or forfeiture could occur under the circumstances imposed on Plaintiff.

517. Despite the absence of lawful authority, Town employees, PBPD officers, and the Town's towing contractor routinely immobilized and towed vehicles as a matter of practice, establishing a de facto custom untethered to law.

517A. The unlawful enforcement practices described herein were not isolated to Plaintiff, but reflect a broader municipal custom applied to other residents of Palm Beach, including vehicles immobilized or towed under the same nonexistent "three-ticket rule." The full scope, duration, and frequency of this practice are within Defendants' exclusive possession, custody, and control and will be established through discovery.

**D. Failure to Train and Supervise on Towing, Due Process, and Enforcement Limits**

518. The Town and PBPD failed to train officers, supervisors, and civilian enforcement personnel on fundamental constitutional and statutory requirements governing:

(a) lawful seizure of private property;

(b) verification of delinquency before escalation;

(c) pre- and post-deprivation due process;

(d) enforcement of municipal release orders;

(e) limits on towing, lien, and storage authority; and

(f) prohibitions on retaliation, intimidation, and misrepresentation of law.

519. The need for such training was obvious, as towing and vehicle seizure directly implicate the Fourth and Fourteenth Amendments and predictably result in constitutional injury when mishandled. The risk that these failures would result in unlawful seizures, prolonged detention, and deprivation of property was obvious, predictable, and known to municipal policymakers.

520. This failure to train and supervise was a moving force behind the unlawful seizure, its continuation, continued detention, retaliation, and ultimate deprivation of Plaintiff's vehicle in a manner that was foreseeable and recurring absent intervention.

**E. Supervisory Misconduct and Failure to Discipline (Parking Enforcement)**

521. Defendant Loretta Brown, a supervisory parking-enforcement official, knowingly exceeded her jurisdictional authority by issuing invalid citations, orchestrating enforcement escalation, and directing subordinates to issue the same unlawful citations against Plaintiff.

522. Brown knowingly relied on and enforced a nonexistent "three-ticket rule," initiated escalation prior to any lawful delinquency, double-ticketed Plaintiff, and targeted Plaintiff for enforcement not applied to similarly situated residents.

523. Brown further impersonated or invoked police authority to intimidate and coerce compliance, intercept neutral review, shield herself from accountability, and permitted subordinates to do the same.

524. Despite repeated warning signs, internal inconsistencies, and the Town's later admission that the tow was unauthorized, the Town failed to discipline, retrain, or remove Brown from supervisory authority, thereby ratifying her misconduct and confirming its alignment with municipal custom.

525. This failure to discipline and supervise constituted deliberate indifference and signaled institutional approval of unconstitutional enforcement practices.

**F. Unconstitutional Custom of Deferring Police Power to a Private Towing Contractor**

526. The Town and PBPD maintained an unconstitutional custom of deferring enforcement authority to a private towing contractor, including decisions regarding vehicle release, lien posture, storage charges, and continued detention.

527. PBPD officers repeatedly refused to enforce the Town's written no-fee release order, instead treating the contractor as the final authority despite knowing the tow was unauthorized.

528. This practice unlawfully delegated police power to a profit-motivated private actor without oversight, safeguards, or accountability.

**G. Supervisory Ratification and Post-Notice Participation by PBPD**

529. Supervisory PBPD personnel, including Fred Waymire, had actual knowledge of the unlawful seizure, lack of legal authority, and the Town's release directive.

530. Rather than correcting the violations, supervisory officials affirmatively misrepresented the law, discouraged Plaintiff from filing reports, restricted access to the police station, and exerted institutional pressure on Town employees to withhold information "for liability reasons."

531. Supervisory officials further participated in post hoc narrative manipulation by shifting the asserted basis for the seizure, suppressing documentation, and allowing the unlawful detention to continue.

532. This conduct constituted ratification of unconstitutional acts and reflected official policy through action and inaction.

### H. Defective Recordkeeping, Conflicts of Interest, and Evidence Suppression

533. The Town and PBPD maintained recordkeeping practices that routinely:

(a) misclassified encounters to avoid evidence creation;

(b) omitted involved officers and material facts from reports;

(c) failed to preserve body-camera, CAD, and dispatch records;

(d) ignored or mishandled preservation demands; and

(e) routed public-records requests through conflicted personnel.

534. The Town permitted a parking-enforcement officer directly involved in the underlying seizure to access and handle Plaintiff's public-records requests and enforcement-related records, creating a clear conflict of interest and undermining neutral review.

535. Supervisors failed to correct over eleven defective public-records responses and multiple ignored preservation demands, further evidencing institutional indifference.

## I. Failure to Enforce the Town's Own Release Order

536. After issuing a written no-fee release order, the Town failed to ensure its enforcement by its contractor.

537. Town officials knew or should have known the order was being ignored, yet took no action to compel compliance or protect Plaintiff's property. Final policymaking authority relevant to towing enforcement, release compliance, discipline, and contractor oversight resided with Town and PBPD command-level officials responsible for enforcement policy, contractor supervision, and disciplinary action.

538. This failure directly enabled the continued unlawful detention and escalation of harm.

## J. Causation

539. The unconstitutional customs, failures to train, failures to supervise, conflicts of interest, and supervisory ratification described above were the direct and proximate cause of:

(a) the unlawful seizure of Plaintiff's vehicle;

(b) refusal to release it despite municipal order;

(c) prolonged detention without due process;

(d) suppression and destruction of evidence; and

(e) permanent deprivation of Plaintiff's property.

540. But for these municipal policies and omissions, Plaintiff's constitutional injuries would not have occurred.

## K. Municipal Liability Statement

541. The Town of Palm Beach is liable under Monell because Plaintiff's injuries were caused by official customs, deliberate indifference, and policymaker ratification—not by isolated misconduct.

## L. Relief Sought Under This Count

542. Plaintiff seeks compensatory damages, declaratory relief, and appropriate injunctive relief against the municipal Defendants for the constitutional violations described herein. Because the same enforcement architecture remains operative.

542A.  Plaintiff seeks injunctive and declaratory relief not only to remedy past harm but to prevent recurrence of the same constitutional violations against other residents, for whom damages alone would be inadequate.

## COUNT X — LIABILITY OF GUARDIAN FLEET SERVICES, INC.

State Action; Joint Participation; Delegated Municipal Authority

(42 U.S.C. § 1983 — Fourth & Fourteenth Amendments)

Against Guardian Fleet Services, Inc. and its wholly owned division Kauff's Towing & Recovery, Inc.

### A. Incorporation

543. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

### B. Guardian Acted Under Color of State Law

544. Defendant Guardian Fleet Services, Inc. ("Guardian"), acting through its wholly owned division Kauff's Towing & Recovery, exercised state-delegated coercive power by executing, prolonging, and escalating the seizure, detention, and threatened disposal of Plaintiff's vehicle.

545. Guardian acted under color of state law through multiple, independently sufficient doctrines, including:

a. Public-Function Doctrine — performing vehicle seizure, detention, and impound functions traditionally and exclusively reserved to law enforcement;

b. Joint-Action Doctrine — acting in concert with Palm Beach Police Department ("PBPD") officers who enforced, enabled, and ratified Guardian's conduct; and

c. Delegated-Authority Doctrine — exercising municipal seizure, lien, and release authority delegated by the Town of Palm Beach without oversight.

546. PBPD officers repeatedly deferred to Guardian as the final authority on release, lien posture, storage charges, and continued detention — even after the Town issued a written no-fee release order acknowledging the tow was unauthorized.

## C. Joint Action With Law Enforcement

547. On June 3, 2025, PBPD officers were physically present while Guardian:

a. refused to release Plaintiff's vehicle in defiance of a Town release directive;

b. asserted fabricated legal requirements and false lien authority;

c. demanded unlawful payment; and

d. continued detaining Plaintiff's vehicle.

548. Rather than intervene, PBPD officers threatened Plaintiff with arrest, misrepresented the law, and classified the matter as "civil," thereby enforcing Guardian's conduct through police authority.

549. PBPD's presence, threats, and refusal to act transformed Guardian's private conduct into state-enforced coercion, satisfying the joint-action requirement under § 1983.

## D. Enforcement of Nonexistent Law

550. Guardian justified the seizure and detention of Plaintiff's vehicle by invoking a purported "three-ticket rule" and other supposed governmental requirements that do not exist in any Florida statute, municipal ordinance, or published Town policy.

551. Guardian nonetheless enforced these fabricated rules as binding law, using police backing to compel compliance.

552. Enforcement of a nonexistent legal standard under color of law constitutes arbitrary state action and violates the Due Process Clause of the Fourteenth Amendment.

**E. Policymaker Ratification by Guardian's CEO**

553. In or about November 2025, Defendant Thomas Tedford became Chief Executive Officer of Guardian Fleet Services, Inc.

554. On December 1, 2025, Tedford personally communicated with Plaintiff in his capacity as Guardian's CEO, threatening continued detention, retroactive storage charges, loss of the vehicle, and fabricated legal penalties if Plaintiff sought court relief.

555. Tedford further asserted that Guardian had complied with Florida lien and notice law despite knowing that no certified notices existed and that the underlying tow had been deemed unauthorized by the Town.

556. Tedford's communications constitute final-policymaker ratification and personal escalation of the unconstitutional seizure and detention, and reflect Guardian's official corporate policy and enforcement posture for purposes of § 1983 liability.

(a) At the time of his communications with Plaintiff, Defendant Thomas Tedford had recently ascended to the position of Chief Executive Officer of Guardian Fleet Services, Inc., assuming centralized authority over Guardian's nationwide towing operations, compliance posture, lien enforcement practices, and release determinations.

(b) Since approximately 2022—and accelerating under Tedford's rise into executive leadership—Guardian Fleet Services, Inc. expanded from fewer than twenty (20) towing operations to more than forty-five (45) locations operating across multiple states, pursuant to a centralized corporate growth and consolidation strategy.

(c) This expansion model consolidated operational control, lien processing, notice practices, and release determinations across Guardian's subsidiary towing companies, including Kauff's Towing & Recovery, placing final authority in centralized corporate leadership rather than local operators.

(d) Guardian's rapid expansion was not accompanied by proportional investment in compliance infrastructure, statutory training, constitutional safeguards, or oversight mechanisms to ensure adherence to state towing statutes, municipal ordinances, or federal constitutional requirements governing seizure, detention, and deprivation of property.

(e) Instead, Guardian implemented and enforced uniform practices that prioritized detention leverage, fee extraction, and revenue generation over statutory compliance, as evidenced by Guardian's disregard of a municipal no-fee release directive, enforcement of fabricated legal standards, and refusal to cure known legal defects in Plaintiff's case.

(f) Tedford's direct communications with Plaintiff—made in his capacity as Chief Executive Officer and final corporate decision-maker—did not merely approve prior conduct, but

affirmatively doubled down on it, threatening continued detention, escalating consequences, and loss of property despite actual notice that the seizure lacked lawful predicate and had been deemed unauthorized by the municipality.

(g) By personally reinforcing unlawful detention, asserting fabricated legal authority, and rejecting corrective action after notice, Tedford transformed Guardian's conduct from private wrongdoing into ongoing, state-enforced deprivation under color of law, effectuated through Guardian's joint operation with municipal actors.

(h) Where a corporation expands rapidly under a centralized enforcement model, and its Chief Executive Officer—after notice—personally escalates and enforces unconstitutional practices rather than correcting them, resulting deprivations are foreseeable, systemic, and attributable to official corporate policy, not isolated error.

### F. Moving Force and Causation

557. Guardian's conduct — enforced through police authority and ratified by its CEO — was the direct and proximate cause of:

a. the continued unlawful seizure and detention of Plaintiff's vehicle;

b. deprivation of property without due process;

c. obstruction of Plaintiff's ability to recover her vehicle; and

d. irreversible loss and salvage-branding of Plaintiff's property.

558. But for Guardian's state-actor conduct and policymaker ratification, Plaintiff's constitutional injuries would not have occurred.

**G. Liability Statement**

559. Guardian Fleet Services, Inc. is liable under 42 U.S.C. § 1983 because it:

a. acted under color of state law;

b. jointly participated with law enforcement;

c. exercised delegated municipal authority;

d. enforced fabricated legal standards; and

e. ratified the deprivation through its final corporate policymaker.

**H. Relief**

560. Plaintiff seeks all relief available under law against Guardian Fleet Services, Inc., including compensatory damages, punitive damages, declaratory relief, injunctive relief, costs, and such further relief as the Court deems just and proper.

**COUNT XI — UNLAWFUL SALVAGE DESIGNATION, FALSE VIN REPORTING, AND PERMANENT DESTRUCTION OF PROPERTY WITHOUT ANY LAWFUL BASIS**

(42 U.S.C. § 1983 — Fabrication of Evidence; Fourth Amendment Unreasonable Seizure; Fourteenth Amendment Procedural and Substantive Due Process)

Against Guardian Fleet Services, Inc.; its wholly owned division Kauff's Towing & Recovery, Inc.; and Doe Defendants 1–20

## Incorporation

561. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

## B. Nature of the Claim

562. This Count arises from Defendants' knowing and intentional reporting of Plaintiff's vehicle identification number ("VIN") to national vehicle, salvage, and disposition databases as though Defendants possessed lawful ownership, lien, or disposal authority when they did not.

563. Defendants undertook these actions for their own financial benefit and self-enrichment, deliberately treating Plaintiff's vehicle as their property despite never having perfected a statutory lien, never acquiring lawful title, and never possessing any legal authority to brand, transfer, dispose of, or destroy the vehicle. Defendants undertook these actions by invoking, manipulating, and misusing state-created lien, salvage, and VIN-reporting mechanisms, thereby acting under color of state law and exercising authority traditionally reserved to the State.

## C. False Salvage Reporting and Fabricated Ownership Status

564. Defendants reported, caused to be reported, or maintained indicators in commercial and/or national databases representing that Plaintiff's excellent-condition 2016 Toyota Prius with

approximately 20,000 miles was salvage, junk, sale-eligible, auction-eligible, or otherwise subject to permanent disposition.

565. These representations were false when made. Defendants knew that:

(a) no statutory lien had ever been perfected;

(b) no lawful right of possession or ownership existed; and

(c) Defendants had never satisfied any mandatory

statutory prerequisites required to treat the vehicle as abandoned, forfeited, or disposable.

566. Despite this knowledge, Defendants treated the vehicle as their own property, acted as though Plaintiff's ownership interests had been extinguished, and relied on fabricated VIN and salvage status to justify continued detention and ultimate destruction of the vehicle.

567. In support of and as part of this course of conduct:

(a) Defendants actively monitored the status of Plaintiff's duplicate title through motor-vehicle systems and became aware when Plaintiff regained documentary proof of ownership, despite Defendants never having perfected any lien or acquired lawful ownership authority.

(b) Immediately upon issuance of Plaintiff's duplicate title, Defendants initiated their first purported notice attempt, evidencing a deliberate effort to preempt Plaintiff's ability to recover her vehicle once lawful proof of ownership was restored.

(c) The sole notice relied upon by Defendants was generated on or about July 30, 2025—more than fifty-seven (57) days after the original seizure—and consisted of a single, defective mailing attempt that was never successfully delivered and never followed by a second attempt as required by statute.

(d) Defendants nonetheless treated a USPS "first attempt" delivery slip as proof of statutory compliance, despite knowing that the notice was not successfully delivered, was not properly certified, and did not satisfy mandatory statutory notice requirements.

(e) Defendants proceeded to report Plaintiff's vehicle as salvage and initiate irreversible branding and disposition actions on or about August 18, 2025—approximately nineteen (19) days after the defective notice attempt and before expiration of any statutorily required waiting period.

(f) This accelerated timeline demonstrates that Defendants' notice and lien processes were not undertaken to provide due process, but instead to manufacture the appearance of compliance while deliberately preventing Plaintiff from reclaiming her vehicle upon restoration of title.

(g) Defendants' actions constitute fabrication of compliance, intentional circumvention of statutory safeguards, and knowing deprivation of property without lawful authority or any meaningful opportunity to be heard.

**D. Absence of Any DMV Authorization or Lawful Transfer**

568. Florida law requires that any lawful transfer of ownership, salvage branding, or permanent disposition of a vehicle be processed through the appropriate state motor-vehicle authority pursuant to strict statutory procedures.

569. Defendants never completed—and were never legally capable of completing—any lawful DMV process transferring ownership, branding the vehicle as salvage, or perfecting a lien. Defendants nevertheless exercised continued dominion and control over Plaintiff's vehicle

through false VIN and salvage reporting, constituting an unreasonable and prolonged seizure in violation of the Fourth Amendment after any arguable basis for custody had expired.

570. Plaintiff has confirmed directly with the California Department of Motor Vehicles that no valid or successful paperwork reflecting lien perfection, ownership transfer, or lawful salvage branding was ever processed, confirming that Defendants never acquired any lawful authority over the vehicle and unlawfully reported it as salvage without legal basis.

**E. Destruction and Concealment Without Disclosure or Consent**

571. Despite lacking any lawful basis, Defendants destroyed or permanently disposed of Plaintiff's vehicle while concealing its true status and continuing to demand payment for "release." This conduct was conscience-shocking, arbitrary, and undertaken with deliberate indifference to—and knowing violation of—Plaintiff's constitutional rights, constituting an abuse of governmental power devoid of any legitimate governmental purpose.

572. Defendants never disclosed to Plaintiff that her vehicle had been reported as salvage, sale-eligible, or destroyed, and never obtained Plaintiff's consent to any such action.

573. Any implication of Plaintiff's consent was fabricated. Plaintiff gave none, and Defendants provided no disclosure sufficient to support informed consent or lawful forfeiture.

**F. Continued Seizure, Cover-Up, and Conscious Wrongdoing**

574. Defendants' false VIN and salvage reporting enabled and prolonged an unconstitutional seizure by creating the appearance of lawful authority where none existed.

575. After Plaintiff objected and demanded proof, Defendants concealed, altered, or suppressed VIN-status indicators rather than producing lawful documentation, evidencing consciousness of wrongdoing.

576. Defendants continued to demand payment while suppressing the true status of the vehicle in order to cover up their lack of authority and prior unlawful actions.

**G. Causation and Harm**

577. Defendants' false VIN reporting and fabricated salvage status were the direct and proximate cause of:

(a) the permanent loss and destruction of Plaintiff's vehicle;

(b) the contamination and destruction of all title, resale, and ownership interests associated with the vehicle;

(c) Plaintiff's financial loss; and

(d) Plaintiff's emotional distress.

578. Defendants knowingly ruined all of Plaintiff's property interests while aware that they possessed no perfected lien, no ownership interest, and no legal authority whatsoever to take, brand, or destroy the vehicle.

**H. Constitutional Violations**

579. Defendants' conduct constituted an unreasonable and prolonged seizure of property in violation of the Fourth Amendment.

580. Defendants further violated Plaintiff's Fourteenth Amendment rights by fabricating ownership and salvage status, concealing material facts, acting with deliberate malice and self-interest, and depriving Plaintiff of property without notice, lawful authority, or any meaningful opportunity to be heard.

581. Defendants' conduct was conscience-shocking, arbitrary, and undertaken with deliberate indifference to—and knowing violation of—Plaintiff's constitutional rights.

## I. Liability Statement

582. Each Defendant is liable under 42 U.S.C. § 1983 for knowingly fabricating, maintaining, benefiting from, and concealing false VIN, salvage, and ownership status that resulted in the permanent destruction of Plaintiff's property and constitutional injuries.

**WHEREFORE,** Plaintiff seeks all compensatory damages (including emotional, general, punitive, and future damages), declaratory and injunctive relief, attorney's fees available under law, and any other relief as set forth in the Prayer for Relief.

## COUNT XII — COORDINATED CONCEALMENT AND OBSTRUCTION OF EVIDENCE

(42 U.S.C. § 1983; U.S. Const. amends. IV & XIV)

Against the Town of Palm Beach; the Palm Beach Police Department; individual sworn PBPD officers; individual civilian parking-enforcement personnel; individual Town of Palm Beach staff members with enforcement, records, administrative, compliance, contractor-oversight, or supervisory responsibilities; individual PBPD dispatchers, communications personnel, and dispatch-records custodians; individual records custodians, managers, and supervisory officials who participated in, ratified, approved, concealed, or failed to prevent the unlawful conduct while acting under color of law; and Doe Defendants 1–20.

## A. Incorporation

583. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

## B. Nature of the Claim

584. This Count alleges intentional concealment, destruction, suppression, and obstruction of evidence undertaken to hide unlawful conduct, prevent contemporaneous proof, and shield Defendants from accountability.

585. Defendants' actions were not accidental, negligent, or the product of ordinary recordkeeping failures. They were deliberate acts designed to ensure that no complete, verifiable evidentiary record of the unlawful tow, refusal to release, police ratification, and salvage-related conduct would exist.

586. Acting under color of law and in coordinated fashion, Defendants destroyed evidence, failed to preserve evidence, refused to create required records, selectively withheld materials, misdirected records requests, and erected technical barriers to access, all after litigation was reasonably foreseeable.

## C. Duty to Preserve Evidence

587. Defendants' duty to preserve evidence attached no later than June 3, 2025, when:

(a) Plaintiff contested the tow in person;

(b) Plaintiff demanded documentation and intervention;

(c) Town personnel acknowledged error and issued a release-without-fees directive; and

(d) Defendants knew the vehicle was being unlawfully detained.

588. The duty to preserve was repeatedly reaffirmed by Plaintiff's written requests, public-records demands, preservation notices, and objections between October and December 2025.

## D. Systematic Concealment Through Misdirection and Non-Disclosure

589. Defendants repeatedly issued boilerplate responses asserting that "no footage exists beyond 90 days," even where Plaintiff's requests expressly sought non-video records—such as CAD logs, dispatch records, routing and approval metadata, internal communications, deletion logs, and custodian identities—thereby concealing whether those records existed, were searched, or were destroyed.

590. Defendants refused to identify the custodians responsible for receiving, searching, reviewing, or responding to Plaintiff's records requests; refused to disclose search methodology; and refused to certify whether responsive records ever existed, were preserved, or were deleted.

591. Defendants further concealed spoliation by refusing to state whether responsive body-worn camera footage and related records ever existed, refusing to identify if or when deletion occurred, refusing to produce deletion metadata or retention logs, and refusing to identify who authorized any destruction.

**E. Concealment and Destruction by PBPD**

592. PBPD failed to preserve, deleted, or refused to produce body-worn camera footage from June 2–3, 2025, despite:

(a) multiple responding officers;

(b) timely requests submitted before any retention expiration; and

(c) knowledge of an active dispute involving threats of arrest and continued seizure.

593. PBPD omitted officers from reports, misclassified encounters as "civil," and failed to generate or preserve CAD logs, dispatch records, supervisory communications, and routing documentation that would have memorialized enforcement decisions, threats of arrest, and refusal to enforce the Town's release order.

594. PBPD later admitted that body-camera recordings existed for October 6–7, 2025, required Plaintiff to pay for access, accepted payment, and still failed to produce the footage—confirming intentional obstruction rather than administrative error.

## F. Conflicted Control Over Record Disclosure

595. Only one public-records response was signed at all, and it was signed by Parking Enforcement Officer Yanela Núñez—a non-sworn employee who directly participated in the immobilization and tow—demonstrating conflicted control over record disclosure and intentional suppression of neutral review.

## G. Concealment by the Town of Palm Beach

596. The Town produced shifting, incomplete, and inconsistent documentation regarding citation authority, delinquency status, payment application, and the timing and scope of the June 3 release-without-fees order.

597. The Town failed to produce routing records, internal communications, audit trails, or authorization metadata documenting issuance, transmission, acknowledgment, or enforcement of the release order, indicating deliberate omission or suppression of contemporaneous records.

598. When Plaintiff later requested written confirmation of the release order from the Town employee who issued it, the employee declined to provide signed documentation, citing "liability reasons," further evidencing institutional pressure to avoid memorializing facts adverse to Defendants.

## H. Concealment by Kauff's Towing & Recovery

599. Kauff's concealed or refused to produce foundational records, including certified-mail notices, USPS tracking documentation, lien paperwork, fee ledgers, chain-of-custody records, and any salvage or auction documentation.

600. Kauff's required Plaintiff to appear in person to obtain records, preventing creation of a verifiable written trail and obstructing discovery.

601. Kauff's made inconsistent claims regarding "sale," "auction," "processing," and "storage" while producing no documentation supporting any lawful lien, notice, or disposition authority.

## I. Concealment by Guardian Fleet Services

602. Guardian Fleet maintained corporate systems and policies that enabled non-creation, suppression, and manipulation of records relating to lien status, notice generation, salvage reporting, and vehicle disposition.

603. Guardian concealed TowBook data, notice-generation metadata, salvage workflows, and internal communications while falsely asserting that compliant documentation "existed."

604. Guardian executives, including Defendant Tedford, refused to produce records while threatening continued detention, fabricated penalties, and disposal, demonstrating intentional concealment to preserve leverage and avoid exposure.

## J. Coordinated and Interlocking Concealment

605. Each Defendant withheld different categories of evidence such that no single custodian possessed a complete record of events.

606. This fragmentation was coordinated and interlocking, ensuring that:

(a) police records lacked towing context;

(b) Town records lacked enforcement and release-order detail;

(c) towing records lacked legal predicates and notice proof; and

(d) salvage-related records lacked statutory authority.

607. The result was a deliberate evidentiary vacuum engineered to conceal wrongdoing.

## K. Prejudice

608. The concealed and destroyed evidence was irreplaceable and directly relevant to:

(a) the legality of the tow;

(b) enforcement of the release order;

(c) police ratification;

(d) existence of any lien or salvage authority; and

(e) Defendants' knowledge of illegality.

596. Plaintiff was severely prejudiced because the missing evidence cannot be reconstructed from alternative sources.

## L. Constitutional Violation

609. Intentional concealment and destruction of evidence by state actors, undertaken to hide unlawful conduct and frustrate accountability, violates the Fourteenth Amendment's guarantees of due process and fundamental fairness.

610. Defendants' conduct also rendered the continued seizure of Plaintiff's property unreasonable under the Fourth Amendment.

## M. Remedies and Inference

611. Defendants' conduct warrants adverse inferences that the concealed and destroyed evidence would have established that:

(a) the tow was unauthorized;

(b) Defendants knew it;

(c) the release order was intentionally ignored;

(d) no lawful lien or salvage authority existed; and

(e) the concealment was purposeful.

## N. Damages and Remedies

612. As a direct and proximate result of Defendants' concealment and destruction of evidence, Plaintiff suffered loss of property, loss of proof, emotional distress, increased litigation burden, and constitutional injury. Plaintiff seeks compensatory damages against all Defendants; punitive damages against the individual Defendants and the private Defendants Kauff's Towing &

Recovery, Inc. and Guardian Fleet Services, Inc.; declaratory and injunctive relief against all
Defendants; and reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988 and other
applicable law.

## COUNT XIII — CIVIL RICO

(18 U.S.C. §§ 1962(c)–(d): Enterprise Conduct By and Through Uniform Methods Constituting a
Pattern of Racketeering Activity and Continuity)

Against the Town of Palm Beach; the Palm Beach Police Department; individual sworn PBPD
officers; individual PBPD supervisors and command-level officials; individual civilian parking-
enforcement personnel; individual Town of Palm Beach staff members involved in enforcement,
records, compliance, contractor oversight, or supervision; Kauff's Towing & Recovery, Inc.;
Guardian Fleet Services, Inc.; and Doe Defendants 1–40.

613. From inception of the seizure through the present, Defendants employed repeatable,
standardized methods to: (i) create the appearance of lawful custody; (ii) block neutral
intervention; (iii) extract money or abandonment; and (iv) preserve the outcome through record
control and post-hoc narrative engineering. These methods were implemented across institutional
boundaries—Parking Enforcement, sworn police, municipal supervisory/records channels, and
the private towing enterprise—despite distinct roles and duties.

614. The defining feature is method uniformity across unrelated departments: different actors
repeatedly delivered the same functional messages ("no remedy exists other than payment," "we

have no authority," "the law requires this," "nothing can be done," "be careful," "the record is what it is") while performing the same functional acts (non-documentation, misclassification, document withholding, deadline pressure, retroactive justification). Such convergence is incompatible with coincidence and supports the inference of institutional practice, supervisory ratification, and coordinated participation in a common unlawful objective.

## THE ENTERPRISE (ASSOCIATION-IN-FACT — BOYLE)

**Enterprise Definition.**

615. The RICO "Enterprise" is an association-in-fact composed of Guardian Fleet Services, Inc.; Kauff's Towing & Recovery, Inc.; the Town of Palm Beach (acting through its officials, departments, employees, and agents, including Parking Enforcement); the Palm Beach Police Department (acting through sworn officers, supervisors, and command-level personnel); and Doe participants, functioning as a continuing unit for a common unlawful purpose.

**Timeframe and Purpose.**

616.  From at least January 2025 through the present, the Enterprise operated with the common purpose of converting unlawful vehicle seizures into profit and forfeiture outcomes by manufacturing apparent legal custody, misrepresenting legal authority and available remedies, blocking neutral intervention and retrieval, and extracting money or abandonment through intimidation and coercion under color of law, while preserving the outcome through record-control and post-hoc "compliance" narratives.

617. **Boyle Elements.** The Enterprise satisfies the structural requirements articulated Boyle v.

United States, 556 U.S. 938 (2009): (a) **common purpose**—vehicle seizure/detention → coerced payment/forfeiture → title impairment and conversion;

(b) **relationships**—Parking Enforcement generated pretext, escalation posture, and the appearance of authority; PBPD supplied coercive leverage, intimidation, and suppression of reporting while refusing corrective action; Kauff's executed detention, release-denial, billing, and lien/sale/salvage postures; and Guardian supplied centralized policies, systems, and executive ratification; and

(c) **longevity**—repeatable methods used over many months across multiple entities, continuing to pose a threat of repetition.

**Integrated Chain.**

618.  The Enterprise functioned as an integrated chain: pretextual citations and police-backed coercion produced immobilization and detention; detention and record suppression prevented neutral review and retrieval; fabricated "requirements" and deadline threats extracted money or abandonment; and title/VIN impairment preserved conversion and economic injury.

**Distinct "Persons" Associated with the Enterprise.**

619.  Each Defendant is a distinct "person" associated with the Enterprise who conducted or participated in the Enterprise's affairs, directly or indirectly, through the racketeering acts and standardized methods alleged herein. No Defendant's liability is premised on respondeat superior alone; each Defendant is alleged to have knowingly participated in the Enterprise's affairs through the acts and methods described herein.

## RICO STATUTORY VIOLATIONS

620. At all relevant times, Defendants were persons associated with and employed by an enterprise engaged in, and the activities of which affected, interstate commerce.

604. Defendants knowingly conducted and participated, directly and indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

621. Defendants knowingly agreed and conspired to conduct and participate in the Enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

## OPERATION OR MANAGEMENT ROLE (REVES)

**Reves Participation.**

622. Each Defendant conducted or participated in the operation or management of the Enterprise, directly or indirectly, satisfying Reves v. Ernst & Young, 507 U.S. 170 (1993). Guardian Fleet and Kauff's operated and enforced the detention/lien/sale/salvage and billing machinery, including the policies, systems, and communications used to deny release, generate coercive demands, and conceal or withhold compliance documentation.

**Municipal and Police Management Functions.**

623. The Town and its Parking Enforcement personnel supplied the enforcement pipeline and pretextual predicates used to trigger immobilization, towing, and escalation posture, while Town supervisors and records channels controlled, routed, withheld, and/or failed to preserve records

necessary for neutral review. PBPD officers and supervisors exercised essential operational authority that enabled the scheme to function—through intimidation and arrest-backed leverage, refusal to enforce the Town's release directive, suppression or misclassification of complaints, and record-control practices that prevented investigation, accountability, and timely retrieval.

**Functional Direction and Control.**

624. Defendants' roles were complementary and interdependent: governmental actors supplied authority, coercion, and insulation from intervention; private actors supplied detention, monetization, and title/salvage conversion tools. This division of labor constitutes participation in the Enterprise's direction and control, not mere parallel conduct.

## ENTERPRISE METHODS AND PATTERNS

### A. Law-as-Weapon Method — Scripted Legal Misrepresentation to Collapse Options

625. Defendants repeatedly weaponized "law" as an operational tool, invoking unnamed "statutes," "policy," "procedure," or "requirements" to create coercive certainty while refusing to identify actual authorizing provisions. The function was not guidance but option-collapse: convert ambiguity into compelled compliance.

626. This posture manifested uniformly: civilian actors asserted powers they did not possess; sworn officers disclaimed powers they did possess; supervisors endorsed the posture; and the towing enterprise repeatedly claimed statutory compulsion to detain, lien, sell, brand, or refuse release—while withholding the very documentation that would permit challenge.

627. Defendants persisted in the same false legal framing after illegality was identified and an official release directive existed, which is probative of intent: good-faith actors correct legal error; the Enterprise repeated it because repetition itself was the mechanism of control.

**B. Fear/Chilling Method — Intimidation and Suppression of Reporting**

628. Defendants enforced the scheme through fear-based control designed to deter inquiry and suppress the creation of reviewable records. Police personnel discouraged sworn reporting and investigation through statements and conduct effectively communicating that Plaintiff should "be careful," that further questioning could cause "trouble," or that the matter was not appropriate for formal enforcement channels.

629. In parallel, the towing enterprise threatened permanent loss (sale/destruction/salvage branding) under shifting deadlines, while municipal and police actors withheld neutral review pathways. The combined message was consistent and coercive: pursuing rights increases risk; submission is the only safe option.

**C. Closed-Loop Method — "No-One-Can-Help" Jurisdiction Shell Game**

630. Defendants repeatedly created a closed system of non-accountability through mutually reinforcing blame-shifting: police described the deprivation as "civil"; municipal channels avoided triggering formal review; the towing enterprise claimed it was constrained by "government rules"; and each pointed to the other as the source of impossibility—distributing responsibility until accountability disappeared.

631. This posture was not passive. Defendants selectively exercised authority when it served deprivation and leverage (threats, suppression, enforcement posture) while disclaiming authority

when it would protect Plaintiff (enforcing a release order, documenting crimes, initiating review). That asymmetry is a hallmark of coordinated misuse of authority, not lawful discretion.

**D. Process-Denial Method — Withholding Due Process and Neutral Remedies**

632. Defendants repeatedly withheld basic procedural protections and information necessary to invoke third-party safeguards. Plaintiff was not meaningfully directed to a hearing, appeal mechanism, neutral review, or lawful recovery pathway capable of interrupting detention.

633. When Plaintiff asked what could be done to recover the vehicle, Defendants did not provide remedy pathways; they repeated the Enterprise script that payment was the only option. The uniformity of this omission across actors shows denial of process was an operational feature.

**E. Record-Control Method — Non-Creation, Misclassification, Suppression, and Spoliation**

634. The Enterprise maintained control by controlling the record. Across municipal, police, and private systems, Defendants repeatedly: (i) failed to create required contemporaneous records; (ii) misclassified encounters to avoid mandatory documentation and escalation; (iii) withheld or selectively produced records; and (iv) omitted material facts from later reports—producing the same outcome each time: no neutral oversight was triggered because no complete record existed to trigger it.

635. Record-control persisted after dispute, illegality, and foreseeable litigation were on notice, strengthening the inference that suppression and non-preservation were strategic. The Enterprise's preference for silence over documentation is evidence of consciousness of wrongdoing: lawful actors preserve; concealment actors minimize the record.

**F. Post-Exposure Method — Post-Hoc Fabrication, Narrative Substitution, and Timeline Shifting**

636. After Plaintiff demanded documentation and challenged legality, Defendants shifted from concealment to post-hoc narrative engineering—rewriting timelines, reframing enforcement bases, retroactively consolidating citation histories, and recalculating amounts allegedly owed to fit an invented theory of lawful process.

637. These narratives did not appear contemporaneously; they appeared only after scrutiny. Legitimate enforcement is documented as it occurs; enterprises engaged in unlawful conduct reconstruct the record after exposure to survive review.

**G. Extraction Method — Coercive Deadlines, Permanent-Loss Threats, and Manufactured "Consent"**

638. Defendants repeatedly imposed short, shifting, non-negotiable deadlines threatening permanent loss of Plaintiff's vehicle. These threats functioned as enforcement tools rather than lawful notice and were deployed to collapse options, suppress questioning or resistance, and force action under duress—rather than to provide any legitimate remedial pathway or lawful means of recovery.

639. Defendants' extraction method further manifested through the timing, silence, and escalation of their conduct, evidencing coercive intent and consciousness of wrongdoing:

(a) For more than one hundred seventy (170) days following the initial seizure, Defendants uniformly refused to release Plaintiff's vehicle free of charge, refused to negotiate, refused to provide proof of statutory compliance, and maintained detention leverage while acting jointly with and supported by law-enforcement authority.

(b) After Plaintiff served formal legal notice and began seeking judicial relief, Defendants deliberately went silent for more than forty-three (43) days—refusing to respond, refusing to cure known defects, and refusing to produce documentation—while continuing to maintain irreversible-loss threats and detention leverage.

(c) This prolonged silence was not inadvertent or administrative. It reflected an assumption that Plaintiff was vulnerable, unsophisticated, and unlikely to pursue legal remedies that were consequential to them (small claims etc.), and that Defendants' position—shielded by police involvement and record suppression—would remain unchallenged.

(d) Only after this period of silence did Defendants re-emerge—not with proof, compliance, or remediation—but with escalated deadline threats, unsupported assertions of statutory compliance, and coercive payment demands, designed to manufacture the appearance of voluntary "consent" and retroactively legitimize unlawful detention.

(e) Defendant Thomas Tedford's subsequent intervention in his capacity as Chief Executive Officer did not cure or clarify any defect. Instead, it intensified the extraction scheme by doubling down on unsupported compliance claims, imposing new deadlines, threatening permanent loss and legal fees, and expanding demands to "whatever Plaintiff could pay"—confirming that the objective was leverage, cover-up, and extraction rather than lawful resolution.

(f) This conduct was designed to (i) suppress evidence of coercion and statutory noncompliance, (ii) fabricate a narrative of voluntary payment or abandonment, and (iii) shift the full burden of deprivation, devaluation, and loss onto Plaintiff while preserving Defendants' unlawful gains.

(g) Such conduct reflects consciousness of wrongdoing and constitutes further racketeering acts undertaken in furtherance of the Enterprise's extraction scheme.

## H. Ultra Vires Civil Enforcement and Police-Impersonation Bridge

640. A critical enterprise method enabling seizure, prolonged detention, and coerced extraction was the systematic use of civilian enforcement actors to project police authority they did not possess, while sworn officers ratified, enforced, or refused to correct that conduct.

641. Parking Enforcement authority is limited to issuing non-criminal civil citations. It does not authorize custodial seizure, arrest-backed threats, suppression of reporting, coercive payment demands, or actions carrying police-backed consequences. The Enterprise overcame these limits by collapsing the distinction between civil enforcement and police power, creating the appearance that all actions were backed by law enforcement authority.

642. Civilian actors repeatedly acted as though vested with police powers by invoking police authority, posting enforcement signage, issuing escalatory citations, demanding compliance under threat, and participating in decisions with custodial and coercive consequences beyond their lawful role.

643. Sworn officers did not correct or halt the ultra vires conduct. Instead, they supplied intimidation, suppressed sworn reporting, declined to enforce a release directive, misclassified encounters to avoid investigation, and reinforced the false narrative of lawful, mandatory deprivation.

644. This impersonation-and-ratification structure was the operational bridge that converted minor civil citations into arrest-backed threats, transformed unlawful detention into apparent

process, and enabled towing actors to detain, demand payment, and manipulate title/salvage systems while diffusing responsibility across actors.

**I. Integrated System Effect — Coordination, Continuity, and Enterprise Intent**

645. These methods operated as an integrated system: misrepresentation collapsed options; intimidation chilled reporting; the shell game prevented intervention; process-denial blocked neutral review; record-control prevented oversight; post-hoc fabrication neutralized exposure; and coercive deadlines extracted money or abandonment. Each method reinforced the others in a self-protecting loop.

646. The sustained uniformity of conduct across distinct entities is incompatible with mere negligence or bureaucratic delay. It supports the inference of an institutionalized playbook implemented through custom, policy, supervisory ratification, and/or training-driven habit, thereby establishing enterprise intent and continuity for purposes of civil RICO and related constitutional and state-law claims. Accordingly, Plaintiff pleads the foregoing racketeering acts as representative and illustrative examples of the Enterprise's conduct. For purposes of this initial pleading—and in the interest of clarity, proportionality, and judicial economy—Plaintiff does not enumerate every predicate act presently known or reasonably anticipated to be established through discovery. Defendants' methods, continuity, and enterprise structure are pleaded with sufficient particularity to satisfy 18 U.S.C. §§ 1962(c)–(d). Plaintiff is prepared to prove additional predicate acts, participants, communications, and transactions as discovery proceeds and expressly reserves the right to supplement as warranted by the evidence produced.

**PATTERN OF RACKETEERING ACTIVITY**

(18 U.S.C. § 1961(5))

647. Defendants engaged in a "pattern of racketeering activity" consisting of multiple related predicate acts within ten years, including extortion under color of official right, mail fraud, wire fraud, obstruction of justice, destruction/suppression of records, and interstate title/VIN-status fraud.

648. The predicate acts are related because they share common victims, participants, methods, and purpose: seize vehicles without authority, suppress recovery and neutral review, extract money through coercion, and preserve conversion through fabricated compliance and record control.

649. The acts were not isolated. They unfolded in sequential phases: unlawful tow → blocked release → fabricated lien/authority narrative → coercive demands → concealment/record suppression → title/salvage impairment → retroactive justification.

**CONTINUITY**

(Closed-Ended and Open-Ended — H.J. Inc., 492 U.S. 229 (1989))

650. Closed-ended continuity is satisfied because Defendants' racketeering acts occurred over a substantial period exceeding six months, from at least June 2, 2025 through December 2025, and involved repeated predicate conduct rather than a single discrete event.

651. Open-ended continuity is satisfied because the conduct reflects a regular way of operating and poses a continuing threat of repetition, including: (a) Guardian Fleet's multi-state

lien/salvage business model; (b) continued reliance on fabricated notice and deadline extraction practices; (c) absence of repudiation; and (d) continuing threat to other vehicle owners.

# MAIL FRAUD — FABRICATED STATUTORY NOTICE, FALSE USPS CLAIMS, AND USE OF THE MAILS TO LEGITIMIZE UNLAWFUL CONVERSION

(18 U.S.C. § 1341 — RICO Predicate Acts)

## A. Scheme to Defraud Using the United States Mail

652. Defendants devised and executed a scheme to defraud Plaintiff of her vehicle, title value, and associated property rights by fabricating, misrepresenting, and strategically invoking purported mail activity to manufacture statutory authority for lien, sale, salvage, and continued detention that did not lawfully exist.

653. The scheme used the appearance of certified-mail compliance—whether by fabricated mailings, mischaracterized USPS artifacts, or impossible timelines—to legitimize unlawful custody, coerce payment or abandonment, and impair title/salvage status, while concealing the absence of lawful notice and the Town's no-fee release order.

## B. Predicate Mail Fraud Acts — Fabricated "Certified Mail" Notice Narrative

654. Defendants asserted that certified mail lien notices were sent on or about July 18, 2025 to Plaintiff at multiple addresses and that their return as "unclaimed" authorized lien enforcement, sale authority, and salvage outcomes.

655. These claims are materially false and/or unsupported. Defendants have not produced the basic USPS-certified proof that necessarily exists if such mailings occurred (tracking numbers, certified receipts, green cards, mailing logs, envelope images, or copies of notices).

656. The asserted July 18 narrative is contradicted by later reliance on a July 30, 2025 USPS "First Attempt" slip as the earliest verifiable mailing artifact, confirming that Defendants used an invented earlier date to backfill statutory prerequisites and launder illegality into apparent compliance.

**C. Predicate Mail Fraud Act — July 30, 2025 USPS "First Attempt" Slip as Deceptive Prop**

657. On July 30, 2025—fifty-seven (57) days after the tow—Plaintiff received a USPS "Sorry We Missed You" (PS Form 3849) identifying "Kauff's of PB" and marking a "First Attempt."

658. The slip did not identify contents and, on its face, could not establish timely certified notice within statutory windows. Defendants nevertheless invoked this artifact as retroactive proof of compliance to support lien/sale/salvage narratives and to coerce payment or abandonment.

659. Using the mails or purported mailing artifacts to manufacture statutory legitimacy, conceal the absence of timely notice, and advance conversion constitutes conduct indictable under 18 U.S.C. § 1341 and is pleaded as mail-fraud predicates.

**D. Predicate Mail Fraud Acts — False Government-Mailing and Impossible DMV Timeline Claims**

660. Defendants further invoked alleged certified mailings to law-enforcement or governmental channels and asserted DMV address narratives inconsistent with objective chronology—claims used to cloak the scheme in governmental legitimacy and to backfill statutory prerequisites.

661. Invocation of impossible governmental responses or nonexistent certified mailings to justify detention and salvage outcomes constitutes additional mail-fraud predicates evidencing scienter and deliberate fabrication of statutory compliance.

**E. Materiality and Intent**

662. The mailing claims were material because statutory notice is essential to lien attachment, sale authority, and salvage/title impairment. Defendants acted knowingly as professional towing/lien operators who understood—or recklessly disregarded—that absent lawful notice, their continued detention and disposition narrative was indefensible.

**F. RICO Predicate Incorporation**

663. The foregoing acts constitute mail fraud and are charged as predicate acts in furtherance of Defendants' RICO enterprise under 18 U.S.C. §§ 1962(c) and (d).

**WIRE FRAUD — ELECTRONIC FABRICATION OF AUTHORITY, FALSE TITLE-STATUS TRANSMISSIONS, AND INTERSTATE DIGITAL MISREPRESENTATIONS**

(18 U.S.C. § 1343 — RICO Predicate Acts)

**A. Scheme to Defraud Using Interstate Wires**

664. Defendants devised and executed a scheme to defraud Plaintiff of property and property rights—and to obtain money, leverage, or abandonment—through materially false

representations, omissions, and fabricated enforcement predicates transmitted via interstate wires, including municipal citation/payment databases, police CAD/RMS systems, towing/lien software, email/telephone communications, online records portals, and nationwide VIN/title-status reporting networks.

665. Wire use was essential: Defendants relied on electronic transmission and propagation of false "authority" narratives to justify the tow, sustain detention, block neutral oversight, manufacture "balances," and impair title marketability in the very systems third parties rely upon.

**B. Predicate Wire Fraud Acts — Electronic Manufacturing of Delinquency and Tow Authority**

666. Parking Enforcement actors entered and transmitted a false enforcement posture through electronic citation systems by issuing and stacking ultra vires and/or facially void citations in rapid succession and recording them as lawful events capable of triggering escalation.

667. These electronic entries were materially false because void citations are legal nullities incapable of creating delinquency or lawful tow authority. Defendants used resulting "counts," "balances," and escalation postures as electronic predicates to justify immobilization, towing, and downstream lien/sale narratives.

**C. Predicate Wire Fraud Acts — False Digital Claims of Statutory Compulsion and Compliance**

668. Defendants transmitted interstate wire communications falsely asserting or implying that statutes "required" detention, prevented release, or authorized lien/sale/salvage outcomes, while failing to satisfy statutory prerequisites and withholding the documentation required to exist (notice proof, lien documentation, itemized lawful charges).

669. Each such communication constitutes a wire-fraud act because it was transmitted through interstate wires to legitimize unlawful custody, foreclose relief, and induce coerced payment or abandonment.

**D. Predicate Wire Fraud Acts — Digital Suppression Through Portals, Email, and Misleading Responses**

670. Defendants used electronic records portals, email, and related digital channels to transmit misleading denials, partial disclosures, and strategic non-answers to lawful records requests for documents exposing police involvement, release authority, notice activity, CAD/body-camera preservation, tow predicates, and statutory compliance.

671. These digital responses were materially misleading because they concealed or distorted records central to neutral oversight and remedy, and were used to prolong detention and preserve leverage.

**E. Predicate Wire Fraud Acts — Interstate Title/VIN-Status and Salvage/Disposition Transmissions**

672. Defendants caused or enabled Plaintiff's vehicle to be electronically designated, flagged, reported, or treated as salvage/junk/non-retailable and/or otherwise impaired in VIN/title-status systems relied upon across state lines, including NMVTIS-linked and commercially relied-upon databases.

673. These electronic status transmissions were materially false and/or unauthorized because they communicated disposition authority and title impairment without lawful predicates, foreseeably destroying title value and coercing payment or abandonment through system-imposed leverage.

**F. Predicate Wire Fraud Acts — Backend Manipulation and Ransom-Style Digital Billing**

674. Defendants entered or caused entry of false data into internal towing/lien platforms to generate coercive billing outputs reflecting fabricated timelines, notice histories, accrual calculations, and sale posture, then transmitted shifting demands and threats via phone/email/electronic communications.

675. Treating amounts as negotiable and subject to "reasonable offers," imposing arbitrary "tow business day" deadlines, and threatening irreversible loss constitutes wire fraud because Defendants sought money and leverage by materially false representations of authority and lawful debt.

**G. Police Electronic Ratification and Laundering Illegality Into "Official" Form**

676. Sworn police personnel further advanced the scheme by electronically generating, approving, transmitting, and/or ratifying sanitized official narratives through CAD/RMS/reporting systems that omitted material facts, misclassified coercive conduct as "civil," concealed release authority, and minimized participating officers—thereby laundering known illegality into an "official" record posture relied upon to block investigation and preserve leverage.

**H. Elements, Scienter, and Interstate Commerce**

677. The foregoing conduct satisfies 18 U.S.C. § 1343: (a) scheme to defraud Plaintiff of property and rights; (b) material misrepresentations/omissions; (c) use of interstate wires; and (d) intent to obtain money, property, leverage, or abandonment by deception. Interstate commerce is satisfied because the systems and communications used operate across state lines by design.

**I. RICO Predicate Incorporation**

678. Each transmission described above constitutes a separate wire-fraud predicate act under 18 U.S.C. § 1961(1), charged in furtherance of the Enterprise under 18 U.S.C. §§ 1962(c) and (d).

**RICO CAUSATION AND INJURY TO BUSINESS OR PROPERTY**

679. As a direct and proximate result of Defendants' racketeering acts—including extortion under color of official right, mail fraud, wire fraud, obstruction, and interstate VIN and title-

status fraud—Plaintiff suffered concrete injury to business and property within the meaning of 18 U.S.C. § 1964(c).

680. These injuries include, but are not limited to: the permanent loss and destruction of Plaintiff's vehicle; impairment and contamination of title and VIN status; loss of market value; coerced or attempted extraction of money; and other measurable financial harm.

681. Plaintiff's injuries were the intended and foreseeable economic outcomes of the Enterprise's racketeering scheme and would not have occurred but for Defendants' predicate acts.

**WHEREFORE**, Plaintiff demands judgment against Defendants, jointly and severally, for

(a) all damages to Plaintiff's business or property proximately caused by Defendants' violations of 18 U.S.C. § 1962(c)–(d);

(b) treble damages pursuant to 18 U.S.C. § 1964(c);

(c) costs of suit and reasonable attorney's fees pursuant to 18 U.S.C. § 1964(c); (d) appropriate equitable relief pursuant to 18 U.S.C. § 1964(a); and

(e) such other relief as the Court deems just and proper.

## COUNT XIV- VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (FDUTPA)

Fla. Stat. §§ 501.201–501.213

Against Kauff's Towing & Recovery, Inc. and Guardian Fleet Services, Inc., as private commercial entities engaged in "trade or commerce" within the meaning of FDUTPA

### A. Incorporation and Applicability

682. Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.

683. FDUTPA applies to any "person" engaged in "trade or commerce," including towing companies, lien processors, storage operators, and private contractors performing vehicle seizure, detention, billing, lien, or salvage activities for profit. Fla. Stat. § 501.203(3), (6), (8).

684. Defendants Kauff's Towing & Recovery, Inc. and Guardian Fleet Services, Inc. were engaged in trade and commerce at all relevant times. Acting pursuant to municipal authorization does not exempt private actors from FDUTPA liability.

### B. FDUTPA Per Se Violations

685. Violations of Florida's towing, lien-notice, storage, and title statutes constitute per se FDUTPA violations. Fla. Stat. § 501.203(3)(c).

686. Defendants committed multiple statutory violations, including towing without lawful authority; initiating lien and storage claims without statutory notice; charging unauthorized fees; fabricating statutory timelines; concealing required disclosures; and unlawfully processing a salvage-title branding. Each violation independently constitutes unfair or deceptive conduct.

## C. Unfair and Deceptive Acts and Practices

### 1. Illegal Tow and Continued Detention

687. Defendants seized and detained Plaintiff's vehicle without lawful authority, delinquency, or statutory predicate, and repeatedly misrepresented that the tow and continued detention were legally required.

### 2. Fabricated Release Conditions

688. Defendants falsely demanded conditions not required by law—including "current registration," possession of a physical Florida title, and compliance with invented "government regulations"—to coerce payment and prevent lawful retrieval, in violation of Fla. Stat. § 713.78.

### 3. Concealed, Fabricated, and Unauthorized Charges

689. Defendants imposed fabricated and inflated charges, refused itemization, withheld written disclosures, and altered invoices. These practices were likely to mislead a reasonable consumer and caused substantial injury.

### 4. Fabricated Lien and Notice Timeline

690. Defendants falsely asserted that statutory lien notices were mailed on July 18, 2025, despite the absence of TowBook entries, USPS tracking data, certified-mail receipts, or contemporaneous records supporting such a mailing. Fabrication of statutory notice constitutes a deceptive act per se.

### 5. False Claims of Sale, Destruction, or Disposition

691. Defendants falsely claimed that Plaintiff's vehicle was "sold," "destroyed," "gone," or "already at auction" to intimidate Plaintiff and deter retrieval, despite knowing the vehicle remained in their custody.

## 6. Salvage-Title Laundering

692. Defendants processed or caused a fraudulent salvage branding without lawful tow authority, without statutory notice, without insurer notification, and without required waiting periods. This constitutes conversion of property through deceptive commercial practices.

## 7. Manipulated and Concealed Recordkeeping

693. Defendants withheld, altered, selectively produced, or refused to generate TowBook entries, lien logs, salvage documents, invoices, and storage records. Suppression or manipulation of records necessary to understand consumer rights constitutes an unfair and deceptive practice.

## D. Deceptive Reinforcement Through False Authority

694. Defendants' deceptive practices were reinforced by false statements attributed to law enforcement—such as "nothing can be done," "civil matter," or "must have current registration"—creating a coercive environment that misled Plaintiff into believing Defendants' fabricated requirements were lawful and mandatory.

695. Use of apparent police authority to reinforce private commercial deception materially increases the likelihood of consumer harm and constitutes an unfair practice under FDUTPA.

## E. Guardian Fleet Services — Corporate-Wide Deceptive Scheme and Ratification

696. Guardian Fleet Services centrally controls towing, lien, storage, salvage, billing, and notice practices across its operations. The deceptive acts inflicted on Plaintiff were the product of uniform corporate policies, not isolated employee conduct.

697. During the period relevant to Plaintiff's claims, Guardian expanded from approximately nineteen (19) locations to more than forty-five (45) locations nationwide under the leadership of Thomas A. Tedford III, who exercised senior operational control over Guardian's towing, lien, salvage, and compliance practices.

698. The deceptive conduct alleged herein occurred within—and was facilitated by—this centralized operational structure. Guardian has publicly announced further consolidation and centralization of its operations, supporting the inference that the same policies and practices remain in force.

699. Following the events giving rise to Plaintiff's claims, Guardian elevated Tedford to Chief Executive Officer, further consolidating policymaking authority in the same individual responsible for the centralized practices challenged herein. This elevation constitutes ratification and reinforces the inference that the challenged conduct reflects Guardian's ongoing corporate policy rather than isolated misconduct.

700. Tedford's December 2, 2025 communication exemplifies Guardian's deceptive practices, including false assertions of statutory compliance, fabricated notice claims, coercive deadlines, refusal to produce documentation except "at trial," threats of unlawful consequences, and demands for payment under threat of disposal. These acts constitute independent FDUTPA violations.

## F. Failure to Disclose Material Information

701. Defendants failed to disclose material facts required by law and necessary for informed consumer decision-making, including the Town's release directive, Plaintiff's right to immediate retrieval with proof of ownership, the absence of any valid lien notice, the legal impossibility of the salvage branding, and the true status and location of the vehicle.

702. Suppression of material information that would affect a reasonable consumer's decisions is independently deceptive under FDUTPA.

## G. Threats of Improper Legal Consequences

703. Defendants falsely threatened consequences not authorized by law, including unavoidable sale or destruction, escalating fabricated fees, unlawful salvage branding, and non-existent liens. Threatening legal consequences without statutory authority constitutes an unfair and deceptive practice.

## H. Fraudulent Predicate — Fabricated "Three-Ticket Rule"

704. Defendants' commercial scheme relied on a fabricated "three-ticket rule" that does not exist in Florida law, municipal ordinance, citation language, or any publicly available policy.

705. Using a nonexistent legal rule to justify towing, detention, billing, lien assertion, or salvage branding constitutes an unfair and deceptive act as a matter of law. All downstream charges, documents, and threats derived from this fabrication were therefore deceptive.

## I. Reliance Not Required

706. FDUTPA does not require proof of reliance. The relevant inquiry is whether Defendants' conduct was likely to mislead a reasonable consumer. Defendants' conduct satisfies this standard.

## J. Continuing Threat and Need for Injunctive Relief

707. Defendants continue to operate under the same centralized policies and practices, posing an ongoing risk to Plaintiff and the public. Injunctive relief is appropriate under Fla. Stat. § 501.211(1).

## K. FDUTPA Injury and Causation

708. Defendants' unfair and deceptive practices directly caused Plaintiff actual damages, including loss of the vehicle, destruction of clear title and market value, loss of use, unlawful fees, costs incurred attempting retrieval, and substantial emotional distress.

## L. Relief Requested

709. Plaintiff seeks all relief available under FDUTPA, including actual damages under § 501.211(2); declaratory and injunctive relief under § 501.211(1); attorney's fees and costs under § 501.2105; rescission of all unlawful lien, storage, and salvage actions; disgorgement of unlawful fees; and such further relief as the Court deems just and proper.

## COUNT XV — § 1983 ABUSE OF AUTHORITY AND SELF-ENRICHMENT UNDER COLOR OF LAW

(Fourth and Fourteenth Amendments; Florida Constitution Public-Trust Provisions)

(42 U.S.C. § 1983; U.S. Const. amends. IV & XIV;

Fla. Const. art. I §§ 2, 9 & 12; Fla. Const. art. II § 8)

Against the Town of Palm Beach; the Palm Beach Police Department; Kauff's Towing & Recovery, Inc.; Guardian Fleet Services, Inc.; and John Doe Defendants 1–25, consisting of municipal officials, sworn law-enforcement officers, parking-enforcement personnel, towing-company employees, supervisors, managers, and other individuals who exercised, ratified, enabled, or exploited state-delegated authority for personal or institutional self-enrichment under color of law.

### A. Incorporation and Action Under Color of Law

710. Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.

711. At all relevant times, Defendants acted jointly and under color of state law.

712. The Town of Palm Beach and the Palm Beach Police Department delegated towing, impoundment, detention, and release authority to Kauff's Towing & Recovery, Inc., thereby vesting a private, profit-driven entity with coercive state power enforced by police authority.

713. By exercising and delegating such authority, each Defendant assumed non-delegable constitutional duties to act lawfully, honestly, without self-interest, and in accordance with due process and public-trust obligations.

714. The Town's failure to supervise, correct, or restrain the exercise of this delegated authority constituted deliberate indifference and gives rise to municipal liability under Monell.

## B. Abuse of Authority for Financial Gain

715. Defendants used citation issuance, booting, towing, impoundment, lien assertions, and release procedures not for legitimate public-safety or regulatory purposes, but to manufacture financial leverage and generate revenue.

716. Defendant Loretta Brown, acting as lead parking-enforcement personnel, issued expired-registration and "status" citations outside statutory authority under Fla. Stat. § 316.640, fabricating the appearance of delinquency where none existed.

718. Defendant Yanela Núñez falsely identified herself as "Palm Beach Police... parking," impersonating police authority and inducing fear and compliance through misrepresentation of official power.

719. Defendants Fred Waymire, Tristan Gordon, and other responding PBPD officers knowingly misrepresented the law to Plaintiff, including false threats of arrest, jail, and renewed citation if Plaintiff attempted to retrieve her own vehicle or challenge Kauff's refusal to release it.

720. These officers presented Plaintiff with only punitive options, refused to enforce the Town's release directive, and affirmatively discouraged Plaintiff from asserting her rights, constituting abuse of authority under color of law.

721. Kauff's Towing & Recovery, Inc., acting in concert with municipal Defendants, capitalized on this misuse of police authority by refusing release, fabricating statutory requirements, asserting false lien rights, imposing unlawful fees, and threatening permanent loss of Plaintiff's vehicle unless payment was made.

722. Defendants Lindsey Burns and Thomas A. Tedford III directed, ratified, and enforced these practices through coercive communications, concealment of material facts, and retaliatory threats tied to Plaintiff's assertion of rights.

723. Each Defendant derived tangible benefit from this coordinated conduct:

(a) the Town obtained citation revenue and avoided public accountability;

(b) PBPD avoided admitting unlawful enforcement and exposure;

(c) Kauff's and Guardian Fleet profited through unlawful detention, fabricated fees, and salvage value.

724. This coordinated exploitation of state power for private enrichment constitutes abuse of authority and breach of the public trust.


**C. Suppression of Evidence and Consciousness of Guilt**

725. PBPD officers refused to take or properly document Plaintiff's reports, misclassified the incident as "civil," and omitted the presence and conduct of multiple responding officers.

726. PBPD represented that body-camera footage was deleted despite notice of dispute and foreseeable litigation, demonstrating intentional destruction of evidence.

728. Town personnel and Kauff's employees withheld, altered, or refused to produce records necessary to expose the unlawful conduct.

729. These acts demonstrate consciousness of guilt, institutional self-protection, and deliberate concealment.

**D. Resulting Harm**

730. As a direct and foreseeable result of Defendants' misconduct, Plaintiff suffered:

(a) loss of her only vehicle and primary asset;

(b) destruction of fair-market and trade-in value through concealed salvage branding;

(c) severe financial destabilization and coerced immobility;

(d) emotional distress, fear of police retaliation, and loss of civil security;

(e) erosion of trust in government authority.

731. Defendants' conduct was willful, retaliatory, oppressive, and undertaken with reckless disregard for Plaintiff's constitutional rights.

**E. Individual Liability and Punitive Exposure**

732. Each individually named Defendant personally participated in, directed, ratified, or knowingly failed to stop the abuse of authority described herein.

733. Such conduct violated clearly established constitutional rights of which a reasonable official would have known, defeating any claim of qualified immunity.

734. Plaintiff seeks punitive damages against all non-immune individual Defendants for intentional abuse of authority under color of law.

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment against Defendants, jointly and severally, award compensatory damages, punitive damages against all non-immune Defendants, declaratory and injunctive relief, attorney's fees and costs pursuant to 42 U.S.C. § 1988, and such other relief set forth in the Prayer for Relief.

## COUNT XVI — ABUSE OF PROCESS AND ULTRA VIRES ENFORCEMENT

(Under Color of Law; Misuse of Legal Mechanisms for Revenue-Driven Coercion)

(42 U.S.C. § 1983; U.S. Const. Amends. IV & XIV;

Fla. Const. art. I §§ 9 & 12;

Fla. Stat. §§ 316.640, 320.38, 713.78(6);

Florida Common Law)

Against the Town of Palm Beach; the Palm Beach Police Department; Kauff's Towing & Recovery, Inc.; Guardian Fleet Services, Inc.; and John Doe Defendants 1–25, consisting of

municipal officials, sworn law-enforcement officers, parking-enforcement personnel, towing-company employees, supervisors, managers, and other persons who jointly exercised, enabled, ratified, or exploited ultra vires enforcement authority and legal process under color of law for improper and revenue-driven purposes

## A. Incorporation and Action Under Color of Law

735. Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.

736. At all relevant times, Defendants acted jointly and under color of state law through municipal employees, sworn police officers, and a privately contracted towing company vested with delegated enforcement authority.

737. The Town of Palm Beach and the Palm Beach Police Department delegated towing, impoundment, detention, and release authority to Kauff's Towing & Recovery, Inc., thereby empowering a private, profit-driven entity to exercise coercive state power backed by police enforcement.

738. By exercising and delegating such authority, each Defendant assumed non-delegable constitutional duties to act within statutory limits, provide due process, and refrain from using legal mechanisms for improper or revenue-driven purposes.

## B. Ultra Vires Enforcement and Void Exercise of Power

739. Under Fla. Stat. § 316.640(2)(b) and (3)(c), municipal parking-enforcement personnel are strictly limited to enforcing parking regulations and possess no authority to enforce state vehicle-registration statutes governed by Chapter 320.

740. Fla. Stat. § 320.38 regulates only the operation or use of an unregistered vehicle and does not criminalize or prohibit stationary parking of a non-moving vehicle.

741. Despite these clear statutory limits, Town personnel repeatedly issued "expired registration" and status-based citations to Plaintiff's lawfully parked, insured, non-moving vehicle.

742. At all relevant times, Plaintiff was actively complying with California DMV procedures to obtain a duplicate title required for renewal—facts known to Defendants.

743. Because Defendants lacked statutory authority to enforce registration law in this context, every citation, immobilization, tow, detention, and post-tow action premised on registration status was ultra vires, void, and unlawful ab initio.

## C. Abuse of Process — Misuse of Legal Mechanisms for Improper Purposes

744. Abuse of process occurs where legal procedures are used for purposes other than those for which they were designed.

745. Here, Defendants used citations, booting, towing, impoundment, release procedures, and lien statutes not for lawful regulation, but to:

(a) manufacture false delinquency;

(b) escalate enforcement without notice or opportunity to cure;

(c) coerce payment of unlawful fines and fees; and

(d) conceal their lack of jurisdiction and authority.

746. The issuance of citations was not intended to enforce valid law, but to create pretextual grounds for seizure and revenue extraction.

747. The elements of abuse of process are satisfied:

(a) use of legal process;

(b) for an ulterior, improper purpose; and

(c) resulting harm to Plaintiff.

D. Abuse of Authority by PBPD — Threats, Coercion, and Enforcement of Void Acts

748. PBPD officers enforced the Town's unlawful citations despite knowing that:

(1) no lawful delinquency existed;

(2) registration status could not justify towing;

(3) Plaintiff possessed documentation showing active renewal; and

(4) officers lacked authority under § 320.38.

749. PBPD officers threatened Plaintiff with arrest and further punishment if she attempted to retrieve or drive her own vehicle, despite the Town's issuance of a release directive.

750. These threats and misstatements of law, delivered under color of authority, converted police power into a coercive instrument to aid Kauff's unlawful detention and served no legitimate governmental objective.

### E. Abuse of Process by Kauff's — Weaponizing Statutes While Violating Them

751. Kauff's repeatedly invoked Fla. Stat. § 713.78 to justify refusing release, falsely asserting that Plaintiff lacked required documentation.

752. Plaintiff presented all proof of ownership required under § 713.78(6), including identification, insurance, DMV title confirmation, and a Town-issued release order.

753. Kauff's refusal to release the vehicle despite statutory compliance constituted deliberate misuse of the statute itself—transforming a consumer-protection law into a coercive barrier.

754. By asserting that statutory compliance was "insufficient," Kauff's inverted the law into a tool for extortion and profit.

### F. Coordinated Closed-Loop Trap

755. Defendants acted in concert to create a self-reinforcing procedural trap:

(a) the Town issued void citations to fabricate delinquency;

(b) PBPD enforced those fictions through threats and misinformation; and

(c) Kauff's refused release even after lawful proof was provided.

756. Because a vehicle cannot be registered while under impound or lien, Defendants knowingly created the very condition they then used to justify continued detention.

757. This engineered impossibility constitutes a closed-loop abuse of process designed to coerce payment and deprive Plaintiff of property.

**G. Resulting Harm**

758. As a direct and foreseeable result of Defendants' ultra vires conduct and abuse of process, Plaintiff suffered:

(a) unlawful seizure and permanent loss of her vehicle;

(b) destruction of title, resale, and trade-in value;

(c) severe financial destabilization;

(d) emotional distress and intimidation; and

(e) loss of civil security and trust in law enforcement.

**H. Legal Effect**

759. Defendants' actions were outside their jurisdiction, contrary to statute, motivated by improper purpose, and used to inflict harm, satisfying every element of ultra vires enforcement and abuse of process under § 1983.

760. Because Defendants acted outside lawful authority and in bad faith, no claim of sovereign or qualified immunity applies.

761. Defendants are liable for compensatory damages, punitive damages against all non-immune Defendants, declaratory and injunctive relief, and attorney's fees under 42 U.S.C. § 1988.

**WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants on this Count; declare Defendants' actions unconstitutional, ultra vires, and abusive of process; award compensatory and punitive damages; grant declaratory and injunctive relief; award attorney's fees and costs pursuant to § 1988; and grant all further relief as set forth in the global Prayer for Relief.

## COUNT XVII – FRAUD AND EXTORTION UNDER COLOR OF LAW

(42 U.S.C. § 1983 – Deprivation of Property Through Coercive Misrepresentation and Abuse of Authority)

The Town of Palm Beach; the Palm Beach Police Department; Kauff's Towing & Recovery, Inc.; Guardian Fleet Services, Inc.; and John Doe Defendants 1–25, including but not limited to municipal officials, sworn and unsworn law-enforcement personnel, parking-enforcement personnel, records custodians, supervisors, managers, dispatch personnel, lien and salvage processors, and other agents who participated in, authorized, ratified, concealed, or benefitted from the fraudulent and extortionate conduct alleged herein, all acting jointly and under color of state and municipal law.

### A. Incorporation

761. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

763. At all relevant times, Defendants acted jointly, in concert, and under color of state and municipal law to fraudulently and coercively deprive Plaintiff of her property and money through misrepresentation of legal authority, intimidation, concealment of statutory rights, and abuse of official power.

## B. Overview of the Fraudulent and Extortionate Scheme

764. Defendants executed a coordinated scheme designed to obtain money, property, or forfeiture from Plaintiff by falsely asserting legal authority that did not exist, suppressing lawful remedies, and presenting payment as the only means of escape from escalating punishment.

765. The scheme operated as a closed loop:

(a) municipal enforcement fabricated delinquency;

(b) police officers reinforced false arrest and criminal exposure;

(c) a private towing contractor monetized the resulting fear and paralysis; and

(d) corporate management ratified concealment, coercion, and continued demands.

734. These acts were not negligent, mistaken, or bureaucratic error. They were deliberate, knowing, and profit-motivated.

## C. Fraudulent Misrepresentation of Legal Authority

766. Defendants repeatedly misrepresented the law to Plaintiff by asserting false or nonexistent legal requirements, including fabricated towing authority, invented lien prerequisites, and unlawful "conditions" for vehicle release.

767. Town Parking Enforcement issued citations outside its statutory authority and treated them as enforceable, falsely representing that Plaintiff faced lawful escalation despite the absence of jurisdiction under Florida law.

768. Parking Enforcement further impersonated police authority through unauthorized signage and communications identifying themselves as "Palm Beach Police… parking," a deliberate misrepresentation designed to induce fear and compliance.

769. Palm Beach Police Department officers reinforced these falsehoods by threatening arrest, jail, renewed citation, or further punishment if Plaintiff attempted to retrieve her vehicle or challenge Kauff's demands—despite knowing no lawful basis existed.

770. Kauff's then relied on these misrepresentations of law to refuse release, demand payment, and impose fabricated legal conditions, falsely asserting that "state law" required current registration, physical title, or other prerequisites that do not exist under Fla. Stat. § 713.78.

## D. Extortion Through Coercion and Suppression of Rights

771. Defendants used the appearance of official authority to coerce Plaintiff into submission by presenting a false binary: pay or permanently lose her property.

772. Defendants suppressed Plaintiff's statutory rights by:

(a) concealing the Town's June 3, 2025 zero-fee Release Order;

(b) withholding lawful release pathways;

(c) mischaracterizing the matter as "civil" while simultaneously invoking criminal consequences; and

(d) refusing to document or investigate Plaintiff's complaints.

773. The cumulative effect of these acts was to override Plaintiff's free will through fear, confusion, and escalating financial pressure, constituting extortion under color of official right.

## E. Defendant-Specific Participation

### 1. Town of Palm Beach

774. The Town knowingly issued and enforced void citations, misrepresented their legal effect, and used those fabrications to justify towing and financial extraction.

775. The Town further concealed and misclassified records after the tow, evidencing intent to preserve the fraudulent narrative and prevent accountability.

### 2. Palm Beach Police Department

776. PBPD officers knowingly misrepresented arrest authority, threatened criminal consequences without legal basis, and refused to enforce a valid municipal release directive.

777. PBPD then disclaimed responsibility by falsely labeling the deprivation "civil," a calculated maneuver that insulated Kauff's extortion while maintaining coercive leverage.

### 3. Kauff's Towing & Recovery, Inc.

778. Kauff's accepted and detained Plaintiff's vehicle without lawful authority, fabricated lien rights, imposed non-existent release conditions, and demanded payment under threat of permanent loss.

779. Kauff's knowingly concealed the salvage branding and continued issuing coercive demands after the vehicle had already been destroyed, demonstrating intentional fraud for financial gain.

**4. Guardian Fleet Services, Inc.**

780. Guardian Fleet, as policymaker and corporate supervisor, ratified the withholding of notices, concealment of material facts, and coercive demands, transforming individual misconduct into corporate policy.

**F. Post-Notice Retaliation and Written Extortion**

781. After Plaintiff asserted her rights and demanded proof of legality, Guardian executive Thomas A. Tedford sent written communications threatening escalating fees, fabricated legal consequences, retaliatory action, and permanent loss unless Plaintiff abandoned her claims.

782. These threats were knowingly false, retaliatory, and designed to punish protected activity and extract payment through fear—constituting written extortion and fraud under color of law.

**G. Reliance, Intent, and Causation**

783. Plaintiff reasonably relied on Defendants' representations because they were made by uniformed officers, municipal officials, and a state-authorized contractor acting under apparent legal authority.

784. Defendants knew their statements were false, intended Plaintiff to rely upon them, and acted with the purpose of obtaining money, property, or forfeiture.

785. Defendants' fraudulent and extortionate conduct was the direct and proximate cause of Plaintiff's loss of property, financial harm, emotional distress, and constitutional injury.

## H. Joint Action Under Color of Law

786. Defendants acted jointly and under color of law within the meaning of 42 U.S.C. § 1983 by combining governmental authority, police intimidation, and private profiteering to accomplish a deprivation that none could lawfully achieve alone.

787. The misuse of false legal authority by multiple actors operating in concert constitutes fraud, extortion, and unlawful deprivation of property without due process.

## I. Damages

788. As a direct and proximate result of Defendants' conduct, Plaintiff suffered:

(a) permanent loss of her vehicle;

(b) destruction of economic and property value;

(c) financial destabilization;

(d) emotional and psychological trauma; and

(e) loss of autonomy, security, and trust in public institutions.

**J. Legal Effect**

789. Defendants' conduct satisfies all elements of fraud and extortion under color of law and constitutes an actionable deprivation of property and liberty interests under 42 U.S.C. § 1983.

790. Plaintiff is entitled to punitive and compensatory damages and all relief available under § 1983 and applicable law, including deterrent and remedial relief to prevent recurrence.

**WHEREFORE,** Plaintiff seeks all compensatory damages (including emotional, general, punitive, and future damages), declaratory and injunctive relief, attorney's fees available under law, and any other relief as set forth in the Prayer for Relief.

**COUNT XVIII — CONVERSION**

(Florida Common Law)

Kauff's Towing & Recovery, Inc.; the Town of Palm Beach; the Palm Beach Police Department; and  Doe Defendants 1–20, including but not limited to municipal officials, sworn and unsworn law-enforcement personnel, parking-enforcement personnel, supervisors, records custodians, dispatch personnel, and other agents or employees who participated in, authorized, ratified, enforced, or benefitted from the unlawful seizure, detention, refusal to release, destruction, and post-conversion exploitation of Plaintiff's property, all acting jointly and under color of municipal authority.

## A. Ownership and Unlawful Taking

791. Plaintiff realleges and incorporates all preceding paragraphs.

792. Plaintiff was the lawful owner of a 2016 Toyota Prius.

793. On June 2, 2025, Defendants seized Plaintiff's vehicle under color of municipal authority without any lawful basis. The underlying citations were non-delinquent, jurisdictionally void, and issued without statutory authority.

794. Because the tow was unlawful at inception, no possessory or lien interest could arise, and Defendants' possession was wrongful from the outset.

795. Under Florida law, a towing lien cannot arise from an unlawful tow, and continued detention constitutes conversion. Carlsen v. Rivera, 382 So. 2d 820 (Fla. 4th DCA 1980).

## B. Refusal to Release After Proof of Ownership

796. On June 3, 2025, the Town of Palm Beach determined the tow was invalid, waived all fees, and ordered immediate release of the vehicle.

797. On June 4, 2025, Plaintiff appeared at Kauff's with proof of ownership satisfying Fla. Stat. § 713.78(6), including identification, insurance, title documentation, and the Town's release order.

767. Fla. Stat. § 713.78 does not require current registration or an original title for owner release.

798. Kauff's nevertheless refused to release the vehicle, falsely asserting unspecified "state law" requirements, and continued detaining Plaintiff's property for profit.

799. Refusal to release a vehicle after proof of ownership constitutes willful conversion and supports punitive damages. Trueman v. Fleet Towing Co., 124 So. 3d 313 (Fla. 2d DCA 2013).

## C. Statutory Noncompliance and Void Lien Claims

800. Kauff's failed to comply with mandatory statutory requirements governing towing, notice, and lien enforcement, including required reporting, certified notice, and accounting.

801. Each such failure independently voids any lien rights and renders continued detention unlawful. Walls v. Roadway Towing, 802 So. 2d 585 (Fla. 5th DCA 2001).

802. Palm Beach Police Department records confirmed that no lawful tow or lien record existed in state databases at the time of seizure.

## D. Unlawful Destruction Through Salvage Branding

803. Plaintiff received no statutory notice of lien, sale, or disposition.

804. Despite the absence of notice and in violation of statutory waiting periods and constitutional due process, Defendants caused Plaintiff's vehicle to be branded "salvage" on August 18, 2025.

805. Salvage branding permanently destroys ownership and title value and constitutes conversion as a matter of law.

806. Defendants' actions deprived Plaintiff of any opportunity to redeem, contest, or prevent destruction, in violation of due process. Fuentes v. Shevin, 407 U.S. 67; Mennonite Bd. of Missions v. Adams, 462 U.S. 791.

**E. Post-Conversion Extortion and Fabricated Charges**

807. After salvage branding, Kauff's demanded payment of fabricated "post-sale" storage fees exceeding $4,500.

808. Storage charges after sale or disposition are unlawful and constitute further conversion. Murrell v. Trio Towing Serv., 294 So. 3d 983 (Fla. 4th DCA 2020).

809. Defendants alternated between false claims that the vehicle was "sold," "gone," or "found," using coercive threats and deadlines to extract payment.

**F. Joint Action, Ratification, and Continuing Conversion**

810. Plaintiff demanded return of her vehicle beginning June 3, 2025. Defendants refused.

811. The Town of Palm Beach and the Palm Beach Police Department ratified and enforced the continued detention by refusing to intervene, refusing to enforce the release order, refusing to document Plaintiff's complaint, and withholding records necessary to reclaim the vehicle.

812. Defendants acted jointly and under color of law to exercise wrongful dominion over Plaintiff's property.

813. The conversion was continuous and extended through unlawful seizure, refusal to release, fabricated legal requirements, concealment of notice, salvage branding, and post-conversion extortion.

**G. Damages**

814. As a direct and proximate result of Defendants' conversion, Plaintiff suffered permanent loss of her vehicle, destruction of clean title and market value, loss of use, financial harm, and severe emotional distress.

815. Defendants' conduct was willful, knowing, malicious, and profit-driven, warranting compensatory and punitive damages and joint and several liability.

**WHEREFORE,** Plaintiff seeks all compensatory damages (including emotional, general, punitive, and future damages), declaratory and injunctive relief, attorney's fees and costs where available under law, and any other relief as set forth in the Prayer for Relief.

**COUNT XIX – TORTIOUS INTERFERENCE WITH PROTECTED PROPERTY AND ECONOMIC RELATIONSHIPS**

(Florida Common Law)

Kauff's Towing & Recovery, Inc.; Guardian Fleet Services, Inc.; the Town of Palm Beach; the Palm Beach Police Department; individual Palm Beach Police Department officers; individual Town of Palm Beach parking-enforcement officers; and Doe Defendants 1–20, consisting of unknown officers, parking-enforcement personnel, supervisors, dispatchers, records custodians, managers, agents, and contractors who participated in, directed, ratified, facilitated, or knowingly failed to prevent the tortious interference alleged herein.

## A. Incorporation

816. Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.

## B. Protected Property and Economic Interests

817. Plaintiff possessed legally protected property and economic interests, including but not limited to:

(a) ownership and immediate possessory rights in her 2016 Toyota Prius;

(b) statutory rights to reclaim the vehicle upon proof of ownership under Fla. Stat. § 713.78;

(c) the right to maintain a clean, non-salvage title;

(d) her DMV registration and title relationships;

(e) contractual and beneficial relationships with her insurer; and

(f) her economic expectancy in the vehicle's full market, resale, and trade-in value.

## C. Defendants' Knowledge

818. Defendants had actual knowledge of Plaintiff's protected property and economic interests.

819. Such knowledge is established by, among other things:

(a) Plaintiff's presentation of valid identification, insurance, and title documentation;

(b) the Town of Palm Beach's written June 3, 2025 zero-fee Release Order;

(c) Plaintiff's repeated in-person and written demands for lawful release; and

(d) Defendants' own records confirming Plaintiff's ownership and entitlement to possession.

## D. Intentional and Unjustified Interference

820. Despite this knowledge, Defendants intentionally and unjustifiably interfered with Plaintiff's protected property and economic interests.

821. Defendants' interference included, but was not limited to:

(a) refusing to release the vehicle after lawful proof of ownership and a municipal release directive;

(b) fabricating legal requirements not found in Florida law as conditions of release;

(c) concealing or fabricating lien and notice records;

(d) initiating or advancing salvage-title branding without statutory authority;

(e) misrepresenting the vehicle's status as "sold," "gone," or "destroyed"; and

(f) imposing coercive, fabricated fees to force payment or forfeiture.

## E. Improper Means

822. Defendants accomplished their interference through improper means, including fraud, deception, coercion, statutory violations, misrepresentation of law, and misuse of delegated governmental authority.

823. Defendants' conduct was not privileged, justified, or undertaken in good faith, as:

(a) the underlying tow was unauthorized;

(b) any asserted lien was void;

(c) the Town had waived all fees and ordered immediate release; and

(d) Defendants knowingly acted in defiance of governing statutes and directives.

## F. Interference with Economic Relationships and Life Mobility

824. Defendants' conduct intentionally and foreseeably interfered not only with Plaintiff's property rights, but with her ability to engage in ordinary economic, professional, and personal activities dependent on mobility and financial stability.

825. By unlawfully detaining Plaintiff's vehicle, imposing daily accruing charges, and offering no lawful path to release, Defendants effectively confined Plaintiff to a single geographic location for an extended period.

826. As a direct result, Plaintiff was forced to cancel multiple pre-planned trips, professional engagements, and personal commitments, causing reputational harm, loss of economic momentum, disruption of professional relationships, and erosion of future opportunities that depended on her ability to travel, appear, and participate.

827. This forced confinement occurred during a period of acute personal vulnerability following the sudden death of Plaintiff's fiancé, compounding the economic and relational harm by depriving Plaintiff of the ability to grieve, restore stability, and maintain normal social and professional functioning.

**G. Causation**

828. Defendants' intentional interference was the direct and proximate cause of Plaintiff's losses.

829. But for Defendants' conduct, Plaintiff would have retrieved her vehicle in early June 2025, preserved its full value, avoided salvage branding, maintained her mobility, and proceeded with her planned travel, professional activities, and economic engagements.

**H. Damages**

830. As a direct and proximate result of Defendants' tortious interference, Plaintiff suffered substantial damages, including:

(a) total loss of her vehicle;

(b) destruction of clean-title status and market value;

(c) prolonged loss of use and mobility;

(d) forced geographic confinement and inability to travel;

(e) cancellation of planned trips and professional engagements;

(f) reputational harm from repeated cancellations and forced withdrawal;

(g) loss of economic momentum and disruption of business and professional relationships;

(h) financial losses incurred attempting retrieval; and

(i) severe emotional distress attendant to property loss, confinement, and instability.

### I. Aggravation and Punitive Damages

831. Defendants' conduct was willful, malicious, fraudulent, oppressive, and undertaken with conscious disregard for Plaintiff's rights.

832. Under Florida law, tortious interference committed through fraud, deception, and coercion supports an award of punitive damages.

### J. Liability

833. Defendants are jointly and severally liable for all damages resulting from their tortious interference with Plaintiff's protected property and economic relationships.

**WHEREFORE,** Plaintiff seeks all compensatory damages (including emotional, general, punitive, and future damages), declaratory and injunctive relief, attorney's fees and costs where available under law, and any other relief as set forth in the Prayer for Relief.

### COUNT XX — CIVIL THEFT

(Intentional Taking, Retention, and Destruction of Property for Financial Gain)

Fla. Stat. §§ 772.11, 812.014

Against Kauff's Towing & Recovery, Inc.; Guardian Fleet Services, Inc.; individual employees, agents, managers, supervisors, officers, and decision-makers of Kauff's Towing & Recovery, Inc. and Guardian Fleet Services, Inc., in their individual capacities; and Doe Defendants 1–20, consisting of presently unidentified personnel of Kauff's Towing & Recovery, Inc. and/or

Guardian Fleet Services, Inc. who knowingly participated in, directed, approved, ratified, or carried out the unlawful taking, retention, concealment, salvage branding, destruction, billing, or extortionate demands relating to Plaintiff's vehicle.

834. Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein, including those describing the unlawful tow, refusal to release, fabrication of legal requirements, false statements of law, unlawful lien procedures, salvage branding, and post-sale fee demands.

835. Under Fla. Stat. § 812.014, theft occurs when a person knowingly obtains or retains property of another with intent to temporarily or permanently deprive the owner of the right to the property or to appropriate it for personal use or gain.

836. Kauff's knowingly obtained possession of Plaintiff's vehicle without lawful authority, based on void citations, an ultra vires tow, and the absence of any valid lien under Fla. Stat. § 713.78.

837. After the Town of Palm Beach determined the tow was invalid, waived all fees, and ordered immediate release, Kauff's knowingly and intentionally retained Plaintiff's vehicle for profit, despite knowing it had no lawful entitlement to continued possession.

838. Plaintiff presented proof of ownership that independently required immediate release under Fla. Stat. § 713.78(6). Kauff's knowingly refused, falsely asserting that "state law" required current registration or a physical title.

839. These representations were knowingly false and were made with intent to mislead, coerce, and extract money from Plaintiff, demonstrating criminal intent.

840. Kauff's then initiated a sham lien and sale process without statutory notices, without DHSMV reporting, without certified mailing, without required waiting periods, and without any lawful predicate.

841. Kauff's caused the vehicle to be branded "salvage," permanently destroying its value, despite lacking any lawful lien rights or authority to do so.

842. After branding the vehicle salvage, Kauff's continued demanding payment of fabricated "post-sale storage" charges and threatened permanent loss unless Plaintiff paid—conduct constituting theft and extortion under Florida law.

843. These acts were intentional, willful, malicious, and profit-motivated, undertaken with full knowledge that Plaintiff was the lawful owner and that Kauff's had no legal entitlement to the vehicle or to any payment.

844. The conduct was not mistake or negligence, but a deliberate pattern of unlawful deprivation for financial gain.

845. Plaintiff satisfies the "clear and convincing evidence" standard required by Fla. Stat. § 772.11 through Defendants' false legal assertions, refusal to release after lawful proof, fabricated charges, unlawful salvage branding, coercive threats, and concealment of required notices.

846. Plaintiff suffered damages including the full fair-market value of the vehicle, destruction of clean-title equity, loss of use, financial destabilization, and emotional harm arising directly from the theft.

847. Plaintiff is entitled to mandatory treble damages, attorney's fees, and costs pursuant to Fla. Stat. § 772.11.

**WHEREFORE**, Plaintiff respectfully requests entry of judgment against Defendants for civil theft and an award of treble damages, attorney's fees, and costs pursuant to Fla. Stat. § 772.11, together with all other relief set forth in the Prayer for Relief.

## COUNT XXI— GROSS NEGLIGENCE, NEGLIGENT SUPERVISION, TRAINING, RETENTION, DELEGATION & HANDLING OF PROPERTY

Against The Town of Palm Beach; the Palm Beach Police Department; Kauff's Towing & Recovery, Inc.; Guardian Fleet Services, Inc.; and Doe Defendants 1–20, consisting of presently unidentified municipal employees, sworn police officers, parking-enforcement personnel, records custodians, supervisors, managers, tow-yard personnel, lien processors, compliance personnel, and corporate agents who, while acting within the course and scope of their employment or agency, negligently or grossly negligently participated in, supervised, delegated, approved, or otherwise  handled the towing, detention, lien processing, notice, release, salvage, recordkeeping, and disposition of Plaintiff's vehicle.

### A. Incorporation and Legal Basis

848. Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.

849. This Count is pled in the alternative to Plaintiff's federal civil-rights, RICO, FDUTPA, and intentional tort claims. It arises under Florida common-law negligence and gross negligence.

850. At all relevant times:

(a) The Town of Palm Beach and the Palm Beach Police Department ("PBPD") owed duties to hire, train, supervise, discipline, and oversee employees and contractors to ensure that towing, impoundment, lien processing, notice, release, and property handling complied with Florida law and due process.

(b) Kauff's Towing & Recovery, Inc.—as the Town's contracted towing and lien agent—owed Plaintiff a duty of reasonable care in verifying ownership, issuing notices, maintaining accurate records, communicating lawfully, preserving title, and releasing property.

(c) Guardian Fleet Services, Inc., as the statewide corporate parent and policymaker for Kauff's, owed an independent duty to design, supervise, audit, and correct the towing, lien, notice, and salvage processes applied to Plaintiff's vehicle and to ensure compliance with Florida Statutes §§ 713.78 and 319.30.

851. Defendants knew, or should have known, that towing, detaining, and processing title for private vehicles carry a substantial and foreseeable risk of severe harm if performed negligently—including wrongful seizure, prolonged deprivation, unlawful storage fees, and irreversible destruction of title.

852. All municipal employees, police officers, tow yard personnel, corporate supervisors, and executives whose conduct is described herein acted within the scope of their employment; their negligent acts are imputable to their institutional employers under respondeat superior, negligent supervision, and negligent retention.


**B. Municipal Negligence in Training, Supervision, Discipline, and Delegation**

853. The Town of Palm Beach and PBPD breached their duties by failing to create or enforce adequate policies to ensure that:

(a) Parking-enforcement officers operated within their lawful jurisdiction under Fla. Stat. §§ 316.640 and 316.650;

(b) No vehicle was booted, towed, or impounded without lawful authority, notice, or opportunity to be heard;

(c) Supervisors verified probable cause, lawful basis, and Town authorization before approving tows;

(d) Officers enforced the Town's June 3 no-fee release order instead of ignoring it;

(e) Tow operators complied with statutory release obligations under Fla. Stat. § 713.78(6);

(f) Body camera footage, dispatch logs, and towing records were preserved, not deleted or suppressed;

(g) Personnel refrained from misrepresenting law, impersonating authority, or using fabricated ordinances such as the nonexistent "three-ticket rule."

854. This absence of training, discipline, oversight, and accountability created an environment in which PBPD officers and parking-enforcement officers believed—correctly—that they could:

(a) issue citations outside jurisdiction;

(b) boot and tow without legal basis;

(c) ignore Town directives;

(d) threaten arrest to enforce a private contractor's demands;

(e) suppress criminal reports;

(f) fabricate legal requirements; and

(g) delete evidence with impunity.

855. Even after the Town admitted the tow was a mistake and issued an unconditional release order, PBPD supervisors failed to act, failed to intervene, failed to discipline personnel, and failed to ensure that the property was returned.

856. This municipal inaction and ratification constituted gross negligence and directly enabled the continued deprivation of Plaintiff's vehicle and destruction of her title. Such conduct reflects a conscious disregard and indifference to Plaintiff's rights and safety, rising well above ordinary negligence and satisfying Florida's standard for gross negligence.

## C. Gross Negligence by Kauff's in Handling, Notice, Recordkeeping, and Release

857. Kauff's Towing & Recovery, Inc. owed Plaintiff a duty to:

(a) verify ownership when she appeared in person on June 4 with ID and insurance;

(b) send certified notices within seven business days under § 713.78(4);

(c) communicate truthfully about fees, lien status, and release requirements;

(d) maintain accurate TowBook records;

(e) refrain from fabricating legal prerequisites ("current registration," "title in hand," "statutory lien"); and

(f) avoid contradictory statements about whether the vehicle was "gone," "sold," "destroyed," or "never moved."

858. Kauff's breached every one of these duties.

859. Kauff's never sent any of the statutory certified notices required by § 713.78(4). PBSO confirmed in writing that no certified mail was ever received.

860. Kauff's lied about having contacted PBSO, lied about sending certified mail to California and Florida, and lied about complying with statutory procedures.

861. Kauff's salvage-branded Plaintiff's clear, undamaged vehicle on August 18 without:

(a) a lawful lien;

(b) any certified notice;

(c) insurer notice;

(d) statutory authority; or

(e) any basis whatsoever.

862. Kauff's then concealed the salvage branding while demanding nearly $4,500 and urging Plaintiff to "come in and pay" under the false implication that the title remained clean.

863. These actions rise above simple negligence and constitute gross negligence—a conscious disregard for statutory obligations and the rights of an owner whose property was under Kauff's exclusive control.

**D. Gross Negligence by Guardian Fleet Services – Corporate Oversight, Policy Design, and Executive Misconduct**

864. Guardian Fleet Services, Inc., as the statewide corporate parent of Kauff's, designed, approved, and supervised the policies governing:

(a) towing authority;

(b) lien initiation;

(c) notice requirements;

(d) salvage workflows;

(e) TowBook system entries;

(f) DMV/NMVTIS submissions;

(g) fee calculation;

(h) release procedures; and

(i) record retention.

865. Guardian owed a heightened duty of care because its internal policies directly governed Kauff's interactions with the public and determined whether owners' vehicles would be lawfully or unlawfully detained, liened, salvaged, or released.

866. Guardian breached this duty through grossly negligent corporate oversight, including:

(a) failing to audit or verify whether Kauff's was complying with statutory notice requirements;

(b) failing to correct obviously unlawful lien and salvage actions;

(c) failing to investigate Plaintiff's detailed preservation letters identifying statutory violations;

(d) allowing employees to rely on legally impossible requirements ("current registration," "must have physical title") invented internally;

(e) permitting contradictory, false, and reckless communications to owners about whether vehicles were "gone," "sold," or "never moved."

## E. Executive-Level Gross Negligence: Chief Executive Officer Tom Tedford III

867. On December 1, 2025, Guardian Fleet Services, Inc.'s Chief Executive Officer, Tom Tedford III, personally responded to Plaintiff's written preservation and inquiry requests and, in doing so, engaged in executive-level conduct constituting gross negligence and reckless disregard for Plaintiff's property rights and statutory protections, including by:

(a) refusing to produce or identify any records evidencing statutory notice, TowBook entries, lien initiation logs, salvage documentation, or title-processing records;

(b) falsely asserting that "all documentation exists" while simultaneously declining to produce, describe, or authenticate any such documentation;

(c) threatening renewed sale, escalating storage charges, and asserting a fabricated "lien on Plaintiff's driver's license," despite no statutory basis for such a claim;

(d) insisting that Kauff's Towing & Recovery, Inc. was "fully compliant with Florida Statute," notwithstanding clear documentary evidence demonstrating noncompliance with Fla. Stat. §§ 713.78 and 319.30;

(e) attempting to pressure Plaintiff into payment rather than undertaking any good-faith verification of the legality of the tow, lien assertions, or continued detention of the vehicle; and

(f) concealing the existence of salvage branding and interstate title-system reporting while simultaneously representing that the vehicle remained in the same pre-tow condition and status when demanding payment under duress.

868. Even under a negligence standard, a chief executive officer's refusal to verify statutory compliance, combined with affirmative misrepresentations, coercive threats, and concealment of title destruction while exercising control over corporate policy and records, constitutes gross negligence and reckless disregard for the foreseeable harm to a vehicle owner whose property was under Defendants' exclusive control.

869. Guardian's supervisory negligence, policy failures, and executive-level ratification were substantial factors in Plaintiff's loss, emotional distress, and irreversible title destruction.


### F. Negligent Retention, Delegation, and Municipal Complicity

870. The Town's decision to repeatedly entrust towing authority to Kauff's—despite years of BBB and Google reviews describing unlawful tows, price inflation, threats, and coordinated misconduct with police—constitutes negligent delegation and negligent retention.

871. PBPD's longstanding refusal to discipline officers who issued illegal tickets, misrepresented law, ignored release orders, and suppressed reports constitutes negligent supervision.

872. Guardian's continued deployment of the same lien and salvage policies, even after repeated complaints from other owners statewide, constitutes negligent corporate retention of defective procedures.

## G. Negligence Per Se – Statutory Violations

873. Violations of Fla. Stat. § 713.78, § 319.30, and related lien/title statutes constitute negligence per se, because these laws were enacted to protect vehicle owners like Plaintiff from wrongful seizure, unauthorized lien actions, lack of notice, and title destruction.

874. Defendants violated these statutes by:

(a) failing to send certified notice within seven business days;

(b) failing to send any notice at all;

(c) initiating a lien without meeting statutory prerequisites;

(d) salvage-branding without lawful lien authority;

(e) misrepresenting law enforcement authorization;

(f) submitting false or contradictory information to DMV/NMVTIS; and

(g) refusing to release the vehicle despite a Town-issued directive.

875. These statutory violations establish breach as a matter of law.

## H. Causation and Damages

876. Defendants' gross negligence directly and proximately caused Plaintiff:

(a) permanent loss of her 2016 Toyota Prius;

(b) irreversible destruction of interstate title;

(c) loss of tens of thousands in market value;

(d) months of unlawful detention of her property;

(e) severe emotional distress, fear, humiliation, and complete destabilization;

(f) ongoing financial hardship and financial paralysis;

(g) interference with her trade-in and economic relationships;

(h) disruption of her grieving process and daily life.

877. A reasonably trained, supervised, and properly managed municipal agency or towing
contractor would have:

(a) verified legality before towing;

(b) followed the Town's release order;

(c) sent certified notice correctly;

(d) disclosed salvage;

(e) preserved records;

(f) corrected errors when Plaintiff appeared in person; and

(g) ensured title remained intact.

878. Defendants did none of these things.

879. Their combined acts and omissions constitute gross negligence, negligence per se, negligent supervision, negligent retention, negligent entrustment, and negligent handling of property, entitling Plaintiff to full compensatory damages under Florida law

**WHEREFORE**, Plaintiff seeks all compensatory damages (including emotional, general, and future damages**)**, punitive damages to the extent permitted by Florida law for grossly negligent conduct, declaratory and injunctive relief, attorney's fees available under law, and any other relief as set forth in the Prayer for Relief.

## COUNT XXII — SPOLIATION OF EVIDENCE (STATE LAW)

(Florida Common-Law Spoliation; Statutory Record-Preservation Duties;

Florida Public Records Principles)

Against Kauff's Towing & Recovery, Inc.; Guardian Fleet Services, Inc.; the Town of Palm Beach; the Palm Beach Police Department; and Doe Defendants 1–20, consisting of presently unidentified municipal employees, sworn police officers, parking-enforcement personnel, dispatchers, records custodians, supervisors, managers, tow-yard personnel, lien processors, compliance personnel, corporate officers, and agents who, while acting within the course and scope of their employment or agency, intentionally or negligently destroyed, altered, concealed, failed to preserve, failed to generate, or permitted the loss of material evidence after litigation was reasonably foreseeable, including but not limited to certified-mail notices and receipts, USPS tracking records, lien-initiation documentation, TowBook entries, salvage and title-processing records, insurer notifications, internal communications, body-camera footage,

dispatch logs, release-order routing records, and statutory-compliance documentation relating to the tow, detention, lien assertion, release refusal, salvage branding, and disposition of Plaintiff's vehicle.

## A. Incorporation and Florida Legal Standard

880. Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.

881. Florida recognizes an independent cause of action for spoliation of evidence where a party intentionally destroys, alters, conceals, or fails to preserve evidence necessary to another's civil claim, causing prejudice to the ability to prove that claim.

882. Each Defendant owed Plaintiff a duty—arising from Florida statutes, common law, contractual delegation of authority, and foreseeability of litigation—to preserve evidence relating to the tow, boot, impoundment, lien assertions, notice procedures, release order, salvage branding, and all related governmental and corporate records.

883. Defendants breached those duties by destroying evidence, failing to create statutorily required records, withholding documentation, manipulating timelines, and allowing the loss of material evidence after litigation was reasonably anticipated.

## B. Failure to Create and Preserve Statutorily Required Lien and Notice Evidence

884. Florida Statutes §§ 713.78(4)–(5) require towing companies to generate, preserve, and be able to produce certified-mail notices to the registered owner and lienholders before storage fees accrue, liens attach, or any sale or salvage action may lawfully occur.

885. Kauff's failed to produce any certified-mail receipts, USPS tracking records, statutory notices, proof of mailing, or mailing logs, despite Plaintiff's repeated written demands and preservation notices.

886. The failure to generate or maintain these mandatory statutory records constitutes spoliation because the mailing documentation is the primary—and often exclusive—evidence establishing whether a lien or salvage action was lawfully initiated.

887. Kauff's refusal and inability to produce these records gives rise to the reasonable inference that the statutory notices were never sent and that the lien, storage charges, and subsequent salvage branding were unlawful.


**C. Concealment of Salvage Branding and Destruction of Third-Party Verification Evidence**

888. Under Florida salvage and title regulations, salvage branding must be reported to the owner's insurer and entered into applicable state and national vehicle-title databases.

889. Kauff's and Guardian failed to notify Plaintiff's insurer of any salvage branding, failed to timely enter salvage data into required systems, and failed to preserve or produce salvage-report documentation.

890. Insurer notification records constitute independent, third-party verification of lawful salvage actions.

891. By failing to generate, preserve, or disclose insurer notification and salvage documentation, Defendants destroyed or concealed critical corroborating evidence necessary to establish statutory compliance.

**D. Municipal Spoliation — Failure to Preserve Public Records and Body-Camera Evidence**

892. Under Florida public-records principles and common law, government entities must preserve accurate records and may not destroy or alter evidence once a dispute exists or litigation is reasonably foreseeable.

893. The Town of Palm Beach and the Palm Beach Police Department produced conflicting, incomplete, and shifting records; withheld internal communications; and failed to preserve body-camera footage, dispatch logs, and internal communications related to the June 3 encounter and the Town-issued release order.

894. PBPD's deletion or non-preservation of body-camera footage—after Plaintiff sought assistance, challenged the tow, and invoked legal rights—constitutes spoliation because the footage was material to whether officers acknowledged the tow was unauthorized and refused to enforce the release order.

895. The absence, alteration, or unexplained loss of these public records breached Defendants' preservation duties and materially prejudiced Plaintiff's ability to prove her claims.


**E. Timeline Manipulation and Destruction of Preservation-Notice Evidence**

896. After receiving Plaintiff's October 7 written legal notice and preservation demand, Defendants delayed responses for weeks and later falsely claimed to have "just received" different communications to obscure the true notice timeline.

897. This manipulation and failure to preserve accurate notice records destroyed evidence material to establishing when Defendants' preservation duties attached and whether subsequent destruction occurred in bad faith.

898. Such conduct constitutes spoliation because it eliminated accurate documentary evidence of Defendants' notice, knowledge, and statutory compliance obligations.

**F. Interference with Access to Evidence and Record-Retention Failures**

899. Defendants maintained record systems, portals, and interfaces that failed to retain, display, or track Plaintiff's public-records requests, communications, and related documentation.

900. These failures constitute spoliation because the affected records were required to be maintained and because the obstruction prevented Plaintiff from accessing and preserving evidence necessary to her underlying claims.

**G. Adverse Inference and Presumptions Under Florida Law**

901. Under Florida law, intentional or reckless spoliation gives rise to a rebuttable presumption that the missing evidence would have been unfavorable to the spoliating party.

902. Given the pattern of destroyed, missing, concealed, or never-created records, the adverse inference applies to all Defendants with respect to all missing documentation.

903. The appropriate inference is that the destroyed or withheld evidence would have shown that:

(a) the tow and impoundment were unauthorized;

(b) the Town's no-fee release order was valid and knowingly ignored;

(c) no lawful lien or salvage process occurred;

(d) statutory certified notices were never sent; and

(e) Defendants acted with knowledge of illegality and bad faith.

## H. Causation and Damages

904. As a direct and proximate result of Defendants' spoliation, Plaintiff suffered:

(a) loss of critical and irreplaceable evidence;

(b) substantial impairment of her ability to contest unlawful fees, liens, and salvage actions;

(c) increased litigation expense and delay;

(d) prolonged deprivation of her property;

(e) emotional distress; and

(f) diminished ability to fully and fairly prove her underlying claims.

905. Plaintiff is entitled to all damages available under Florida law for spoliation of evidence, including compensatory damages and all evidentiary presumptions and adverse inferences warranted by Defendants' conduct.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment against Defendants on this Count; impose all adverse inferences and evidentiary presumptions

warranted under Florida law; award compensatory damages for spoliation of evidence; and grant all further relief to which Plaintiff is entitled.

## COUNT XXIII — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

(Florida Common Law)

Against the Town of Palm Beach; the Palm Beach Police Department; Kauff's Towing & Recovery, Inc.; Guardian Fleet Services, Inc.; and Doe Defendants 1–20, consisting of presently unidentified sworn police officers, parking-enforcement personnel, dispatchers, supervisors, records custodians, tow-yard personnel, lien processors, corporate officers, managers, and agents who, while acting within the course and scope of their employment or agency, intentionally or recklessly engaged in, directed, ratified, approved, or failed to stop extreme and outrageous conduct—including coercive threats, misuse or impersonation of police authority, concealment of material facts, fabrication of legal requirements, and prolonged unlawful deprivation of Plaintiff's property—under circumstances in which they knew or should have known that such conduct would cause severe emotional distress.

907. Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.

### A. Extreme and Outrageous Conduct

906. Defendants engaged in a prolonged course of extreme and outrageous conduct that exceeded all bounds tolerated in a civilized society by using custody of Plaintiff's vehicle as psychological and financial leverage—refusing release despite proof of ownership and lawful

entitlement to possession, while invoking fabricated legal obstacles and shifting "requirements" to keep Plaintiff trapped.

## B. Coercive Threats and Manufactured Helplessness

907. Defendants repeatedly threatened permanent and irreversible loss—sale, disposal, and/or salvage branding—unless Plaintiff paid large and escalating sums, even though Defendants lacked a perfected lien and lacked lawful authority to treat the vehicle as forfeited or disposable.

880. Defendants used time-pressured ultimatums, shifting deadlines, and escalating consequences to induce panic, submission, and abandonment of rights, deliberately manufacturing a state of helplessness and fear.

## C. Concealment and Deception to Intensify Distress

908. Defendants compounded the coercion by withholding and concealing material facts necessary for neutral intervention and self-protection, including refusing to provide basic documentation and clear, truthful disclosures regarding the vehicle's true legal status and disposition posture, while continuing to demand "release" payment and implying lawful authority that did not exist.

## D. Knowledge of Plaintiff's Vulnerability and Conscious Disregard

909. By June 3, 2025, Defendants knew that Plaintiff was recently bereaved, emotionally vulnerable, isolated, and without meaningful support. Plaintiff communicated her circumstances,

distress, and reliance on Defendants' representations while seeking lawful resolution and assistance.

910. Rather than exercising restraint, compassion, or corrective action after recognizing Plaintiff's vulnerability and the absence of lawful authority for continued detention, Defendants collectively chose to escalate pressure, issue threats, conceal material facts, and prolong deprivation in order to protect themselves from accountability and extract financial benefit.

911. Defendants' decision to double down on coercion despite actual knowledge of Plaintiff's bereavement and vulnerability constituted a conscious choice to inflict foreseeable emotional harm in furtherance of their self-protective and revenue-generating scheme.

**E. Impersonation and Misuse of Police Authority**

912. Defendants intentionally or recklessly invoked, represented, and leveraged police authority—directly and indirectly—to deter resistance, suppress complaints, and prevent neutral intervention, despite lacking lawful authority to do so.

913. By presenting themselves as operating under police control, approval, or enforcement power, Defendants created the appearance that further resistance would expose Plaintiff to arrest, retaliation, or additional enforcement action. This misuse and impersonation of police authority was designed to intimidate, silence, and psychologically dominate Plaintiff, and independently qualifies as extreme and outrageous conduct.

**F. Reckless Disregard and Induced Reliance**

914. Defendants acted intentionally, or at minimum with reckless disregard of the high probability, that their conduct would cause severe emotional distress. Plaintiff repeatedly communicated that Defendants' threats, stonewalling, and refusal to release her vehicle were causing escalating fear and emotional harm; Defendants responded by escalating pressure rather than correcting the misconduct.

915. Defendants knowingly or recklessly misrepresented material facts and legal authority in a manner calculated to induce Plaintiff's reliance. Plaintiff reasonably relied on these representations for an extended period before uncovering their falsity, narrowly avoiding coerced payment and involuntary forfeiture of rights.

916. The prolonged deception, followed by Plaintiff's eventual discovery of the scope and falsity of Defendants' representations, foreseeably caused profound shock, humiliation, emotional collapse, and lasting psychological injury.


**G. Post-Notice Indifference After Explicit Pleas for Help (October 2025)**

917. On or about October 6, 2025, Plaintiff again sought assistance from Defendants and associated actors, expressly communicating that the unlawful detention and ongoing deception had devastated her life, caused prolonged isolation, and left her fearful, destabilized, and unable to resume normal living.

918. At that point, Defendants had actual notice not only of the unlawfulness of the underlying conduct, but of the severe and ongoing emotional harm it had caused. Nevertheless, Defendants refused to intervene, correct prior misrepresentations, provide relief, or mitigate harm.

919. Defendants' continued inaction after direct notice of Plaintiff's suffering was not inadvertent or negligent, but a deliberate choice to allow harm to continue in order to preserve their positions, suppress exposure, and avoid accountability.

## H. Severe Emotional Distress

920. As a direct and proximate result of Defendants' conduct, Plaintiff suffered severe and continuing emotional distress, including panic attacks, sleep disruption, nausea, hypervigilance, humiliation, loss of enjoyment of life, prolonged isolation and self-preservation due to impending uncontrollable debt, and persistent fear associated with operating her vehicle due to perceived surveillance and retaliation.

## I. Causation

921. Defendants' coercive threats, deception, impersonation of authority, concealment of material facts, and refusal to release Plaintiff's vehicle were a substantial factor in causing Plaintiff's severe emotional distress and resulting impairment of daily functioning.

## J. Elements Satisfied

922. Defendants' conduct satisfies all elements of intentional infliction of emotional distress under Florida law:

(a) deliberate or reckless conduct;

(b) extreme and outrageous behavior;

(c) causation; and

(d) severe emotional distress.

**WHEREFORE**, Plaintiff respectfully requests entry of judgment against Defendants, jointly and

severally, for compensatory damages (including damages for severe emotional distress), punitive

damages for intentional or reckless conduct as permitted by Florida law**,** pre- and post-judgment

interest, attorney's fees and costs where authorized by law, and such other relief as the Court

deems just and proper.

## XXVII. SYSTEMIC CONSTITUTIONAL VIOLATIONS, MUNICIPAL LIABILITY, AND CONTINUING DEPRIVATION

### A. The June 2–3, 2025 Seizure Was Void *Ab Initio* and Irrevocably Tainted All Subsequent Acts

923. The June 2–3, 2025 seizure of Plaintiff's vehicle was unlawful from its inception. The

Town of Palm Beach Parking Enforcement Division lacked statutory jurisdiction to issue

registration-based citations or initiate enforcement under Fla. Stat. § 316.640, rendering the

predicate enforcement action ultra vires, void, and without legal effect.

924. Because there was no lawful citation, no statutory delinquency, no valid notice, and no legal

authority to immobilize or remove the vehicle, the tow constituted an unreasonable seizure in

violation of the Fourth Amendment to the United States Constitution and Article I, § 12 of the Florida Constitution.

925. Plaintiff's vehicle did not fall within any category permitting immediate removal under Florida law. It was not abandoned, hazardous, obstructing traffic, unattended in a right-of-way, or subject to any statutory exception authorizing summary seizure without prior process.

926. A seizure undertaken without jurisdiction or statutory authority is void *ab initio*. It confers no lawful custody, no possessory interest, no lienable status, and no enforcement power. From the moment the vehicle was taken, Defendants' possession was constitutionally unlawful, and all subsequent conduct was irreversibly contaminated by that initial defect.

## B. An Unlawful Seizure Can Never Ripen into Lawful Authority

927. As a matter of constitutional and statutory law, an unlawful seizure can never ripen into a lawful lien, possessory interest, or ownership right through the passage of time, the accrual of fees, administrative processing, or post hoc invocation of statutory timelines.

928. Florida's towing, lien, auction, and salvage statutes presuppose lawful initial custody. Where the initial seizure is void, all downstream acts—whether labeled as notice, lien assertion, fee accrual, auction processing, or salvage branding—are legal nullities incapable of curing the original constitutional defect.

929. No amount of paperwork, delay, retroactive compliance, or fabricated statutory sequencing can transmute an unconstitutional seizure into lawful authority. A vehicle unlawfully taken

cannot become lawfully detained, liened, forfeited, or destroyed by administrative repetition or procedural layering.

930. Accordingly, every subsequent refusal to release the vehicle, every asserted fee, every claimed lien right, every auction-related act, and every act of salvage branding flowed from a seizure that was constitutionally void and legally incapable of maturation. Each constituted an independent and continuing violation of Plaintiff's property and constitutional rights.

931. Defendants' course of conduct depended on the deliberate manufacture of procedural disorder—conflicting directives, concealed authority, suppressed records, and shifting enforcement narratives—designed to confuse, intimidate, and exhaust, rather than to lawfully enforce.

## C. The Town's Release Order Confirmed the Absence of Any Lawful Authority

932. On June 3, 2025, Town officials reviewed the circumstances, acknowledged that the tow was premature and unauthorized, and issued a written directive ordering immediate release of Plaintiff's vehicle and waiver of all fees.

933. This directive conclusively confirmed that Defendants lacked lawful custody or enforcement authority and extinguished any conceivable claim of a valid possessory interest.

934. Kauff's refusal to comply with the release order—while continuing to detain the vehicle and conditioning release on extra-statutory demands that were neither lawful nor satisfied—

constituted willful defiance of municipal authority and the continued exercise of state-delegated power without legal basis.

935. From that moment forward, Defendants' conduct was not merely unlawful, but knowingly unlawful, deliberate, and undertaken with conscious disregard for Plaintiff's rights.

## D. Continued Detention Was Coercive, Punitive, and Constitutionally Intolerable

936. Following the release order, Defendants transformed unlawful possession into a mechanism of coercion.

937. By rejecting proof of ownership, refusing lawful release pathways, inventing requirements not found in statute, and leveraging continued deprivation of Plaintiff's vehicle to demand payment, Defendants imposed a constitutionally forbidden "no-pathway-to-redemption" regime.

938. The continued deprivation served no public-safety, regulatory, or lawful enforcement purpose. It functioned solely as a profit-driven mechanism of leverage and punishment. Such conduct shocks the conscience and violates substantive due process.

939. Each day of continued detention constituted a fresh constitutional injury, compounding the original unlawful seizure and escalating the harm through deliberate persistence.

**E. Permanent Destruction of Property as the Foreseeable End of a Void Enforcement Chain**

940. The unlawful seizure culminated in the irreversible destruction of Plaintiff's property through salvage branding and disposition.

941. Salvage branding is not a procedural inconvenience. It is a permanent deprivation of economic value, title integrity, and ownership rights. Once imposed, it cannot be undone by later payment, later correction, or administrative revision.

942. Because Defendants never possessed lawful authority at any stage, the destruction of Plaintiff's vehicle represents the final act in a continuous, foreseeable chain of constitutional violations flowing directly from a void seizure.

**F. Municipal Liability Under *Monell***

943. The violations described herein were not isolated errors or discretionary misjudgments. They reflect municipal policies, customs, delegation failures, training failures, supervision failures, and post-notice ratification by the Town of Palm Beach and the Palm Beach Police Department.

944. These municipal failures were the moving force behind the unlawful seizure, the prolonged deprivation, the suppression of correction, and the ultimate destruction of Plaintiff's property. Municipal liability under *Monell* is therefore established.

## G. Punitive Damages and Remedies Analysis

945. Because Defendants acted without jurisdiction, without lawful authority, and with actual knowledge that their conduct was unauthorized—yet continued to detain, coerce, conceal, and ultimately destroy Plaintiff's property—the conduct alleged warrants heightened compensatory damages and punitive damages against all non-immune individual and private Defendants.

946. Equitable relief is necessary not merely to compensate Plaintiff, but to restore lawful order to an enforcement system Defendants intentionally destabilized. Declaratory and injunctive relief are required to dismantle practices that convert procedural chaos into coercive power and to reestablish transparent, rule-bound enforcement consistent with constitutional guarantees.

## H. Prospective Harm, Irreparable Injury, and Need for Equitable Relief

947. Defendants' conduct was not an isolated towing error. It reflects an ongoing enforcement architecture—civilian escalation, contractor-driven detention, deficient notice and recordkeeping, and non-enforcement of release directives—that remains operative and capable of repetition.

948. This architecture inflicts irreparable injury by coercing forfeiture through fear, intimidation, and manufactured procedural dead ends, and by accelerating irreversible deprivation—including premature sale, salvage branding, and destruction—before an owner can obtain neutral review. Absent declaratory and narrowly tailored injunctive relief, Plaintiff and other residents face a real and immediate risk of recurrence of the same coercive pipeline.

## XXVIII. PUBLIC-INTEREST NECESSITY

949. The practices alleged here predictably and disproportionately harm vulnerable individuals—including those grieving, disabled, elderly, low-income, or otherwise least able to navigate opaque procedures or withstand official intimidation. A system that uses threatened arrest, false legal claims, withheld notices, and concealed remedies to compel payment or abandonment functions as an unlawful forfeiture mechanism. Such a system, structured to bypass judicial review and leverage administrative chaos for profit, constitutes a grave affront to the public interest and requires judicial intervention to restore constitutional order.

## XXIX. STATEMENT OF DAMAGES

*(Compensatory, Emotional, Medical, Psychological, Constitutional, Dignitary, Life-Trajectory, Creative-Capacity, Public-Interest, and Punitive Damages)*

950. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

951. As a direct, foreseeable, proximate, and compounding result of Defendants' coordinated acts and omissions—including the unlawful seizure and prolonged detention of Plaintiff's vehicle; defiance of a municipal no-fee release directive; fabrication and misrepresentation of legal requirements; assertion of unlawful lien authority; intimidation under color of state law; refusal to accept or properly document criminal complaints; obstruction of remedial processes; concealment and spoliation of evidence; and the permanent salvage-branding and destruction of Plaintiff's property—Plaintiff has suffered severe, ongoing, and multidimensional harm. Plaintiff

seeks recovery from each Defendant individually to the extent of that Defendant's own acts and omissions, and from institutional Defendants for policies, customs, supervision failures, ratification, and delegated practices that facilitated or directed the misconduct, with joint and several liability where permitted.

952. Plaintiff's damages are layered, continuing, and cumulative. They include substantial economic loss; medical and psychophysiological injury, including objective physiological and physical manifestations of stress; emotional and psychological harm; constitutional and dignitary injury, including loss of reputation, standing, and personal credibility; loss of personal security, freedom of movement, autonomy, and trust in government; disruption of normal life functioning; loss of creative and professional capacity; and significant public-interest harm. These injuries were not transient, speculative, or self-limited and continue to accrue.

953. Defendants acted with actual knowledge of Plaintiff's acute vulnerability, including her recent bereavement following the sudden death of her fiancé and her resulting financial fragility. Despite this knowledge, Defendants knowingly permitted and prolonged an unlawful deprivation of Plaintiff's property, mobility, and economic security over an extended period exceeding seven months. Rather than correcting acknowledged illegality, Defendants continued to enforce and ratify the deprivation, thereby escalating harm that was foreseeable, preventable, and humanly significant.

954. From June 3, 2025 forward, Defendants' conduct imposed a prolonged condition of financial coercion and fear that compelled Plaintiff to curtail ordinary life activities, withdraw from public life, and remain in a sustained survival-stress state. Plaintiff's inability to travel, plan for the future, safely expend financial resources, access care, grieve, or rebuild her life was not

voluntary or incidental, but the direct and foreseeable result of Defendants' refusal to correct an acknowledged unlawful deprivation and their continued exercise of coercive authority without legal basis.

955. Independent of any particular diagnosis or treatment history, Plaintiff suffered a profound and independently compensable deprivation of liberty, autonomy, and life agency. Through misuse of governmental authority, Defendants effectively restrained Plaintiff—under color of law—from freely leaving her home, driving, traveling, deploying financial resources, socializing, or directing her energy toward healing, creative work, or ordinary pursuits without pervasive fear and uncertainty.

956. Plaintiff's medical, psychological, and physical injuries are substantial and compensable harms in their own right and are also interrelated consequences of the same unlawful course of conduct. These injuries do not define the outer limit of Defendants' liability. Defendants inflicted multiple, parallel categories of harm simultaneously—including deprivation of liberty, coerced isolation, bodily injury, psychological trauma, and dignitary loss—each of which independently supports substantial compensatory and punitive damages.

957. Plaintiff's recovery does not depend upon the presence, absence, degree, or documentation of any single diagnosis or treatment history. Defendants are liable for the full human impact of their actions and omissions, including injury to Plaintiff's life, liberty, bodily integrity, dignity, autonomy, and future, whether manifested medically, economically, psychologically, or constitutionally.

## A. Economic and Property Damages (Compensatory)

958. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff suffered substantial, quantifiable, and ongoing economic and property losses. These damages were foreseeable, measurable, and the natural consequence of Defendants' seizure, detention, conversion, and destruction of Plaintiff's vehicle, and include, but are not limited to:

(a) the full fair-market value of Plaintiff's vehicle immediately prior to Defendants' unlawful seizure;

(b) the permanent destruction of the vehicle's clean-title status and all associated resale, equity, financing, refinancing, and trade-in value resulting from unlawful salvage branding;

(c) all booting, towing, storage, administrative, lien-related, and post-seizure fees asserted or demanded without lawful authority and in the absence of any valid or perfected lien;

(d) insurance premiums and related expenses paid to protect and maintain property that Defendants unlawfully detained, concealed, and ultimately destroyed;

(e) consequential and cascading financial losses caused by Defendants' conduct, including destabilization of Plaintiff's financial position during a period of acute vulnerability and bereavement, when Defendants' coercive actions foreseeably magnified economic harm; and

(f) loss of use of the vehicle, measured by the reasonable daily rental value of a comparable vehicle in the relevant market, calculated from June 3, 2025, through the date of final judgment (or such longer period as the trier of fact deems appropriate), regardless of whether Plaintiff actually rented a substitute vehicle, as compensation for the deprivation of use itself.

959. Plaintiff seeks full compensatory recovery sufficient to restore her to the financial position she would have occupied but for Defendants' unlawful conduct, including all consequential economic losses, loss-of-use damages calculated on a daily rental-value basis, prejudgment and post-judgment interest, and any additional relief necessary to fully compensate the economic harm inflicted.

## B. Emotional, Psychological, and Human-Impact Damages

960. As a direct and foreseeable result of Defendants' unlawful conduct, Plaintiff suffered severe, pervasive, and enduring emotional and psychological harm. This harm included, among other injuries: shock and distress upon discovering the seizure of her vehicle without notice or lawful authority; sustained fear of retaliation, arrest, or further punitive action under color of law; prolonged anxiety and emotional dysregulation caused by inescapable financial coercion and uncertainty; forced isolation from normal social, professional, and restorative activities; loss of enjoyment of life; chronic hypervigilance; sleep disturbance; impaired concentration and executive functioning; withdrawal from community engagement; and a profound and lasting destruction of trust in law-enforcement and municipal institutions.

961. This harm included sustained depressive symptoms marked by pervasive hopelessness and a diminished sense of future possibility, proximately caused by Defendants' deliberate use of financial coercion, intimidation, and misrepresentation of law to confine Plaintiff within a closed enforcement loop in which she reasonably believed she was the wrongdoer, faced escalating daily debt or punishment regardless of action, and had no lawful or safe avenue to end the deprivation.

962. These injuries were not the product of transient upset or subjective reaction. They were the natural and foreseeable consequence of months of coordinated intimidation, misrepresentation of legal rights, obstruction of lawful remedies, and misuse of governmental authority designed to coerce submission, suppress challenge, and conceal unlawful conduct. The resulting psychological and emotional harm materially altered Plaintiff's daily functioning, decision-making capacity, sense of safety, and ability to engage in ordinary life pursuits.

963. Defendants' conduct foreseeably magnified these harms by occurring during a period of acute vulnerability and bereavement following the sudden death of Plaintiff's fiancé. Rather than allowing space for grief, healing, or stabilization, Defendants' actions imposed sustained fear, isolation, and coercive pressure, compounding the emotional injury and extending its duration and severity.

964. Plaintiff's emotional and psychological injuries are ongoing and reasonably certain to require future care, support, and accommodation. These damages are independent of any particular diagnostic label or treatment history and are compensable as part of the total human impact of Defendants' unlawful conduct, including the loss of peace of mind, emotional security, personal dignity, and the ability to live without persistent fear or coercion.**C. Coercive Financial Deprivation, Forced Austerity, and Life-Disabling Anxiety**

*(Compensable Non-Economic and Economic-Adjunct Damages)*

965. Central to Plaintiff's damages was Defendants' imposition of an inescapable and compounding financial burden arising from the unlawful seizure and continued detention of Plaintiff's vehicle. Defendants caused daily storage and related charges to accrue without

providing transparent accounting, itemized receipts, or reliable notice of amounts owed, while simultaneously denying Plaintiff any meaningful ability to halt, contest, or mitigate the purported debt. This opaque and uncontrollable financial exposure was a direct, foreseeable, and proximate result of Defendants' conduct.

966. Defendants' actions created a sustained condition of coercive financial uncertainty. Plaintiff was never informed of the precise daily rate, cumulative total, or lawful basis for the charges imposed. In the absence of accurate information or lawful exit pathways, Plaintiff reasonably assumed worst-case financial exposure far exceeding her ability to pay. This deprivation of financial clarity foreseeably produced continuous, escalating anxiety and compelled Plaintiff into extreme financial self-restriction.

967. Defendants, including law-enforcement personnel acting under color of state law, expressly and implicitly communicated that failure to comply with the imposed financial demands—or to continue paying private storage fees—would expose Plaintiff to arrest, jail, repeated citation, towing, or additional enforcement consequences. Multiple officers affirmatively represented that continued payment to Kauff's was Plaintiff's only viable option to avoid further punishment, reinforcing the false premise that no lawful relief was available. These communications transformed the asserted debt into a state-backed mechanism of control rather than a private financial dispute.

968. As a direct and foreseeable result, Plaintiff was rationally compelled to curtail all non-essential expenditures and activities. Plaintiff ceased socializing, traveling, and participating in community life because it was objectively unjustifiable to expend resources beyond basic survival needs while facing an unknown, mounting, and unavoidable financial obligation

imposed by Defendants. This forced austerity was not voluntary and did not reflect personal budgeting choices; it was a predictable consequence of Defendants' coercive conduct.

969. The constant presence of unresolved and escalating financial exposure—combined with the absence of lawful remedies, reliable information, or protective intervention—created a persistent state of hypervigilance and life-disabling anxiety. Plaintiff's daily decision-making, mobility, and social participation were governed by fear of worsening financial exposure and enforcement consequences. Defendants' deprivation of Plaintiff's economic security, autonomy, and normal life functioning constitutes a concrete and compensable injury proximately caused by their unlawful conduct under color of state law.

970. These financial and liberty-based harms were distinct from, and in addition to, emotional distress. They include loss of financial control, forced abandonment of ordinary life activities, deprivation of social participation, erosion of independence, and prolonged disruption of Plaintiff's ability to rebuild her life following bereavement. Each was a direct, foreseeable, and proximate result of Defendants' coercive actions.

971. Defendants' conduct further caused severe and clinically significant psychological injury, including the onset or marked exacerbation of anxiety and depressive symptoms. Prolonged forced isolation, sustained financial threat, and credible fear of enforcement foreseeably impaired Plaintiff's social functioning and re-entry, producing difficulty resuming ordinary interpersonal activity. Defendants' actions also resulted in persistent mental and physical exhaustion consistent with chronic stress overload, including ongoing fatigue, diminished energy, and cognitive depletion caused by prolonged hypervigilance. These conditions materially interfered with Plaintiff's daily functioning and constitute compensable non-economic injuries.

972. Defendants' actions deprived Plaintiff of the ability to accept, plan, or pursue out-of-state travel and restorative opportunities during the months following her fiancé's death. Plaintiff was repeatedly unable to leave Florida due to compounding financial exposure and the credible threat of further enforcement. This deprivation foreclosed Plaintiff's ability to exit the coercive environment created by Defendants' conduct and to engage in restorative, life-affirming opportunities essential to recovery and reintegration.

973. Acting under color of state law, Defendants expressly and implicitly represented that Plaintiff's only options were continued payment of private storage fees or exposure to repeated citation, towing, or arrest, while simultaneously misrepresenting that no lawful remedies or interventions were available. Defendants withheld information regarding lawful release mechanisms and affirmatively discouraged further requests for assistance, chilling Plaintiff's access to law enforcement and rendering such efforts reasonably perceived as futile, dangerous, and humiliating.

974. Defendants undertook this conduct with actual knowledge of Plaintiff's financial vulnerability and recent bereavement, including the death of her fiancé. Despite this knowledge, Defendants chose to escalate, intimidate, and withhold lawful remedies, foreseeably compounding Plaintiff's psychological injury and intensifying the coercive effect of their actions. The resulting financial captivity, confinement, anxiety, and loss of life opportunities constitute substantial and compensable non-economic damages proximately caused by Defendants' unlawful conduct under color of state law.

**D. Reputational, Social, Identity, and Life-Trajectory Harm**

*(Compensable Non-Economic Damages)*

975. As a direct, foreseeable, and proximate result of Defendants' unlawful acts and omissions under color of state law, Plaintiff suffered substantial non-economic harm to her reputation, social standing, community integration, and life trajectory. These injuries were the natural and probable consequence of Defendants' conduct and were reasonably foreseeable at the time the violations occurred.

976. Defendants' actions—including unlawful seizure, prolonged deprivation of property, financial coercion, obstruction of lawful remedies, and intimidation—materially interfered with Plaintiff's freedom of movement, ability to safely expend financial resources, and capacity to participate in ordinary social and community life. As a result, Plaintiff was compelled to withdraw from public presence, social engagement, travel, and relationship-building activities, causing measurable deterioration of friendships, social capital, and community continuity.

977. Plaintiff's prolonged absence from social and public life was not voluntary and was not attributable to personal preference, disengagement, or independent intervening causes. Rather, it was directly caused by Defendants' conduct, which created a sustained condition of financial precarity, fear of retaliation, and reasonable apprehension of further enforcement action. These conditions foreseeably altered third-party perceptions of Plaintiff, resulting in reputational injury, relational strain, and social loss.

978. Defendants' conduct further caused reputational and social harm by inducing Plaintiff to internalize blame for circumstances created entirely by Defendants' unlawful acts. Through

misrepresentation of authority, refusal to provide lawful relief, and the shifting of responsibility onto Plaintiff, Defendants foreseeably caused Plaintiff to withhold disclosure of the true cause of her absence and isolation. This coercive dynamic amplified reputational damage and deepened social estrangement by depriving Plaintiff of the ability to accurately contextualize her withdrawal.

979. Plaintiff also suffered compensable identity-level and autonomy-based injury. At the time of Defendants' misconduct, Plaintiff was actively rebuilding her life and social world following the death of her fiancé. Defendants' actions foreseeably disrupted this life transition, undermining Plaintiff's sense of agency, independence, personal efficacy, and forward momentum at a critical juncture of recovery and reintegration.

980. Defendants further deprived Plaintiff of the use, enjoyment, and psychological benefit of her newly purchased vehicle, which was acquired as part of Plaintiff's effort to re-establish independence and mobility. Due to reasonable fear of police surveillance, retaliation, and further unlawful enforcement, Plaintiff has been effectively deterred from using the vehicle since June 2025. This deprivation constitutes a concrete loss of liberty, autonomy, and normal life functioning independent of emotional distress.

981. The foregoing harms are distinct, non-duplicative injuries separate from emotional or psychological distress and are independently compensable under federal law. They include loss of reputation, loss of social standing, loss of relational continuity, loss of freedom of movement, loss of personal autonomy, and disruption of life trajectory. Each injury was a direct, foreseeable, and proximate result of Defendants' conduct and entitles Plaintiff to full compensatory damages.

### E. Medical, Dental, and Psychophysiological Damages

982. Defendants' misconduct also produced objective physical and psychophysiological injury consistent with prolonged stress-induced physiological dysregulation, including somatic, inflammatory, neuro-immune, vascular, dermatologic, and dental effects. These injuries were caused or materially aggravated by Defendants' sustained misuse of governmental authority, coercive financial deprivation, and prolonged exposure to fear and uncertainty under color of law. The full nature, extent, permanence, and future implications of these injuries will be established through discovery and expert evaluation.

983. As a direct, foreseeable, and proximate result of Defendants' prolonged and coercive misconduct, Plaintiff suffered measurable physical and psychophysiological injury. These injuries include trauma-related autonomic dysregulation, inflammatory and neuro-immune responses, dermatologic and somatic manifestations, and other objective physiological effects consistent with sustained stress overload and prolonged nervous-system activation.

984. Defendants' conduct caused permanent and visible alterations to Plaintiff's physical condition and appearance, including changes affecting facial tissues and other bodily structures. These injuries resulted in ongoing discomfort, functional impairment, and diminished physical well-being, and they foreseeably necessitate future medical, dermatologic, dental, and restorative intervention, including corrective or surgical care, the full extent of which will be established through discovery and expert testimony.

985. Defendants are liable for all physical and psychophysiological conditions newly caused, materially aggravated, rendered chronic, or made more severe by the duration, intensity, and

coercive nature of their misconduct, including the aggravation of any pre-existing vulnerabilities under well-settled principles of tort and constitutional law.

986. Plaintiff expressly seeks recovery for all latent, delayed-onset, or progressive injuries and complications caused or materially contributed to by Defendants' conduct, whether such injuries manifest before or after trial. Plaintiff reserves the right to supplement medical proof, diagnoses, and expert testimony as discovery proceeds and additional evaluation is completed.

987. Defendants' misconduct further deprived Plaintiff of reasonable access to ordinary medical and dental care by imposing sustained financial coercion and uncertainty, forcing Plaintiff to defer necessary evaluation and treatment out of a reasonable fear of financial collapse. This deprivation foreseeably exacerbated Plaintiff's physical condition and caused additional injury that would not have occurred had care been accessible.

988. Plaintiff seeks compensation for all past, present, and future medical, dental, neurological, dermatological, psychological, and trauma-informed care reasonably necessary to diagnose, treat, mitigate, or remediate these injuries, whether presently known or later discovered.

### F. Compelled Self-Advocacy, Forced Labor, and Re-Traumatization

*(Compensable Non-Economic and Economic-Adjunct Damages)*

989. As a direct, foreseeable, and proximate result of Defendants' concealment of evidence, obstruction of lawful remedies, misclassification and suppression of complaints, refusal to accept reports, and failure to provide institutional protection, Plaintiff was forced to assume the burden

of investigating, reconstructing, documenting, and responding to Defendants' unlawful conduct while the violations were ongoing and uncorrected.

990. This compelled self-advocacy was not voluntary and was not an ordinary incident of litigation. It was imposed by Defendants' misconduct and their refusal to acknowledge, correct, or halt the unlawful deprivation. As a result, Plaintiff was required to perform extensive uncompensated labor—including legal research, evidence reconstruction, document production, records tracking, and rights preservation—under conditions of coercion, fear, and financial deprivation.

991. Defendants' actions foreseeably forced Plaintiff to divert substantial time, cognitive capacity, emotional energy, and physical endurance away from healing, employment, creative work, and ordinary life functioning in order to protect herself from further harm, prevent additional loss, and preserve her legal rights. This diversion constituted a measurable loss of productive capacity and normal life activity directly attributable to Defendants' conduct.

992. The necessity of sustained self-representation under coercive conditions caused compounded psychological and physiological injury, including re-traumatization, cognitive overload, deterioration of health, prolonged isolation, loss of professional momentum, and disruption of Plaintiff's creative and vocational development. These injuries were not incidental to litigation but were the predictable consequence of Defendants' ongoing misconduct and failure to provide lawful relief.

993. The harms described herein constitute independently compensable non-economic and economic-adjunct damages. Defendants are liable for the full human cost of forcing Plaintiff to

assume institutional burdens that properly belonged to Defendants themselves, including the physical, psychological, vocational, and life-trajectory injuries proximately caused by this compelled labor under color of state law.

## G. Constitutional and Civil-Rights Damages

994. Defendants' conduct caused independently compensable violations of Plaintiff's constitutional and civil rights, including but not limited to: the Fourth Amendment right to be free from unreasonable seizure; the Fourteenth Amendment rights to procedural and substantive due process; the First Amendment rights to petition for redress of grievances and to be free from retaliation for seeking such redress; the Equal Protection guarantees of the Fourteenth Amendment; and correlative protections secured by the Florida Constitution.

995. These constitutional violations inflicted concrete and substantial injury independent of any accompanying economic or emotional harm. Defendants' misuse of governmental authority deprived Plaintiff of liberty, property, autonomy, and lawful access to neutral remedies, and imposed coercive restraints on Plaintiff's movement, decision-making, and participation in ordinary civic life. Such injuries constitute direct constitutional harm and are compensable in their own right under 42 U.S.C. § 1983 and Florida law.

996. The damages flowing from these violations include, but are not limited to, loss of constitutional security, deprivation of lawful process, suppression of protected petitioning activity, exposure to arbitrary enforcement, and the dignitary injury inherent in being subjected to coercive state power without lawful justification. These harms do not depend on proof of economic loss and are recoverable even where damages are difficult to quantify.

997. Defendants are liable for the full measure of constitutional injury proximately caused by their actions, including compensatory, nominal, and punitive damages where permitted, as well as declaratory and injunctive relief necessary to remedy and prevent ongoing or future violations. The vindication of these rights serves not only Plaintiff's interests but the public interest in maintaining constitutional limits on governmental power.

## H. Dignitary Harm and Destruction of Trust in Government

998. Defendants' misuse of state authority inflicted profound dignitary harm upon Plaintiff by subjecting her to arbitrary power, intimidation, and institutional disregard, thereby stripping her of the equal respect, legitimacy, and security guaranteed to all persons under the Constitution.

999. Through unlawful seizure, refusal to provide lawful relief, misrepresentation of authority, and coercive enforcement tactics, Defendants treated Plaintiff not as a rights-bearing citizen, but as an object of control. This conduct conveyed official disapproval, suspicion, and vulnerability to punishment without legal basis, inflicting injury to Plaintiff's dignity independent of emotional distress.

1000. Defendants' actions foreseeably and permanently damaged Plaintiff's trust in law-enforcement and municipal institutions as neutral protectors of the public. Plaintiff was compelled to perceive ordinary civic interaction—seeking police assistance, asserting legal rights, or engaging with government officials—as dangerous, futile, or retaliatory.

1001. Such dignitary harm constitutes a distinct and compensable constitutional injury. It includes loss of equal standing before the law, erosion of civic security, and the imposition of

fear as a condition of interacting with government. These injuries are recognized forms of harm under federal civil-rights law and warrant substantial compensatory and punitive damages independent of economic or emotional loss.

**I. Life-Trajectory and Identity Disruption**

1002. Defendants' misconduct foreseeably and permanently disrupted Plaintiff's post-bereavement recovery during a critical period of emotional stabilization and life reconstruction following the death of her fiancé.

1003. Rather than allowing Plaintiff to regain autonomy, rebuild social and economic stability, and re-establish a coherent sense of direction, Defendants' actions imposed sustained uncertainty, coercion, and institutional obstruction that altered the course of Plaintiff's personal development, decision-making, and future planning.

1004. This disruption constitutes a concrete and compensable injury to Plaintiff's life trajectory and identity. Defendants' conduct interfered with Plaintiff's ability to pursue ordinary milestones of recovery and reintegration—including restoring independence, re-entering public life, engaging in creative and professional growth, and forming future plans—thereby causing lasting harm to Plaintiff's sense of self-determination and agency.

1005. These injuries are distinct from emotional distress and do not depend on proof of psychological diagnosis. They reflect the loss of developmental continuity, delayed life progress, and permanent alteration of Plaintiff's path forward caused by Defendants' misuse of state authority during a uniquely vulnerable period.

## J. Loss of Creative, Contemplative, and Higher-Order Cognitive Capacity

1006. Plaintiff's creative and professional work depends upon access to sustained contemplative states, advanced conceptual synthesis, and uninterrupted higher-order cognitive functioning. These states require psychological safety, autonomy, and freedom from persistent survival-stress activation.

1007. Defendants' unlawful conduct forcibly drove Plaintiff into a prolonged state of survival cognition characterized by hypervigilance, threat monitoring, financial fear, and coercive uncertainty. This state is neurologically incompatible with the reflective, integrative, and abstract cognitive processes required for Plaintiff's creative work.

1008. As a direct and foreseeable result, Plaintiff lost the ability to access the contemplative and higher-order cognitive states necessary to engage in sustained creative development, complex ideation, and long-form conceptual work. Ongoing projects requiring deep focus, internal coherence, and reflective continuity were halted entirely.

1010. This impairment was not voluntary, transient, or motivational. It resulted from Defendants' sustained activation of survival-stress pathways through coercion, financial captivity, and misuse of state authority, which foreseeably suppressed Plaintiff's creative cognition and higher-level executive functioning.

1012. The resulting loss of contemplative and higher-order cognitive capacity constitutes a compensable impairment of Plaintiff's creative and professional functioning. These injuries are forward-looking and reasonably certain to affect Plaintiff's future productivity, development, and

capacity to engage in advanced creative and intellectual work, independent of any specific project's commercial outcome.

## K. Public-Interest and Systemic Harm

1013. Defendants' conduct revealed and operationalized a systemic failure in municipal governance involving unlawful seizure and detention practices, contractor defiance of municipal release authority, law-enforcement acquiescence, suppression and misclassification of complaints, and concealment or loss of material evidence. This combination created a closed enforcement loop insulated from correction once harm began.

1014. The practices exposed in this case present an ongoing and substantial risk to the public. They demonstrate how ordinary citizens can be deprived of property, liberty, and access to remedies through coordinated misuse of state-delegated authority, opaque financial coercion, and institutional non-responsiveness.

1015. Plaintiff's injuries were not the product of isolated error, but the foreseeable outcome of a system that permitted private contractors and municipal actors to exercise unreviewable power without accountability, transparency, or lawful restraint.

1016. Substantial damages are therefore necessary not only to compensate Plaintiff, but to deter recurrence, disrupt economically incentivized misconduct, and reaffirm that constitutional and statutory limits on governmental and quasi-governmental power are enforceable in practice—not merely in theory.

1017. Absent meaningful consequences, the conduct alleged herein is reasonably likely to be repeated against other members of the public, particularly those experiencing vulnerability, grief, or limited access to immediate legal intervention. This case implicates core public-interest concerns central to the legitimacy of municipal governance and the rule of law.

## L. Punitive Damages (Non-Immune Defendants)

1018. Punitive damages are warranted against all non-immune Defendants because their conduct was intentional, knowing, willful, deceitful, and undertaken with reckless and callous indifference to Plaintiff's federally protected rights. Defendants did not merely misapply law or exercise poor judgment; they affirmatively exploited state authority, concealed illegality, and pursued private or institutional advantage in conscious disregard of predictable constitutional and human harm.

1019. Defendants' misconduct was not episodic or self-limiting. It constituted a continuous, escalating, and compounding course of conduct that inflicted new and independent injury each day it remained uncorrected—despite actual notice of illegality, express municipal acknowledgment of error, repeated requests for lawful relief, and the obvious foreseeability of severe economic, psychological, and liberty-based harm.

1020. After notice, Defendants chose escalation over correction, intimidation over remedy, and concealment over accountability. This deliberate persistence transformed an unlawful seizure into a prolonged regime of coercion under color of law, rendering Defendants' conduct especially blameworthy and placing it squarely within the core purposes of punitive damages: punishment, deterrence, and condemnation of abuses of governmental power.

1021. Compensatory damages alone are insufficient to address conduct of this nature. Without punitive sanctions, Defendants—and similarly situated actors—retain economic and institutional incentives to repeat the same misconduct, suppress correction, and externalize harm onto individual citizens. Punitive damages are therefore necessary to disrupt that incentive structure and to affirm that constitutional rights are not optional, negotiable, or subordinate to profit, convenience, or institutional self-protection.

1022. Plaintiff accordingly seeks punitive damages against all non-immune Defendants in an amount sufficient to punish past misconduct, deter future violations, and vindicate the fundamental principle that no person—public or private—may knowingly wield state power to coerce, extort, or silence without consequence.

**M. Joint and Several Liability**

1023. Defendants are jointly and severally liable for all damages caused by their coordinated, interdependent, and mutually reinforcing acts and omissions to the fullest extent permitted by law. Each Defendant knowingly participated in, benefited from, facilitated, ratified, or failed to correct a unified course of unlawful conduct that operated as a single, indivisible harm.

1024. Plaintiff's injuries were not susceptible to reasonable apportionment among Defendants. Rather, the violations arose from an integrated enforcement and detention scheme involving shared authority, overlapping roles, mutual reinforcement, and conscious reliance on one another's actions and omissions.

## XXX. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Simone Valentine respectfully requests that this Court enter judgment in her favor and against all Defendants, jointly and severally where permitted by law, and award the following relief:

## A. Declaratory Relief

(a) A declaration that the June 2–3, 2025 seizure of Plaintiff's vehicle was void ab initio for lack of statutory jurisdiction and constituted an unreasonable seizure in violation of the Fourth Amendment to the United States Constitution and parallel provisions of the Florida Constitution;

(b) A declaration that because the initial seizure was void, no lawful lien, storage fee, possessory interest, or enforcement authority ever attached to Plaintiff's vehicle, and that all subsequent acts—including continued detention, fee accrual, asserted liens, auction processing, salvage branding, database submissions, and disposition—were legal nullities incapable of curing the original constitutional defect;

(c) A declaration that Defendants' policies, customs, and practices permitting private towing contractors to defy municipal release orders, ignore lawful proof of ownership, and impose extra-statutory conditions violate the Due Process Clause of the Fourteenth Amendment.

**B. Injunctive and Equitable Relief Requested**

**(d)** A permanent injunction prohibiting Defendants and all persons acting in concert with them from immobilizing, towing, or otherwise seizing vehicles based on registration-based citations, parking citations, or other non-statutory violations absent express statutory or ordinance authority, clear jurisdiction, and constitutionally adequate process.

**(e)** A permanent injunction prohibiting Defendants from engaging in discretionary or surprise vehicle immobilization or towing practices unless such enforcement authority, thresholds, and triggering conditions are expressly enacted by ordinance or statute and publicly disclosed in advance in a manner reasonably calculated to inform residents of the conduct that may result in immobilization or towing.

**(f)** A permanent injunction prohibiting Defendants from enforcing, relying upon, or threatening enforcement of any uncodified citation-accumulation rule, escalation policy, or informal enforcement threshold—including any asserted "multi-ticket" or "three-ticket" rule—as a basis for immobilization, towing, or seizure absent express enactment by ordinance and strict compliance with statutory and constitutional requirements.

**(g)** A permanent injunction requiring the Town of Palm Beach to implement mandatory, neutral oversight mechanisms ensuring that municipal no-fee release orders are immediately honored by third-party contractors and civilian enforcement entities without extra-statutory conditions, invented requirements, or discretionary refusal.

**(h)** A permanent injunction prohibiting Defendants from automatically deferring to, enforcing on behalf of, or providing institutional protection to any private contractor or civilian enforcement

entity absent a demonstrated lawful basis for the contractor's actions, including jurisdiction, statutory authority, and compliance with constitutional requirements, and requiring an independent, good-faith legality assessment upon notice of a disputed seizure or detention.

**(i)** Prospective, narrowly tailored injunctive relief requiring Defendants to adopt and enforce constitutionally adequate safeguards governing vehicle immobilization, towing, detention, and contractor-related enforcement, including but not limited to:

1. written verification standards confirming lawful authority, jurisdiction, and statutory compliance prior to immobilization or towing;

2. time-certain compliance procedures requiring prompt adherence to municipal release directives;

3. prompt, documented mechanisms for vehicle owners to contest detention and obtain neutral review;

4. clear, standardized notice, receipt, and itemization requirements consistent with governing law;

5. record-preservation, evidence-retention, and audit-trail protocols sufficient to prevent spoliation or post hoc reconstruction;

6. meaningful oversight, auditing, and accountability measures governing private contractors and civilian enforcement personnel acting under color of law;

7. constitutionally adequate training for civilian parking enforcement personnel expressly delineating the limits of their authority and prohibiting the exercise, implication, or coercive invocation of sworn police powers by non-sworn individuals;

8. prohibitions on the use of informal, handwritten, or extra-legal signage or payment demands—including cashier's check or money-order-only demands—absent express statutory authorization; and

9. conflict-of-interest safeguards restricting civilian enforcement personnel and contractors from accessing law-enforcement databases or public-records systems in matters in which they are involved or have a financial or enforcement interest.

(j) A permanent injunction requiring Defendants to implement standards governing the preparation, completeness, and review of police reports and enforcement narratives relating to vehicle immobilization, towing, or detention, including requirements that such reports accurately document the asserted legal basis for enforcement, contractor involvement, citizen objections or disputes of authority, and any threats or representations of legal consequence.

(k) A permanent injunction requiring meaningful supervisory review of enforcement reports and complaint classifications by officials not directly involved in the underlying enforcement action, and prohibiting rubber-stamp approval or report manipulation designed to shield unlawful conduct, suppress complaints, or protect contractor interests.

(l) An order expressly permitting Plaintiff to amend or supplement the requested injunctive and equitable relief following discovery, upon a fuller understanding of Defendants' policies, practices, training protocols, delegation structures, and contractor relationships, so that any final injunctive relief may be precisely tailored to prevent recurrence of the constitutional violations alleged.

**C. Compensatory, Economic, and Property Damages**

(g) Compensatory damages against all Defendants, jointly and severally where permitted by law, in an amount to be determined at trial, for all economic and property loss proximately caused by Defendants' conduct, including but not limited to:

(1) the full fair-market value of Plaintiff's vehicle;

(2) permanent destruction of clean-title equity, resale value, and ownership interests through unlawful salvage branding;

(3) unlawful towing, booting, storage, and administrative fees asserted without lawful authority;

(4) insurance premiums paid to protect property Defendants unlawfully detained and destroyed;

(5) consequential economic losses, opportunity costs, and financial destabilization.

(h) Loss-of-use damages measured by the reasonable rental value of a comparable vehicle from June 2, 2025 through the date of final judgment, regardless of whether a substitute vehicle was actually rented, consistent with *Meakin v. Dreier*, 209 So. 2d 252 (Fla. 2d DCA 1968);

(i) Additional special and non-economic damages, in an amount to be determined at trial, for coerced isolation, deprivation of mobility, loss of autonomy, hedonic loss, destruction of social capital, and imposed financial insecurity resulting from Defendants' prolonged and coercive deprivation of Plaintiff's property under color of law.

**D. Medical and Human-Impact Damages**

(j) Damages for psychological, neurological, and trauma-informed evaluation, monitoring, treatment, and care reasonably necessitated by Defendants' conduct, including all costs associated with therapeutic reintegration and vocational rehabilitation for injuries caused, aggravated, rendered chronic, or made progressive by prolonged stress, coercion, and deprivation.

**E. Constitutional and Dignitary Damages**

(k) Constitutional and dignitary damages, in an amount to be determined at trial, for violations of Plaintiff's rights under the Fourth, First, and Fourteenth Amendments to the United States Constitution and parallel provisions of the Florida Constitution, including loss of liberty, autonomy, life agency, procedural fairness, and freedom from unreasonable seizure and coercive state action;

(l) Nominal damages for each proven constitutional violation, independent of compensatory damages.

**F. Punitive Damages (Non-Immune Defendants)**

(m) Punitive damages against all non-immune Defendants, including private entities and individual Defendants sued in their personal capacities, in an amount sufficient to punish, deter, and condemn intentional, malicious, fraudulent, oppressive, and recklessly indifferent

misconduct, and to dismantle the economic incentives underlying the unconstitutional practices alleged.

### G. Corrective, Restitutionary, and Disgorgement Relief

(n) Corrective equitable relief requiring Defendants, to the extent permitted by law and within their authority, to take all reasonable steps to correct, withdraw, or remediate unlawful title, salvage, and database submissions (including NMVTIS-related submissions), and to provide Plaintiff with all documentation necessary to pursue restoration of title status and mitigation of harm;

(o) Restitution, disgorgement, and unjust-enrichment relief requiring Defendants who financially benefited from unlawful detention, fabricated lien assertions, deceptive fee demands, or concealment of disposition to disgorge such gains.

### H. Attorneys' Fees, Costs, and Interest

(p) Attorneys' fees and costs to the extent permitted by law, including reasonable fees incurred after appearance of counsel, expert fees where applicable, and all taxable and non-taxable litigation costs pursuant to 42 U.S.C. § 1988 and other applicable authority;

(q) Pre-judgment and post-judgment interest at the maximum rate permitted by law.

### I. Further Relief

(r) Such other and further legal or equitable relief as the Court deems just, proper, and necessary to fully redress the harms suffered and to prevent recurrence of the unconstitutional practices alleged.

## XLIV. JURY DEMAND

1025. Pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh Amendment to the United States Constitution, Plaintiff Simone Valentine hereby demands a trial by jury on all issues and claims so triable as a matter of right in this action, including all claims for compensatory, special, dignitary, and punitive damages.

## XLV. VERIFICATION & DECLARATION

1026. I, **Simone Valentine**, declare as follows:

Pursuant to **28 U.S.C. § 1746**, I declare under penalty of perjury under the laws of the United States of America that the factual allegations contained in this Complaint are true and correct to the best of my knowledge and firsthand experience, except as to those matters stated upon information and belief, and as to those matters, I believe them to be true.

**Executed on: January 25, 2026**

At Palm Beach, Florida

/s/ Simone Valentine

**SIMONE VALENTINE**

**Respectfully submitted,**

Dated: January 25, 2026

/s/ Simone Valentine

**SIMONE VALENTINE**

*Plaintiff, Pro Se*

270 Seminole Avenue, Apartment 5

Palm Beach, Florida 33480

Email: simonevalentine111@gmail.com

Phone: 804-317-9286